## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

FREEDOM OF THE PRESS
FOUNDATION
49 Flatbush Avenue #1017
Brooklyn, NY 11217, and

CITIZENS FOR RESPONSIBILITY
AND ETHICS IN WASHINGTON
P.O. Box 14596
Washington, DC 20044,

        Plaintiffs,

        v.

DONALD TRUMP, in his official capacity as
President of the United States of America,
1600 Pennsylvania Avenue NW
Washington, DC 20500,

THE EXECUTIVE OFFICE OF THE
PRESIDENT OF THE UNITED STATES
1600 Pennsylvania Avenue NW
Washington, DC 20500,

JAMES DAVID VANCE, in his official
capacity as Vice President of the United
States of America,
1600 Pennsylvania Avenue NW
Washington, DC 20500,

OFFICE OF THE VICE PRESIDENT OF
THE UNITED STATES,
1600 Pennsylvania Avenue NW
Washington, DC 20500

THE WHITE HOUSE OFFICE
1600 Pennsylvania Avenue NW
Washington, DC 20500,

SUSAN WILES, in her official Capacity as
White House Chief of Staff,
1600 Pennsylvania Avenue NW
Washington, DC 20500

**COMPLAINT FOR DECLARATORY
AND INJUNCTIVE RELIEF**

Civil Action No. _____

1

NATIONAL ARCHIVES AND RECORDS
ADMINISRATION,
8601 Adelphi Road
College Park, MD 20740, and

EDWARD FORST, in his official capacity as
Acting Archivist of the United States

              Defendants.

## INTRODUCTION

1.     Congress enacted the Presidential Records Act of 1978 ("PRA") in the aftermath

of the Watergate scandal, where President Nixon used his official authority to illegally target his

perceived political foes and then to conceal and attempt to destroy evidence of that wrongdoing.

The PRA was designed to fix failings in the legal regime that enabled these abuses. With certain

limitations, the statute requires that the official acts of the President and his staff are documented

and preserved, makes clear that Presidential records are the property of the United States (not

any individual President), and confers on both the public and Congress rights to access

Presidential records through the National Archives and Records Administration ("NARA") under

a carefully calibrated scheme that protects the President's needs for confidentiality and autonomy

during his term in office.

2.     For 48 years and across 11 presidential administrations, the PRA successfully

balanced the interests of the public and Congress with the President's need for independence. No

President refused across-the-board to comply with the statute's dictates. Until now.

3.     Earlier this year, President Trump and his White House Counsel's Office

determined that the PRA is unconstitutional and requested that the Department of Justice's

Office of Legal Counsel ("OLC") issue an opinion to that effect. On April 1, 2026, OLC gave the

White House what it requested: a sweeping opinion declaring the PRA "unconstitutional" and "invalid in its entirety." *Constitutionality of the Presidential Records Act*, 50 Op. O.L.C. __ at 1, 50 (April 1, 2026), https://perma.cc/V4M7-NQFA.

4.      In wrongly claiming that the PRA "exceeds Congress's enumerated and implied powers and aggrandizes the Legislative Branch at the expense of the constitutional independence and autonomy of the Executive," *id.* at 1, the OLC Opinion disregarded binding Supreme Court precedent and rewrote the history of the PRA. Worse, although no *court* has declared the PRA unconstitutional, the OLC Opinion unilaterally declared that, effective immediately, "the President need not further comply with its dictates[,]" *id.* at 52.

5.      On April 2, the White House issued a revised recordkeeping policy adopting the erroneous OLC Opinion and, per that policy, is no longer complying with the PRA.[1] And like all agencies, NARA—which the PRA requires to collect, preserve, and facilitate public access to Presidential records—is directly bound by the OLC Opinion per a previous order by President Trump requiring compliance with all legal opinions of the Attorney General. *See* Exec. Order No. 14,215, *Ensuring Accountability for All Agencies*, 90 Fed. Reg. 10447, 10448-49 (Feb. 18, 2025). It, too, is no longer complying with the PRA's requirements.

6.      Among the PRA provisions that the White House is flouting are requirements Congress enacted in 2014 to ensure preservation of text messages reflecting official business, which the White House's April 2 recordkeeping policy expressly defies.

7.      By adopting the OLC Opinion and illegally defying the PRA, Defendants have returned to a status quo rejected nearly a half century ago, where records of the President's and

---

[1] Memorandum from David Alan Warrington, Assistant to the President and Couns. to the President, Records Retention Policy After Office of Legal Counsel Finding that the Presidential Records Act is Unconstitutional (Apr. 2, 2026) (attached hereto as Exhibit A).

White House's official conduct are private property of the President that he can destroy or sell at will, even the most consequential official acts need not be documented, and the public and Congress will only ever see the documents that the President wishes to show them.

8.     Defendants' unlawful actions pose a real and immediate threat that Presidential records will be irrevocably destroyed and forever lost to history.

9.     Plaintiffs are two nonpartisan, nonprofit organizations that utilize the PRA to fulfill their mission-critical functions and who are irreparably harmed by Defendants' outright defiance of the law. They seek declaratory and injunctive relief affirming the PRA's constitutionality and requiring Defendants to comply with the statute, like every administration before it since the PRA went into effect in 1981.

### JURISDICTION AND VENUE

10.     This Court has subject-matter jurisdiction and personal jurisdiction under 5 U.S.C. §§ 552(a)(4)(B) and 552(a)(6)(C)(i).

11.     This Court further has jurisdiction pursuant to 28 U.S.C. § 1331 because this case arises under the PRA, 44 U.S.C. §§ 2201–2209, and the Administrative Procedure Act (APA), 5 U.S.C. § 702. This court has further remedial authority under the Declaratory Judgment Act, 28 U.S.C. §§ 2201 and 2202 *et. seq*.

12.     This Court further has jurisdiction pursuant to 28 U.S.C. § 1361, which grants original jurisdiction to the district courts of "any action in the nature of mandamus to compel an officer or employee of the United States or any agency thereof to perform a duty owed to the plaintiff."

13.     Venue lies in this district under 5 U.S.C. § 552(a)(4)(B) and 28 U.S.C. § 1391(e).

**PARTIES**

14.     Plaintiff Freedom of the Press Foundation ("FPF") is a national non-profit, non-partisan organization organized under section 501(c)(3) of the Internal Revenue Code. FPF was co-founded in 2012 by Daniel Ellsberg, a whistleblower who was unlawfully targeted and unsuccessfully prosecuted by the Nixon administration for facilitating the public disclosure of the "Pentagon Papers," which exposed more than a decade of Executive Branch deception of Congress, the public, and the press regarding the conduct and scope of the Vietnam War. FPF is dedicated to press freedom, government accountability, and the public's right to know. FPF regularly relies on federal and Presidential records to gather information and educate the public about matters key to its mission, including government corruption and secrecy. FPF also regularly publishes a newsletter which details updates and news related to its mission, including stories related to the federal and Presidential records it obtains.

15.     Plaintiff CREW is a non-profit, non-partisan organization organized under section 501(c)(3) of the Internal Revenue Code. CREW is committed to protecting the rights of citizens to be informed about the activities of government officials and agencies, and to ensuring the integrity of government officials and agencies. CREW seeks to empower citizens to have an influential voice in government decisions and in the government decision-making process through the dissemination of information about public officials and their actions. To advance its mission, CREW uses a combination of research, litigation, and advocacy and is a repeat requester of federal and Presidential records.

16.     Defendant Donald Trump is the President of the United States. He is sued in his official capacity.

17.    Defendant J.D. Vance is the Vice President of the United States. He is sued in his official capacity.

18.    Defendant the Office of the Vice President of the United States ("OVP") is a component of the Executive Office of the President. It is headed by Assistant to the President and Chief of Staff to the Vice President Jacob Reses.

19.    Defendant the Executive Office of the President ("EOP") is an entity comprised of various offices that support or execute the official business of the President. Established by President Franklin Roosevelt in 1939 pursuant to the Reorganization Act of 1938,[2] the EOP is overseen by the White House Chief of Staff and consists of, among other entities that are subject to the Presidential Records Act, the Office of the Vice President, the Office of Policy Development, the Council of Economic Advisors, the National Security Council, the President's Foreign Intelligence Advisory Board, the President's Intelligence Oversight Board, the National Economic Council, the Office of Administration, and the White House Office.[3]

20.    Defendant the White House Office ("WHO"), also established by President Roosevelt in 1939, is a component office of EOP that includes, among others, the Office of the Chief of Staff, Oval Office Operations, the Office of the First Lady, the Office of Presidential Personnel, and of the Office of the Staff Secretary.

21.    Defendant Susan Wiles is the White House Chief of Staff. By virtue of that position, she is the head of the EOP and WHO. She is sued in her official capacity. Defendants

---

[2] *Executive Office of the President*, Obama White House Archives, https://obamawhitehouse.archives.gov/administration/eop (last updated Jan. 2017); Franklin D. Roosevelt, Message to Congress on the Reorganization Act (Apr. 25, 1939), https://perma.cc/922F-TETP.

[3] Nat'l Archives and Recs. Admin., *Guidance on Presidential Records from the National Archives and Records Administration* (Jan. 21, 2021), https://perma.cc/32UZ-2H85.

President Trump, Vice President Vance, OVP, EOP, WHO, and Wiles are collectively referred to as the "White House Defendants."

22.     Defendant NARA is an agency within the meaning of 5 U.S.C. § 551(1) and a Federal agency within the meaning of 44 U.S.C. § 2901(14). NARA operates under the supervision and direction of the Archivist of the United States.

23.     Defendant Edward Forst is the Acting Archivist of the United States. He is sued in his official capacity. Defendants NARA and Forst are referred to collectively as the "NARA Defendants."

## LEGAL FRAMEWORK

### *The Presidential Records Act*

24.     The PRA was enacted in the wake of the abuses of the Watergate scandal, during which the Nixon Administration unlawfully weaponized the authority and resources of the presidency and the White House for personal political gain. After the exposure of his and his staff's misconduct, the discovery of a criminal conspiracy to conceal it, and his resignation in August 1974, President Nixon asserted his private property interests over recordings he created during that criminal conspiracy so that he could destroy them.[4]

25.     Congress reacted to the immediate crisis of Watergate by passing the Presidential Recordings and Materials Preservation Act of 1974 ("PRMPA"), which mandated the recovery of the records of President Nixon's administration. Pub. L. 93-526, 88 Stat. 1695 (codified at 44 U.S.C. § 2107 note). Congress passed the PRA in 1978 as a permanent fix to the legal gaps

---

[4] Meghan M. Stuessy, Cong. Rsch. Serv., R46129, *The Presidential Records Act: An Overview* 1 (2023), https://www.congress.gov/crs-product/R46129#fn15.

exposed by Watergate, creating a mechanism for transparency and public ownership of Presidential records and shielding against future presidential misconduct.

26.    Instead of subordinating the public interest to the whims and private interests of individual Presidents, the PRA "'establish[es] the public ownership of records created by . . . presidents and their staffs in the course of discharging their formal duties.'" *CREW v. Trump*, 924 F.3d 602, 603 (D.C. Cir. 2019) (quoting H.R. Rep. No. 95-1487, 95th Cong. at 2 (1978)).[5]

27.    Specifically, the PRA provides that "the United States"—not the President— "shall reserve and retain complete ownership, possession, and control of Presidential records," and further provides that upon the completion of a President's final term in office, "the Archivist of the United States shall assume responsibility for the custody, control, and preservation of, and access to, the Presidential records of that President." 44 U.S.C. §§ 2202, 2203(g)(1).

28.    The PRA also provides that the "duties and responsibilities of the Vice President, with respect to Vice-Presidential records, shall be the same as the duties and responsibilities of the President" except as it relates to one provision of the PRA allowing the President to challenge the release of individual Presidential records. *Id.* § 2207; *see also id.* § 2208.

29.    Under the PRA, "[t]he term 'Presidential records' means documentary materials, or any reasonably segregable portion thereof, created or received by the President, the President's immediate staff, or a unit or individual of the Executive Office of the President whose function is to advise or assist the President, in the course of conducting activities which

---

[5] *See also* Presidential Records Act (PRA) of 1978, Nat'l Archives and Records Admin., https://perma.cc/NW4H-NFVX ("The PRA changed the legal ownership of the official records of the President from private to public, and established a new statutory structure under which Presidents, and subsequently NARA, must manage the records of their Administrations.").

relate to or have an effect upon the carrying out of the constitutional, statutory, or other official or ceremonial duties of the President." *Id.* § 2201(2).

30.     For purposes of this Complaint, references to Presidential records also include Vice Presidential Records and, in accordance with 44 U.S.C. § 2207, all allegations regarding the President's obligations with respect to Presidential records are also made against the Vice President with respect to Vice-Presidential records.[6]

31.     To ensure and administer the United States' ownership, custody, and control of Presidential records, the PRA charges the President with taking all necessary steps "to assure that the activities, deliberations, decisions, and policies that reflect the performance of the President's constitutional, statutory, or other official or ceremonial duties are adequately documented and that such records are preserved and maintained as Presidential records." *Id.* § 2203(a).

32.     In 2014, Congress amended both the PRA and the Federal Records Act through the Presidential and Federal Records Act Amendments of 2014, Pub. L. 113-187, 128 Stat. 2003 (2014) ("2014 Amendments"). The 2014 Amendments sought to "modernize[] records management by focusing more directly on electronic records."[7]

33.     The 2014 Amendments prohibit "[t]he President, Vice President, or [any] covered [White House] employee[s]" from using "non-official electronic messaging account[s]" to "create or send" Presidential records, 44 U.S.C. § 2209(a), unless they "(1) cop[y] an official electronic messaging account . . . in the original creation or transmission of the Presidential record," or "(2) forward[] a complete copy of the Presidential . . . record to an official electronic

---

[6] 44 U.S.C. § 2207 ("Vice-Presidential records shall be subject to the provisions of this chapter in the same manner as Presidential records.").

[7] Press Release, NARA, National Archives Welcomes Presidential and Federal Records Act Amendments of 2014 (Dec. 1, 2014), https://perma.cc/6W7D-XV5U.

messaging account . . . not later than 20 days after the original creation or transmission of the Presidential . . . record." *Id.* § 2209(a)(1)–(2).

34.     The amended statute defines "covered employee" to include both "the immediate staff of the President," and "a unit or individual of the Executive Office of the President whose function is to advise and assist the President." *Id.* § 2209(c)(1)(A), (C).

35.     The amended statute broadly defines "electronic messages" to mean "electronic mail and other electronic messaging systems that are used for purposes of communicating between individuals," and "electronic messaging account" to mean "any account that sends electronic messages." *Id.* § 2209(c)(2)–(3).

36.     The legislative history for section 2209 confirms what the statutory text makes plain: that Congress wanted both the "President" and the President's "staff" to "ensure that *all* Presidential records, even those sent from a personal electronic messaging account, are properly preserved and maintained in an official electronic messaging account." S. Rep. No. 113-218, at 6 (2014) (emphasis added).

37.     The PRA establishes a mandatory multi-step process before the President can destroy Presidential records while in office. The President must first affirmatively determine that the records "no longer have administrative, historical, informational, or evidentiary value." 44 U.S.C. § 2203(c). Next, the President must obtain "the views, in writing, of the Archivist concerning" the proposed destruction. *Id.* § 2203(c)(1).

38.     If the Archivist believes that the records to be destroyed "may be of special interests to the Congress" or that "the disposal of these particular records is in the public interest," the Archivist "shall request the advice of the Committee on Rules and Administration and the Committee on Governmental Affairs of the Senate and the Committee on House

Oversight and the Committee on Government Operations of the House of Representatives with respect to" the proposed destruction. *Id.* § 2203(e). If the Archivist informs the President that no such consultation with Congress is required, the President must nevertheless inform Congress by submitting a disposal schedule "to the appropriate Congressional Committees at least 60 calendar days . . . in advance of the proposed disposal date." *Id.* § 2203(d).

39.    The PRA dictates that when a President leaves office, the Archivist assumes "responsibility for the custody, control, and preservation of, and access to" the former president's records, *id.* § 2203(g)(1), and ensures that Presidential records are collected and archived to the greatest extent possible. For example, the Archivist is bound "to secure to the Government, as far as possible, the right to have continuous and permanent possession of the materials" and empowered to "exercise . . . all the functions and responsibilities otherwise vested in him pertaining to Federal records or other documentary materials in his custody or under his control." *Id.* § 2112(c).

40.    In recognition of the public's ownership of Presidential records and its interest in both public and Congressional access to them, the PRA imposes on the Archivist an "affirmative duty" to make the Presidential records of former presidential administrations "available to the public as rapidly and completely as possible." *Id.* § 2203(g)(1).

41.    To facilitate and ensure public access, the PRA further provides that beginning five years after a President leaves office, the public can access Presidential records from NARA through the procedures established in the Freedom of Information Act ("FOIA"). *See id.* § 2204(c). Although some materials can be withheld for a longer period, they too eventually become accessible to the public through FOIA. *Id.* § 2204(a).

11

42.     Notwithstanding those limitations, the PRA vests in Congress a special right to access archived Presidential records by requiring the Archivist to provide access to them whenever requested by either House of Congress or a committee acting within its jurisdiction and the information in the records is "needed for the conduct of its business and [is] not otherwise available." *Id.* § 2205(2)(A)–(C). Disclosure under this section is "subject to any rights, defenses, or privileges which the United States or any agency or person may invoke." *Id.* § 2205(2).

43.     The PRA and implementing regulations set out detailed procedures—including judicial review—for resolving disputes over access to a former President's records. *See id.* § 2204(e); 36 C.F.R. § 1270.44(f). President Trump is the only former President to have filed suit under these provisions, when he sued unsuccessfully to block disclosure of Presidential records from his first term to the House Select Committee to Investigate the January 6th Attack on the United States Capitol. *See Trump v. Thompson*, 142 S. Ct. 680 (2022) (mem.).

44.     The D.C. Circuit has held that courts may review EOP's official recordkeeping guidelines or directives to assess their facial compliance with the PRA. *See Armstrong v. Exec. Off. of the President, Off. of Admin.*, 1 F.3d 1274, 1290 (D.C. Cir. 1993) ("[C]ourts are accorded the power to review guidelines outlining what is, and what is not, a 'presidential record' under the terms of the PRA. The PRA does not bestow on the President the power to assert sweeping authority over whatever materials he chooses to designate as presidential records without any possibility of judicial review.").

### *The Freedom of Information Act*

45.     An agency must respond to a party making a FOIA request within 20 working days, notifying that party of at least the agency's determination of which of the requested records

it will release, which it will withhold and why, and the requester's right to appeal the determination to the agency head. 5 U.S.C. § 552(a)(6)(A)(i).

46.     An agency's failure to make a determination on a FOIA request within 20 working days is subject to judicial review without exhausting administrative remedies. *Id.* § 552(a)(6)(C)(i). In "unusual circumstances," an agency may extend the time to respond to a request by no more than 10 working days provided that the agency gives the requester written notice setting forth the unusual circumstances and the date on which the agency expects to make a determination. *Id.* § 552(a)(6)(B)(i)–(iii).

47.     In addition to challenging an agency's handling of specific FOIA requests, a plaintiff "may challenge an agency's 'policy or practice' where it 'will impair the party's lawful access to information in the future.'" *CREW v. Dep't. of Just.*, 846 F.3d 1235, 1242 (D.C. Cir. 2017) (quoting *Newport Aeronautical Sales v. Air Force*, 684 F.3d 160, 164 (D.C. Cir. 2012)). Such a "practice" may be "informal, rather than crystalized in regulation or an official statement of policy." *Judicial Watch, Inc. v. Dep't. of Homeland Sec.*, 895 F.3d 770, 778 (D.C. Cir. 2018) (quoting *Payne Enterprises, Inc. v. United States*, 837 F.2d 486, 491 (D.C. Cir. 1988)).

### *The Administrative Procedure Act*

48.     The APA provides that a "person suffering legal wrong because of agency action, or adversely affected or aggrieved by agency action within the meaning of a relevant statute, is entitled to judicial review thereof." 5 U.S.C. § 702.

49.     The term "agency" in the APA "means each authority of the Government of the United States, whether or not it is within or subject to review by another agency," with certain exceptions that do not include Defendants. *Id.* § 551(1).

13

50.    The term "agency action" includes "the whole or a part of an agency rule, order, license, sanction, relief, or the equivalent or denial thereof, or failure to act." *Id.* § 551(13).

51.    A court reviewing a claim under 5 U.S.C. § 702 "shall decide all relevant questions of law, interpret constitutional and statutory provisions, and determine the meaning or applicability of the terms of an agency action." 5 U.S.C. § 706. The reviewing court shall "compel agency action unlawfully withheld or unreasonably delayed" and "hold unlawful and set aside agency action, findings, and conclusions found to be—arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law," "contrary to constitutional right, power, privilege or immunity," or "in excess of statutory jurisdiction, authority, or limitations, or short of statutory right." *Id.* §§ 706(1), (2)(A)–(C).

### *Mandamus*

52.    Where a Plaintiff can "demonstrate (1) a clear and indisputable right to relief, (2) that the government agency or official is violating a clear duty to act, and (3) that no adequate alternative remedy exists," *Am. Hosp. Ass'n v. Burwell*, 812 F.3d 183, 189 (D.C. Cir. 2016), "[t]he district courts shall have original jurisdiction" to compel performance of the duty by issuing a writ of mandamus. 28 U.S.C. § 1361.

### FACTUAL ALLEGATIONS

### *The OLC Opinion*

53.    At some point before April 1, 2026, the White House Counsel's Office "asked [OLC] to review the constitutionality of the PRA," based on the White House's erroneous view that "Congress never had the Article I power to regulate the President's records in the manner contemplated by the PRA." Ex. A at 1.

14

54.     On April 1, 2026, after 48 years and administrations of 11 Presidents of both parties (including President Trump) deeming themselves bound by the PRA,[8] OLC issued its opinion declaring the PRA facially "unconstitutional because it exceeds Congress's enumerated and implied powers and aggrandizes the Legislative Branch at the expense of the constitutional independence and autonomy of the Executive." OLC Op. at 1.

55.     The OLC Opinion purported to declare the "PRA is invalid in its entirety" because supposed "constitutional defects lie at the statute's core[,]" *id.* at 50–51, and further asserted that because "the PRA is unconstitutional, . . . the President need not further comply with its dictates[,]" *id.* at 52.

56.     The OLC Opinion confirmed that it was requested by, and issued to, the Counsel to the President. It contained no indication that it was issued in response to any intervening act of Congress, recent judicial opinion, change of material circumstances, or dispute, disagreement, or conflicting interpretation of the law among Executive Branch agencies.

57.     The OLC Opinion cited no judicial decision at any level holding that the PRA is facially unconstitutional. Nor could it, as no President has ever mounted such a challenge.

58.     To the contrary, the OLC Opinion acknowledged that the Supreme Court's decision in *Nixon v. Administrator of General Services*, 433 U.S. 425 (1977), a challenge to the constitutionality of the PRMPA brought by President Nixon so that he could destroy Presidential records, *affirmed* Congress's authority to require the collection, public ownership, and public availability of Presidential records, ruling that the exercise of that authority does not, as the OLC

---

[8] Memorandum from Donald F. McGahn II, Couns. to the President, to all White House pers. (Feb. 22, 2017), https://tinyurl.com/54szspa6 ("remind[ing] all personnel of their obligation to preserve and maintain presidential records, as required by the [PRA]").

15

Opinion claims, violate the separation of powers. OLC Opinion at 11–13. The OLC Opinion cited no Supreme Court decision overturning *Nixon*.

59.    To avoid this binding precedent and compliance with the PRA, the OLC Opinion simply asserted that *Nixon* was decided incorrectly and, if challenged by the Trump Administration today would be distinguishable because of what the OLC Opinion incorrectly claimed are salient factual distinctions between the circumstances surrounding *Nixon* and the relationship between Congress and the President at all other times. *Id.* at 41–49.

60.    The OLC Opinion did not cite any authority to justify its conclusion that the President can lawfully refuse to comply with the PRA, or instruct others to do so, based solely on the legal opinions of the President, the White House Counsel, or the Department of Justice. The OLC Opinion did not cite any such authority because none exists and the President is bound to comply with the law absent a judicial order.

61.    In total, the OLC Opinion purports to, among other things, give the President sole legal ownership over all Presidential records of his administration for all time (including after leaving office), allow the President and White House Staff to not create records memorializing official actions and policy decisions, allow the President to destroy any and all Presidential records or instruct others to do so, and deprive the public and Congress of their statutory rights to access all Presidential records created since the PRA took effect in 1981.

### *Defendants' New Policies of Non-Compliance with the PRA*

62.    All Executive Branch employees have been ordered by President Trump to comply with the OLC Opinion. In Executive Order 14215, President Trump declared that "[t]he President and the Attorney General's opinions on questions of law are controlling on all [Executive Branch] employees in the conduct of their official duties" and that "[n]o employee of

16

the executive branch acting in their official capacity may advance an interpretation of the law as the position of the United States that contravenes the President or the Attorney General's opinion on a matter of law." 90 Fed. Reg. 10447–49.

63.    The OLC Opinion constitutes the Attorney General's opinion on a question of law. *See Whether the CFPB May Continue to Draw Funds from the Federal Reserve System Under 12 U.S.C. § 5497 When the Federal Reserve System Is Operating at A Loss*, 49 Op. O.L.C. __,  at *33 (Nov. 7, 2025), 2025 WL 3251685 ("[OLC] exercises the Attorney General's delegated authority to interpret the Constitution and laws for the Executive Branch."). Thus, under Executive Order 14215, it is "controlling" on all Executive Branch employees, including NARA officials. *Id.* at *33–34 (citing *Camp. for Accountability v. Dep't of Just.*, No. 24-5163, 2025 WL 2942433, at *3 (D.C. Cir. Oct. 17, 2025) ("Executive Branch officials consider final OLC opinions to be 'controlling legal advice.'") (quoting Memorandum from David J. Barron, Acting Assistant Attorney General, to Attorneys of the Office of Legal Counsel 1 (July 16, 2010))).

64.    Further, by wrongly asserting that the PRA is invalid "in its entirety," OLC Op. at 50, because the operation of each of its constituent parts comes "at the expense of the constitutional independence and autonomy of the Executive," *id.* at 1, the OLC Opinion indicates that *any* compliance with the PRA at any level of government is likely to both harm President Trump in the operation of his official duties and draw his ire for interference with his personal property and interests.

65.    Since OLC issued its opinion on April 1, Defendants have adopted new policies memorializing their non-compliance with the PRA.

17

66.     On April 2, 2026, White House Counsel David Warrington issued a memorandum to EOP staff titled "Records Retention Policy After Office of Legal Counsel Finding that the presidential Records Act is Unconstitutional" ("April 2 Policy"). *See* Ex. A.[9]

67.     The April 2 Policy adopts the OLC Opinion in its entirety and confirms that the White House is no longer complying with the PRA. It then sets out new record retention policies for EOP personnel that are inconsistent with the PRA in several respects.

68.     Most notably, while the PRA establishes that Presidential records are the property of the United States over which NARA takes custody after the President leaves office, the April 2 Policy states that "[t]he Office of White House Counsel will coordinate regarding the ownership and storage of [Presidential] records." *Id.* at 2.

69.     In contrast to the PRA's various mandatory obligations to create and preserve Presidential records, the April 2 Policy does not explicitly obligate any person to create or preserve any record of their conduct in the course of their official duties. It does not purport to apply to the President and universally describes what individual EOP employees "should" do instead of what they "shall," "must," or "need" to do with respect to records creation and preservation.

70.     For instance, the April 2 Policy includes a section titled "Records Generally," which states that "EOP staff *should* preserve any material related to the performance of their duties" because "[r]ecords may be relevant to ongoing or future litigation, and thus may be subject to other legal preservation requirements." *Id.* This provision both fails to make retention

---

[9] The White House disclosed the April 2 Policy as an exhibit to its opposition to motion for preliminary injunction in *American Historical Association v. Trump*, No. 26-cv-01169 (D.D.C. Apr. 21, 2026), ECF No. 19-2.

mandatory and encourages EOP staff to make their own, unguided determinations about what must be preserved, in violation of the PRA.

71.    Similarly, the "Electronic Records" section of the April 2 Policy indicates that electronic records—limited to emails and "electronic records saved"—are only being retained "[a]s a matter of prudence," *id.*, which conflicts with the PRA's explicit requirement that *all* Presidential records, regardless of format, be preserved. With respect to electronic records not already saved, the April 2 Policy merely states that "[m]aterials created or edited by EOP staff *should* be saved on your EOP laptop or the EOP network." *Id.* (emphasis added).

72.    The "Paper Records" section similarly states that "EOP staff *should* preserve paper records necessary to the performance of their duties." *Id.* (emphasis added). The separate "Duty to Preserve" section of the April 2 Policy simply repeats that "EOP staff *should* ensure that both electronic and paper records are preserved." *Id.* at 3 (emphasis added).

73.    The April 2 Policy also expressly defies the PRA's requirements for text messages that constitute Presidential records.

74.    The PRA prohibits the President and White House staff from using "non-official electronic messaging account[s]" to "create or send" Presidential records unless they follow specific measures to ensure those Presidential records are promptly saved in "an official electronic messaging account." 44 U.S.C. § 2209(a)(1)–(2). Congress enacted these requirements to ensure that all electronic records that meet the statutory definition of Presidential records—including text messages—are saved in an "official electronic messaging account."

75.    The April 2 Policy mischaracterizes the PRA as categorically requiring preservation of "*all* text messages" generated by EOP personnel, claiming that such a requirement "would create an enormous technological burden while chilling the ability of

19

presidential advisors to provide candid advice." Ex. A at 2. In reality, the PRA requires preservation of text messages that meet the statutory definition of a Presidential record.

76.    The April 2 Policy flouts these requirements. It does not explicitly require EOP staff to preserve *any* text messages and merely states that "[t]ext messages *should only* be preserved when they are the sole record of official decision-making, government action, or contain unique information not available elsewhere" and frees EOP personnel from any obligation to retain text messages regarding "ministerial tasks or other workplace minutiae." *Id.* (emphasis added).

77.    The April 2 Policy provides no instructions for how EOP personnel should determine whether text messages reflect "the sole record of official decision-making, government action, or contain unique information not available elsewhere," nor does this standard appear anywhere in the PRA. *Id.* The April 2 Policy thus gives EOP personnel unchecked discretion not to preserve text messages with Presidential record material if they determine it is not "the sole record of official decision-making," or does not "contain unique information not available elsewhere." *Id.*

78.    Moreover, the April 2 Policy says that "text messages that are the sole record of official decision-making, government action, or unique information should either be stored on an EOP system as soon as possible or memorialized in an email or memorandum." *Id.* at 3. This conflicts with the PRA, which requires that when EOP personnel create or send Presidential records "using a non-official electronic message account," they must either "cop[y] an official electronic messaging account . . . in the original creation or transmission of the" record, or "forward[] a complete copy of the" record "to an official electronic messaging account . . . not later than 20 days after [its] original creation or transmission." 44 U.S.C. § 2209(a)(1)–(2).

20

79.     By failing to require prompt and complete preservation of *all* text messages meeting the statutory definition of Presidential record, and instead creating the White House's own, non-statutory criteria for text message preservation, the April 2 Policy flouts the PRA and will result in the irreparable loss or destruction of Presidential record material generated through text messages.

80.     The April 2 Policy's use of the phrase "should only be preserved" also unlawfully encourages staff not to retain certain Presidential records, even if they would otherwise do so.

81.     The April 2 Policy's text message provisions further indicate that EOP staff engaged in widespread noncompliance with the PRA's electronic communications requirements before the OLC Opinion was issued insofar as it asserts that text messaging at the White House is so ubiquitous that it is "becom[ing] more akin to speaking every day," and notes that retention of text messages under the PRA "would" be—rather than "is" or "has been"—too resource intensive. Ex. A at 2.

82.     The "Duty to Preserve" section of the April 2 Policy also merely states that "EOP staff *should* ensure that both electronic and paper records are preserved" and reiterates the Policy's deficient instructions about text messages. *Id.* at 3 (emphasis added). It also warns that "[s]taff *should* avoid using personal devices for government business whenever possible," not because of any obligation under the PRA or because doing so would conceal Presidential records, but because doing so "has the potential to require the examination of personal devices in litigation or in response to congressional oversight requests." *Id.* (emphasis added).

83.     The April 2 Policy also does not ensure that EOP staff will be trained to comply with it, as it requires "mandatory" training on no timeline and merely encourages that EOP staff "should make every effort to participate" without any consequence for failing to do so.

21

84.    The April 2 Policy includes no consequences or disciplinary mechanisms for violations of the policy by EOP personnel, in contrast to the PRA. *See* 44 U.S.C. § 2209(b) (subsection titled "Adverse Actions").

85.    When asked about the OLC Opinion on April 2, the White House, through spokesperson Abigail Jackson, did not disavow the OLC Opinion or say that the White House would continue to comply with the PRA. Instead, it merely asserted the that the President "is committed to preserving records from his historic Administration and he will maintain a rigorous records retention program." [10] It also claimed that EOP staff "must undertake records training so they properly preserve all materials related to: the performance of their duties for historical value, the administrative record of policy decisions and actions, and litigation needs," Jackson said.[11]

86.    Jackson also asserted that "[t]he President will also retain the program currently in place for electronic records — emails and documents cannot be deleted from the White House system."[12] As described in the April 2 Policy, however, the White House has dramatically reduced EOP personnel's obligations to retain Presidential record material in text messages. Ex. A at 2.

87.    Even if the April 2 representations of the White House are believed, both those representations and the April 2 Policy fall far short of compliance with the PRA. Among other failings, all of the undertakings described by the White House are voluntary in the absence of the

---

[10] Maegan Vazquez & Jeremy Roebuck, *Justice Dept. Says the Presidential Records Act Is Unconstitutional*, Wash. Post (Apr. 2, 2026), https://www.washingtonpost.com/national-security/2026/04/02/trump-doj-presidential-records-act/.

[11] *Id.*

[12] *Id.*

PRA and can be withdrawn or ignored at any time without consequence, and neither the statement nor the April 2 Policy account for the President's purported private ownership of Presidential records in the absence of the PRA, the President's *own* duties under the PRA (as the April 2 Policy only applies to EOP *staff*, not the President himself), Congress's right to access Presidential records, or the PRA's mandatory processes regarding destruction, collection by NARA, or public dissemination of Presidential records.

88.     On April 9, 2026, Plaintiff CREW sent a letter to White House Counsel Warrington, attached hereto as Exhibit B, asking him to confirm by April 16, 2026, "whether the White House has adopted any or all portions of the OLC Opinion and whether the White House has adopted, or is planning to adopt, any change in its operations as a result of the OLC Opinion." CREW has received no response to date.

89.     On April 9, 2026, CREW sent a letter to NARA, attached hereto as Exhibit C, asking it to confirm by April 15, 2026, whether it has "adopted any or all portions of the OLC Opinion and whether NARA has adopted, or is planning to adopt, any change in its operations as a result of the OLC Opinion." CREW has received no response to date.

90.     On April 10, 2026, FPF sent an email to NARA, attached hereto as Exhibit C, asking it to confirm by April 15, 2026, whether it has ceased complying with the PRA per the OLC opinion, or whether NARA will continue to process FPF's pending FOIA requests for Presidential records in accordance with the PRA. FPF has received no response to date.

91.     On April 21, in separate litigation before this Court challenging the Defendants' compliance with the PRA, Defendants submitted the declaration of the Director of the Archival Operations Division in NARA's Office of Presidential Libraries. *See* Decl. of K. McClure, *Amer. Hist. Ass'n*, No. 26-cv-01169 (D.D.C. Apr. 21, 2026), ECF No. 19-3 ("NARA Decl."). That

declaration claimed that "NARA is continuing to preserve all Presidential records in its custody and plans to continue processing requests for access to such records" and "NARA maintains custody of records of President Trump's 45th Presidential administration that were transferred by President Trump to NARA." NARA Decl. ¶¶ 4–5.

92.     NARA's declaration did not address how NARA intends to continue to comply with any portion of the PRA when the OLC Opinion concluded that the PRA is unconstitutional "in its entirety," OLC Op. at 50, and the President has ordered all Executive Branch officers to comply with the legal opinions of the President and Attorney General, 90 Fed. Reg. 10447–49.

93.     NARA's declaration also did not commit to fully complying with the PRA going forward. Nor did it commit the NARA Defendants to ensure the continued custody, control, and preservation of Presidential records as property of the United States, to "secure to the Government, as far as possible, the right to have continuous and permanent possession of [those] materials[,]" or to make Presidential records "available to the public as rapidly and completely as possible[,]" all of which are required by the PRA. *See* 44 U.S.C. §§ 2112(c), 2202, 2203(g)(1). And it contained no indication that the NARA Defendants would resist attempts by President Trump to assert personal ownership over Presidential records or otherwise further order them to violate the PRA.

### *Injuries to Plaintiffs*

94.     As organizations that routinely request federal and Presidential records and rely on them to perform their mission-critical functions, FPF and CREW are concretely harmed by Defendants' unlawful recordkeeping policies and practices. *See Khine v. DHS*, 943 F.3d 959, 965 (D.C. Cir. 2019) ("[R]epeat requesters who 'will suffer continuing injury' have standing to bring" claims alleging that an "agency policy or practice will impair the party's lawful access to

24

information in the future." (emphasis omitted) (quoting *Payne Enters., Inc. v. United States*, 837 F.2d 486, 491 (D.C. Cir. 1988), and citing *CREW v. Dep't. of Just.*, 846 F.3d 1235, 1242 (D.C. Cir. 2017)).

95.     Plaintiff FPF's mission is to protect, defend, and facilitate the freedom of the press. It does so by fighting against unlawful secrecy, surveillance, censorship measures, threats to whistleblowers, and other conduct by the government that threatens the freedom of the press in the United States.

96.     A central pillar of FPF's pursuit of its mission is a continual effort to both gain and ensure the public's access to government records regarding issues of public importance. This includes fighting for Presidential records that are required to be made public under public disclosure laws but needlessly kept secret by federal agencies, and obtaining Presidential records regarding issues that have significant impacts on the freedom of the press and the broader public interest through traditional journalistic methods.

97.     FPF uses Presidential records, like other public records, to test the veracity of the information that the government provides to the public and the press regarding its conduct, to publish and disseminate those records to advance the ability of the press to report on the actions of the government, to identify when and how government systems are misapplied or misused to conceal records or information from public view (such as through the persistent overuse of the classification and control system), and to identify and understand the extent to which the government is engaged in conduct that is intended to chill freedom of the press, such as efforts to intimidate members of press and individual reporters, surveil sources, and deny press access without justification.

98. In addition to distributing the Presidential records that it obtains to journalists, FPF uses the information described above to publish its own reports and trackers to threats to freedom of the press and to advocate for more and better safeguards for press freedom.

99. FPF currently has 15 pending FOIA requests to NARA for Presidential records from President Trump's first term on a variety of topics, including compliance with the PRA, handling and storage of classified materials, meetings with foreign heads of state, election integrity, immigration enforcement, and the January 6, 2021 attack on the Capitol.

100. As part of its mission-critical functions, CREW routinely requests and utilizes government records made available to it under FOIA, the Ethics in Government Act, the Federal Advisory Committee Act, and other federal transparency laws. CREW uses that information to create public-facing reports, draft administrative complaints, requests for investigation, and public testimony and letters to Congress regarding oversight matters, and to craft targeted FOIA requests for additional information. CREW widely disseminates these materials to the public through its website, which receives hundreds of thousands of page views every month.

101. Because of its pervasive reliance on government records, CREW has a vested interest in ensuring government compliance with recordkeeping laws, including the PRA, and it has brought numerous lawsuits to vindicate that interest, including *CREW v. Trump*, 924 F.3d 602 (D.C. Cir. 2019), *CREW v. Trump*, 438 F. Supp. 3d 54 (D.D.C. 2020), and *National Security Archive v. Trump*, No. 20-2500 (D.D.C. Dec. 1, 2020).

102. CREW has made multiple FOIA requests to NARA for Presidential records, including one such request for records from the first Trump administration that is currently pending.

103.    In furtherance of its mission, CREW relies on Presidential records, obtained through the PRA's FOIA provisions and otherwise, to inform the public about the conduct of the President and White House. CREW has published scores of reports regarding that conduct, many of which relate to official acts that are required to be documented by the PRA.[13] CREW has also pursued litigation relying on Presidential records that had come into public view. *See* Verified Pet., *Anderson v. Griswold*, 2023 WL 8006216 (Colo. Dist. Ct. 2023) (No. 2023CV3257).

104.    Both Plaintiffs intend to submit additional FOIA requests for Presidential records from the first Trump administration, the Biden administration, the second Trump administration, and other administrations, if and when they become available pursuant to FOIA and the PRA.

105.    While Presidential records have always been vital to each Plaintiff's mission, recent history and current circumstances make them especially so. The President and White House offices subject to the PRA have always been at the pinnacle of Executive Branch authority, with maximum influence over, and in some instances total control of, federal policy and the deployment of federal authority and resources. How they conduct the public's business has enormous consequences on not only the freedom of the press, but the everyday lives of

---

[13] *See, e.g.*, *Trump's Unprecedented Meddling Has Turned OGE into a Revolving Door*, CREW (Dec. 19, 2025), https://www.citizensforethics.org/reports-investigations/crew-investigations/trumps-unprecedented-meddling-has-turned-oge-into-a-revolving-door/; *How President Trump is Dismantling Our Democracy, One Piece at a Time*, CREW (Oct. 23, 2025), https://www.citizensforethics.org/reports-investigations/crew-reports/how-president-trump-is-dismantling-our-democracy-one-piece-at-a-time/; *Trump Has Granted Clemency to 20 Corrupt Politicians—So Far*, CREW (June 2, 2025), https://www.citizensforethics.org/reports-investigations/crew-investigations/trump-has-granted-clemency-to-16-corrupt-politicians-so-far/; *Tracking Trump's Unprecedented—Often Illegal—Firings of Political Appointees and Watchdogs*, CREW (Mar. 31, 2025), https://www.citizensforethics.org/reports-investigations/crew-reports/tracking-trumps-unprecedented-often-illegal-firings-of-political-appointees-and-watchdogs/.

American citizens that rely on a free press and other government transparency measures to keep them informed.

106.    President Trump's and his Administration's demonstrated hostility to public records laws has already irreparably harmed, and will continue to harm, Plaintiffs' ability to obtain and utilize Presidential records in performing their mission-critical functions.

107.    President Trump set an example of outright hostility to PRA compliance during his first term, as he, for example, routinely destroyed notes at the close of meetings,[14] posted and then deleted Tweets (which according to both NARA and the White House violates the PRA),[15] confiscated records of his one-on-one meeting with Russian President Vladimir Putting during the 2017 G20 meeting,[16] and maintained a general antipathy toward note-taking that included chastising the then-White House Counsel for taking notes in meetings.[17] President Trump's disdain for public records laws during his first term culminated in his unlawful retention and obstruction of justice in concealing a large cache of Presidential records containing highly-classified and controlled information when he left office, for which he was indicted on 40 felony

---

[14] Annie Karni, *Meet the Guys Who Tape Trump's Papers Back Together*, Politico (June 10, 2018), https://politi.co/33cqS7p; Jill Lepore, *Will Trump Burn the Evidence?*, New Yorker (Nov. 16, 2020), https://bit.ly/3kZesWy.

[15] Lepore, *supra* note 14; Rachel Treisman, *As President Trump Tweets and Deletes, the Historical Record Takes Shape*, NPR (Oct. 25, 2019), https://perma.cc/U6ZU-E6B5.

[16] Peter Baker, *Trump and Putin Have Met Five Times, What Was Said Is a Mystery*, N.Y. Times (Jan. 15, 2019), https://nyti.ms/397bQDK; Greg Miller, *Trump Has Concealed Details of His Face-to-face Encounters with Putin from Senior Officials in Administration*, Wash. Post (Jan. 13, 2019), https://wapo.st/3fqArEy.

[17] Special Couns. Robert S. Mueller, III, Report on the Investigation Into Russian Interference In the 2016 Election, Vol. II, at 117 (2019).

counts.[18] His defense did not dispute that he willfully retained the Presidential records after he left office.

108.    The President's and his Administration's hostility to public records laws has escalated in his second term, as evidenced by the White House Counsel's pre-determination that the PRA was unconstitutional and its reliance on the OLC Opinion as cover to ignore the law. OLC Op. at 1.

109.    The OLC Opinion comes in the wake multiple high-profile, embarrassing, and troubling examples of the President and other White House officials conducting sensitive government business on private electronic applications like Truth Social and even the ephemeral messaging applications Signal. For example, on September 20, 2025, President Trump publicly posted a Truth Social message, which was later reported to be an intended private message, to then-Attorney General Pamela Bondi demanding that she be more aggressive in using the Department of Justice to criminally prosecute the President's perceived enemies.[19]

110.    Similarly, from March 11 to March 15, 2025, Vice President Vance, Chief of Staff for the National Security Council Brian McCormack, National Security Advisor Mike Waltz, White House Deputy Chief of Staff for Policy Stephen Miller, and Defendant Wiles, in addition to multiple cabinet secretaries and other officials, participated in a group chat on Signal, in which the group discussed impending military operations in Yemen, including attack plans,

---

[18] Superseding Indictment, *United States v. Trump*, 740 F. Supp. 3d 1245 (S.D. Fla. 2024) (No. 23-CR-80101), https://perma.cc/NA2L-GCPK.

[19] Kyle Cheney, *'We Can't Delay Any Longer': Trump Urges Bondi to Prosecute His Rivals*, Politico (Sept. 20, 2025), https://www.politico.com/news/2025/09/20/trump-bondi-truth-social-00574380; Kristen Welker & Rebecca Shabad, *Trump Accidentally Posted Message Pressuring Pam Bondi to Charge His Enemies, Source Says*, NBC News (Oct. 10, 2025), https://perma.cc/LJ28-ZDMV.

putting America's war plans and the welfare of members of the United States armed forces at risk.[20] The Signal chat only came to light because they also inadvertently included a reporter.[21]

111.    The public interest and need for the retention of these types of electronic communications are precisely why Congress amended the PRA in 2014 to prohibit the President, Vice President, and their staffs from creating or sending Presidential records via electronic messaging accounts unless they copy an official government account or are promptly sent to them. *See* 44 U.S.C. § 2209(a)(1)–(2). Nor are they isolated incidents, as the April 2 Policy indicates that text messaging is so ubiquitous at the Trump White House that it is akin to talking. Ex. A at 2.

112.    The importance of the PRA to each Plaintiffs' mission is also enhanced by the President's and his Administration's overt and unprecedented hostility to the press, which has had a profound chilling effect on press freedom. For example, in President Trump's second term the White House has launched a chilling "Media Offenders" page on the White House website that targets published stories, and even opinion pieces, that the White House does not like, identifies journalists by name, and accuses them of an "offense" in often incendiary rhetoric.[22]

---

[20] Jeffrey Goldberg, *The Trump Administration Accidentally Texted Me Its War Plans*, Atlantic (Mar. 24, 2025), https://www.theatlantic.com/politics/archive/2025/03/trump-administration-accidentally-texted-me-its-war-plans/682151/; Jeffrey Goldberg & Shane Harris, *Here are the Attack Plans That Trump's Advisers Shared on Signal*, Atlantic (Mar. 26, 2025), https://www.theatlantic.com/politics/archive/2025/03/signal-group-chat-attack-plans-hegseth-goldberg/682176/; Dep't of Def. Off. of Inspector Gen., Evaluation of the Secretary of Defense's Reported Use of a Commercially Available Messaging Application for Official Business (Dec. 2, 2025), https://www.politico.com/f/?id=0000019a-ea21-dd9e-afba-fa6d21b50000; Owen Scott, *JD Vance Texted in Hegseth's Infamous Signalgate Group at 2:30am After Scandal Broke*, Independent (Dec. 5, 2025), https://www.independent.co.uk/news/world/americas/us-politics/jd-vance-hegseth-signal-chat-houthi-yemen-b2878815.html.

[21] *See supra* note 20.

[22] *Media Offenders,* White House, https://perma.cc/JDJ4-6GDS (last visited Apr. 22, 2026).

113.    In just one example, the White House used the website to accuse two journalists of the "offense" of reporting that "[g]uardrails against racist, xenophobic or dehumanizing rhetoric have all but vanished on the American right," and that the Trump "administration has gutted major pillars of America's civil rights protections and racial equity infrastructure, wiping away public data, slashing research funding, and recasting Black history."[23] The website further accused the journalists of publishing a "race-baiting article . . . to inflame racial tensions, and [to try] to (unsuccessfully) paint President Trump as racist."[24]

114.    Among a litany of additional examples of the President's and his Administration's hostility to the press during his second term are: the Administration's unlawful efforts to defund Voice of America, National Public Radio, and the Public Broadcasting Service that have been blocked by judicial orders;[25] an unsuccessful attempt by President Trump to sue the Wall Street Journal for defamation for publishing a letter that President Trump allegedly wrote to Jeffrey Epstein;[26] the White House unlawfully restricting the Associated Press's access to White House events for failing to refer to the Gulf of Mexico as the "Gulf of America" in its reporting;[27] the White House calling press outlets that accurately reported on high-ranking Administration officials and cabinet secretaries discussing war plans on the private messaging application Signal

---

[23] *Media Offenders: Axios*, White House, https://perma.cc/KXY7-TQL4 (last visited Apr. 22, 2026).

[24] *Id.*

[25] Michael Kunzelman & Associated Press, *Judge Blocks Trump's Executive Order to End Federal Funding for PBS and NPR*, PBS News (Mar. 31, 2026), https://perma.cc/749B-R37U; Paulin Kola, *US Judge Orders Trump Administration to Reopen Voice of America*, BBC (Mar. 18, 2026), https://perma.cc/E7A6-BEDD.

[26] Aysha Bagchi, *Trump Lawsuit Against WSJ Over Lewd Epstein Birthday Letter Dismissed*, USA Today (Apr. 13, 2026), https://perma.cc/TS6S-W8FB.

[27] David Folkenflik, *Judge Orders White House to Allow AP Access to News Events*, NPR (Apr. 9, 2025), https://perma.cc/5NYC-5QYJ.

"propagandists,"[28] and President Trump publicly calling individual reporters "stupid and nasty," a "terrible person," "ugly," "stupid," "piggy," "obnoxious," and "a sleazebag" for asking questions or publishing stories he did not like.[29]

115. The President's all-out, unprecedented assault on the press increases Plaintiffs' need for documentation of the White House's actions via Presidential records, both now and when they become available later through FOIA.

116. The PRA's public access and FOIA provisions are also currently more valuable to each Plaintiff's mission because of the non-consecutive nature President Trump's administrations. Because President Trump's presidential terms have not been consecutive, the records from his first administration are currently subject to FOIA pursuant to the PRA. They therefore shed unique light on President Trump and those with whom he has chosen to surround himself.

117. Access to Presidential records is essential for Plaintiffs to fulfill their core missions. The ongoing failure of the White House Defendants to meet their obligations under the PRA to create, preserve, and eventually transmit to NARA the records of their actions and the performance of their duties, and their failure to treat those records as the property of the United States rather than the personal property of President Trump, has and will continue to prevent

---

[28] Bernd Debusmann Jr., *Trump Officials Attack Journalist After Signal Leak Published in Full*, BBC (Mar. 26, 2025),https://perma.cc/8PAV-BK94.

[29] Clarissa-Jan Lim, *Trump Insults CNN's Kaitlan Collins: 'Stupid and Nasty,'* MS NOW (Dec. 6, 2025), https://perma.cc/E55E-6ML9; Melissa Quinn, *Trump Lashes Out at Female Reporters, Calling Them "Ugly," "Stupid," and "Piggy,"* CBS News (Nov. 28, 2025), https://perma.cc/P4K8-RHLW; Brian Flood, *Trump Scolds Reporter as 'Very Obnoxious' Over Question on Air Force One, Blasts 'Most Corrupt' ABC News*, Fox News (Mar. 16, 2026), https://perma.cc/J6Q5-F497; Debusmann, *supra* note 28.

Plaintiffs from accessing the documentary history of this administration, whether through FOIA or through traditional investigative and journalistic methods.

118.    The NARA Defendants' refusal to comply with the PRA has impaired, and will continue to impair, Plaintiffs' ability to access Presidential records not only of the current administration, but of every Presidential administration since the PRA took effect in 1981.

119.    Defendants' unlawful refusal to comply with the PRA will make it harder for Plaintiffs to perform their mission-critical functions and will deprive them of unique, highly valuable government records to which they are statutorily entitled.

## CLAIMS FOR RELIEF

### COUNT I
### Equitable Cause of Action
### (against All Defendants)

120.    Plaintiffs re-allege and incorporate by reference all preceding paragraphs.

121.    This Court has inherent equitable power to enjoin unlawful Executive Branch conduct. *See Free Enter. Fund v. Pub. Co. Acct. Oversight Bd.*, 561 U.S. 477, 491 n.2 (2010); *Armstrong v. Exceptional Child Ctr., Inc.*, 575 U.S. 320, 326-27 (2015).

122.    The PRA imposes several non-discretionary duties on Defendants and establishes that Presidential records are the property of the United States. Collectively, these obligations ensure that Presidential records are appropriately created, preserved, transferred to NARA, and made available to the public and to Congress.

123.    Courts may review EOP's official recordkeeping guidelines or directives to assess their facial compliance with the PRA. *See Armstrong v. Exec. Off. of the President, Off. of Admin.*, 1 F.3d 1274, 1290 (D.C. Cir. 1993) ("[C]ourts are accorded the power to review guidelines outlining what is, and what is not, a 'presidential record' under the terms of the PRA.

33

The PRA does not bestow on the President the power to assert sweeping authority over whatever materials he chooses to designate as presidential records without any possibility of judicial review.").

124. On April 1, 2026, OLC issued an opinion unilaterally declaring that the PRA is unconstitutional "in its entirety" and that "the President need not further comply with its dictates."

125. Contrary to the OLC Opinion, the PRA is a valid and lawful exercise of Congress's constitutional authority, as established by Supreme Court precedent including *Nixon v. Administrator of General Services*, 433 U.S. 425 (1977).

126. No court has declared the PRA unconstitutional.

127. Because the PRA is a valid, duly enacted statute and has not been invalidated by any court, Defendants must comply with its requirements.

128. Defendants have nonetheless adopted the erroneous OLC Opinion and have ceased complying with the PRA altogether.

129. The White House adopted a revised recordkeeping policy on April 2, 2026, that is facially invalid and inconsistent with numerous non-discretionary requirements of the PRA.

130. The OLC Opinion is "controlling" on the NARA Defendants per the terms of Executive Order 14215, *Ensuring Accountability for All Agencies*, 90 Fed. Reg. 10447 (Feb. 18, 2025).

131. On information and belief, NARA has adopted its own policy of non-compliance with the PRA consistent with the OLC Opinion and the April 2 White House Recordkeeping Policy.

132.    Accordingly, the Court should enjoin and declare unlawful Defendants' policies of non-compliance with the PRA.

**COUNT II**
**Mandamus**
**(against Defendants Trump, Vance, and Forst)**
**28 U.S.C. §§ 1361, 1651**

133.    Plaintiffs re-allege and incorporate by reference the foregoing paragraphs.

134.    The Mandamus Act, 28 U.S.C. § 1361, vests this Court with original jurisdiction over "any action in the nature of mandamus to compel an officer or employee of the United States or any agency thereof to perform a duty owed to the plaintiff."

135.    The All Writs Act, 28 U.S.C. § 1651, authorizes this Court to issue all writs "necessary or appropriate" in aid of its jurisdiction.

136.    Defendant Trump has a non-discretionary duty to:

   a.   take all necessary steps "to assure that the activities, deliberations, decisions, and policies that reflect the performance of the President's constitutional, statutory, or other official or ceremonial duties are adequately documented and that such records are preserved and maintained as Presidential records," 44 U.S.C. § 2203(a);

   b.   before disposing of Presidential records, determine that those records "no longer have administrative, historical, informational, or evidentiary value," *id.* § 2203(c);

   c.   before disposing of Presidential records, obtain "the views, in writing, of the Archivist [of the United States] concerning" such disposal, *id.* § 2203(c)(1); and

   d.   before disposing of Presidential records, if the Archivist does not seek the advice of Congress regarding such disposal, provide a "disposal schedule" to "the appropriate Congressional Committees at least 60 calendar days . . . in advance of the proposed disposal date," *id.* § 2203(d).

137.    Defendant Vance has a non-discretionary duty to fulfill the same duties and responsibilities of the President listed in paragraph 136 above with respect to Vice-Presidential records.

138. Defendant Forst has a non-discretionary duty to:

   a. "secure to the Government, as far as possible, the right to have continuous and permanent possession of" Presidential records, 44 U.S.C. § 2112(c);

   b. "exercise . . . all the functions and responsibilities otherwise vested in him pertaining to Federal records or other documentary materials in his custody or under his control," *id.*

   c. take "responsibility for the custody, control, and preservation of, and access to," Presidential records of former presidents, *id.* § 2203(g)(1); and

   d. make the Presidential records of a former President "available to the public as rapidly and completely as possible," *id.*

139. By adopting policies of non-compliance with the PRA, Defendants are violating their non-discretionary duties under the PRA.

140. Plaintiffs have a clear right to relief from Defendants' violations of their non-discretionary duties.

141. It is necessary and appropriate for this Court to issue a writ of mandamus pursuant to 28 U.S.C. §§ 1361 and 1651 under this Court's equitable authority to compel Defendants to comply with their non-discretionary duties under the PRA.

### COUNT III
### *Ultra Vires*
### (Against All Defendants)

142. Plaintiffs re-allege and incorporate by reference the foregoing paragraphs.

143. Plaintiffs have a non-statutory right of action to challenge a federal official's *ultra vires* violations of, or actions in excess of their authority under, federal statutes when an official's *ultra vires* actions are a "clear departure" from a "statutory mandate" and are "blatantly lawless" violations of statutory requirements. *Fed. Express Corp. v. Dep't of Commerce*, 39 F.4th 756, 764 (D.C. Cir. 2022); *see also Fresno Cmty. Hosp. & Med. Ctr. v. Cochran*, 987 F.3d 158, 162 (D.C. Cir. 2021).

36

144.    The PRA imposes binding legal mandates and prohibitions on Defendants.

145.    No statute, constitutional provision, or other source of law authorizes Defendants' policies of non-compliance with the PRA or any other refusal to comply with it. Defendants' refusal to comply with the PRA is "blatantly lawless" and a "clear departure" from its statutory requirements.

146.    This Court should exercise its inherent equitable power to enjoin Defendants' *ultra vires* conduct.

### COUNT IV
### SEPARATION OF POWERS
### (Against All Defendants)

147.    Plaintiffs re-allege and incorporate by reference the foregoing paragraphs.

148.    Plaintiffs have an equitable right of action to a judicial order declaring unlawful and enjoining Defendants' unconstitutional conduct. *See Free Enter. Fund v. Pub Co. Acct. Oversight Bd.*, 561 U.S. 477, 491 n.2 (2010); *Youngstown Sheet & Tube Co. v. Sawyer*, 343 U.S. 579 (1952).

149.    The Constitution empowers Congress to make laws. U.S. Const. art. I, § 1, and requires the President to faithfully execute those laws, *id.* art. II, § 3. The President lacks the authority to unilaterally modify or amend duly enacted federal law. *Clinton v. City of New York*, 524 U.S. 417, 439–40 (1998) (citations omitted); *see* U.S. Const. art. I, § 7, cl. 2. The President cannot delegate powers to other executive branch officials that violate the Constitution or compel executive branch officials to take actions that do so.

150.    Congress enacted the PRA in accordance with its constitutional authority to make laws, U.S. Const. art. I, § 1, its implicit authority, and several of its constitutionally enumerated powers, *see, e.g., id.* art. I, § 8, cl. 18; *id.* art. I, § 9, cl. 7; *id.* art. IV, § 3, cl. 2.

151. No court has declared the PRA an unconstitutional exercise of Congressional authority or an unconstitutional infringement into the authorities or prerogatives of the President or the Executive Branch, and the PRA is constitutional.

152. By refusing to comply with the PRA, Defendants are violating the constitutional separation of powers by infringing on Congress's legislative authority, failing to faithfully execute laws passed by Congress, and attempting to nullify duly enacted legislation.

**COUNT V**
**APA - Contrary to Law and Contrary to Constitutional**
**Right, Power, Privilege, or Immunity**
**(against Defendants NARA and Forst)**
**5 U.S.C. § 706(2)(A), (B)**

153. Plaintiffs re-allege and incorporate by reference the foregoing paragraphs.

154. The APA provides that a court "shall" "hold unlawful and set aside agency action" found to be "not in accordance with law," "contrary to constitutional right, power, privilege, or immunity," or "in excess of statutory jurisdiction, authority, or limitations, or short of statutory right." 5 U.S.C. § 706(2)(A)–(C).

155. The NARA Defendants' policy of non-compliance with the PRA is "final agency action for which there is no other adequate remedy in a court," within the meaning of the APA. 5 U.S.C. § 704.

156. The NARA Defendants' policy of non-compliance with the PRA is contrary to their obligations under the PRA to:

   a. "secure to the Government, as far as possible, the right to have continuous and permanent possession of" Presidential records, 44 U.S.C. § 2112(c);

   b. "exercise . . . all the functions and responsibilities otherwise vested in him pertaining to Federal records or other documentary materials in his custody or under his control," *id.*;

38

c.  exercise "responsibility for the custody, control, and preservation of, and access to," Presidential records of former presidents, *id.* § 2203(g)(1);

d.  process FOIA requests for Presidential records made available through the PRA; *id.* § 2204(c);

e.  make the Presidential records of former Presidents "available to the public as rapidly and completely as possible," *id.* § 2203(g)(1); and

f.  otherwise facilitate the legal obligations of the Archivist as required by the PRA.

157.  The NARA Defendants' policy of non-compliance with the PRA is contrary to law, exceeds NARA's statutory authority, and impermissibly infringes on Congress's powers and privileges under Article I of the Constitution in violation of the separation of powers.

158.  The NARA Defendants' policy of non-compliance with the PRA has caused and will continue to cause violations of the PRA's non-discretionary requirements.

159.  Accordingly, the NARA Defendants' actions are "not in accordance with law," "contrary to constitutional right, power, privilege, or immunity," and "in excess of statutory jurisdiction, authority, or limitations, or short of statutory right." 5 U.S.C. § 706(2)(A) – (C).

### COUNT VI
### PRA AND FOIA - Unlawful Policy or Practice of Non-Compliance with FOIA Requests for Presidential Records
### (against Defendant NARA)

160.  Plaintiffs re-allege and incorporate by reference all preceding paragraphs.

161.  A plaintiff "may challenge an agency's 'policy or practice' where it 'will impair the party's lawful access to information in the future.'" *CREW*, 846 F.3d at 1242 (quoting *Newport*, 684 F.3d at 164). Such a "practice" may be "informal, rather than crystalized in regulation or an official statement of policy." *Judicial Watch*, 895 F.3d at 778 (quoting *Payne Enterprises*, 837 F.2d at 491).

162.  By adopting a policy of non-compliance with the PRA pursuant to the OLC

39

Opinion, NARA has adopted and is engaged in a policy or practice of violating the PRA and FOIA by refusing to process FOIA requests for Presidential records made accessible through the PRA, 44 U.S.C. § 2204(c).

163.    NARA's unlawful policy or practice has impaired and will continue to impair in the future Plaintiffs' lawful access to Presidential records under the PRA and FOIA.

**REQUEST FOR RELIEF**

WHEREFORE, Plaintiffs respectfully requests that this Court:

(1)    Declare that the PRA is constitutional and that Defendants are bound by its requirements;

(2)    Declare that Defendants' policies of non-compliance with the PRA are unlawful, invalid, and unenforceable;

(3)    Declare unlawful, vacate, and set aside under the APA the NARA Defendants' policy of non-compliance with the PRA;

(4)    Declare that the NARA Defendants are engaged in an unlawful policy or practice of refusing to process FOIA requests for Presidential records that are made subject to FOIA through the PRA;

(5)    Permanently enjoin and prohibit the NARA Defendants from continuing to engage in an unlawful policy or practice of refusing to process FOIA requests for Presidential records that are made subject to FOIA through the PRA;

(6)    Issue preliminary and permanent relief, including but not limited to mandamus and injunctive relief, requiring Defendants to cease carrying out their unlawful policies and actions, and to immediately, fully, and continually comply with their non-discretionary duties under the PRA without regard to the OLC Opinion or any policy of adherence to it;

(7)     Order Defendants to preserve all records subject to the PRA during the pendency of this litigation;

(8)     Provide expeditious proceedings in this action;

(9)     Retain jurisdiction of this action to ensure compliance with this Court's orders;

(10)    Award Plaintiffs its costs and reasonable attorneys' fees in this action; and

(11)    Grant such other relief as the Court may deem just and proper.


Date: April 24, 2026                              Respectfully Submitted,

                                                  */s/ Jonathan E. Maier*
                                                  Jonathan E. Maier (D.C. Bar No. 1013857)
                                                  Nikhel S. Sus (D.C. Bar No. 1017937)
                                                  Lauren C. Bingham (D.C. Bar No. 90043462)*
                                                  CITIZENS FOR RESPONSIBILITY AND
                                                  ETHICS IN WASHINGTON
                                                  P.O. Box 14596
                                                  Washington, DC 20044
                                                  (202) 408-5565
                                                  jmaier@citizensforethics.org
                                                  nsus@citizensforethics.org
                                                  lbingham@citizensforethics.org

                                                  *admission pending*

                                                  *Counsel for Plaintiffs*

41