**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

|  |  |
|---|---|
| FREEDOM OF THE PRESS FOUNDATION, *et al.*, | |
| Plaintiffs*,* | |
| v. | Case No. 26-cv-1402-JDB |
| DONALD TRUMP, *et al*., | |
| Defendants. | |

**<u>MEMORANDUM IN SUPPORT OF PLAINTIFFS'
MOTION FOR PRELIMINARY INJUNCTION</u>**

**TABLE OF CONTENTS**

TABLE OF AUTHORITIES ............................................................................................................. ii

INTRODUCTION ........................................................................................................................... 1

BACKGROUND ............................................................................................................................. 4

I. The Presidential Records Act .................................................................................................. 4

II. Defendants' refusal to comply with the PRA......................................................................... 8

    A.  The White House engineers the OLC Opinion to justify its refusal to comply with the
        PRA................................................................................................................................... 8

    B.  The EOP Defendants formally repudiate the PRA. ...................................................... 11

ARGUMENT................................................................................................................................. 19

III. Plaintiffs are likely to succeed on the merits with respect to their claims against the EOP
Defendants. ................................................................................................................................ 19

    A.  Plaintiffs have standing................................................................................................. 19

    B.  The EOP Policy is reviewable by this Court. ............................................................... 20

    C.  Plaintiffs are likely to prevail on their equitable, *ultra vires*, and separation-of-powers
        claims challenging EOP's Policy of non-compliance with the PRA............................. 22

    D.  The PRA is constitutional. ............................................................................................ 26

IV. Plaintiffs will suffer irreparable injury absent a preliminary injunction. ........................... 31

V. The balance of equities and public interest favor granting a preliminary injunction. ......... 36

CONCLUSION.............................................................................................................................. 39

# TABLE OF AUTHORITIES[*]

**Cases**

*In re Aiken County*,
725 F.3d 255 (D.C. Cir. 2013) ................................................................................................23

*Am. First Legal Found. v. Becerra*,
No. CV 24-1092 (RC), 2024 WL 3741402 (D.D.C. Aug. 9, 2024) .......................................32

*Am. Friends Serv. Comm. v. Webster*,
485 F. Supp. 222 (D.D.C. 1980) .............................................................................................32

*Am. Friends Serv. Comm. v. Webster*,
720 F.2d 29 (D.C. Cir. 1983) ..................................................................................................32

*Am. Oversight v. Hegseth*,
788 F. Supp. 3d 14 (D.D.C. 2025) .....................................................................................32, 33

*Am. Oversight v. U.S. Agency for Int'l Dev.*,
No. 25-CV-719 (TSC), 2026 WL 592311 (D.D.C. Mar. 3, 2026) .........................................33

*Am. Sch. of Magnetic Healing v. McAnnulty*,
187 U.S. 94 (1902) ..................................................................................................................22

*Armstrong v. Bush*,
807 F. Supp. 816 (D.D.C. 1992) .............................................................................................32

*Armstrong v. Bush*,
924 F.2d 282 (D.C. Cir. 1991) ..........................................................................20, 33, 36, 37

*Armstrong v. Exceptional Child Ctr., Inc.*,
575 U.S. 320 (2015) ............................................................................................................22, 23

*Armstrong v. Exec. Off. of the President, Off. of Admin.*,
1 F.3d 1274 (D.C. Cir. 1993) ..........................................................................3, 20, 21, 22

*Ashwander v. Tennessee Valley Auth.*,
297 U.S. 288 (1936) ................................................................................................................26

*Camfield v. United States*,
167 U.S. 518 (1897) ................................................................................................................26

*Campaign for Accountability v. Dep't of Just.*,
155 F.4th 724 (D.C. Cir. 2025) ...............................................................................................10

*CREW v. Cheney*,
577 F. Supp. 2d 328 (D.D.C. 2008) ...............................................................................4, 32, 36

*CREW v. DOJ*,
846 F.3d 1235 (D.C. Cir. 2017) .........................................................................................19, 33

*CREW v. Off. of Admin.*,
559 F. Supp. 2d 9 (D.D.C. 2008), *aff'd*, 566 F.3d 219 (D.C. Cir. 2009) ...............................33

---

[*] Authorities marked with an asterisk are those on which counsel chiefly relies.

**Cases—continued**

*CREW v. Off. of Admin.*,
565 F. Supp. 2d 23 (D.D.C. 2008) ................................................................. 32

*CREW v. Trump*,
438 F. Supp. 3d 54 (D.D.C. 2020) ................................................................. 34

*CREW v. Trump*,
924 F.3d 602 (D.C. Cir. 2019) ........................................................... *passim*

*Dalton v. Specter*,
511 U.S. 462 (1994) ................................................................................ 25

*Don't Tear It Down, Inc. v. Pennsylvania Ave. Dev. Corp.*,
642 F.2d 527 (D.C. Cir. 1980) ................................................................ 27

*Fed. Express Corp. v. U.S. Dep't of Com.*,
39 F.4th 756 (D.C. Cir. 2022) ................................................................. 24

*Free Enter. Fund v. Pub. Co. Acct. Oversight Bd.*,
561 U.S. 477 (2010) ................................................................................ 25

*Khine v. DHS*,
943 F.3d 959 (D.C. Cir. 2019) ................................................................ 33

*Kleppe v. New Mexico*,
426 U.S. 529 (1976) ................................................................................ 26

*League of Women Voters of U.S. v. Newby*,
838 F.3d 1 (D.C. Cir. 2016) ............................................................. 31, 38

*Mathis v. U.S. Parole Comm'n*,
749 F. Supp. 3d 8 (D.D.C. 2024) ............................................................ 23

*McGrain v. Daugherty*,
273 U.S. 135 (1927) ................................................................................ 28

*McQuiggin v. Perkins*,
569 U.S. 383 (2013) ................................................................................ 23

*Mistretta v. United States*,
488 U.S. 361 (1989) ................................................................................ 27

*Nat'l Ass'n of Postal Supervisors v. U.S. Postal Serv.*,
26 F.4th 960 (D.C. Cir. 2022) ................................................................. 24

*National Security Archive v. Trump*,
No. 20-2500 (D.D.C. Dec. 1, 2020) ......................................................... 34

*Newport Aeronautical Sales v. Air Force*,
684 F.3d 160 (D.C. Cir. 2012) ................................................................. 20

*Nixon v. Administrator of General Services*,
433 U.S. 425 (1977) ................................................................. 9, 29, 30, 31

**Cases—continued**

*Nken v. Holder*,
556 U.S. 418 (2009) .......................................................................................................36

*Open Cmtys. All. v. Carson*,
286 F. Supp. 3d 148 (D.D.C. 2017) ...............................................................................37

*Payne Enters., Inc. v. United States*,
837 F.2d 486 (D.C. Cir. 1988) .......................................................................................33

*Porter v. Warner Holding Co.*,
328 U.S. 395 (1946) .......................................................................................................22

*Rodriguez v. Robbins*,
715 F.3d 1127 (9th Cir. 2013) .......................................................................................38

*Sidak v. ITC*,
-- F.4th --, 2026 WL 1110981 (D.C. Cir. Apr. 24, 2026) ......................................22, 25

*Trump v. Mazars USA, LLP*,
591 U.S. 848 (2020). OLC Op. ................................................................................28, 29

*Trump v. Thompson*,
142 S. Ct. 680 (2022) .......................................................................................................8

*Winter v. Nat. Res. Def. Council, Inc.*,
555 U.S. 7 (2008) .............................................................................................19, 32, 36

*Youngstown Sheet & Tube Co. v. Sawyer*,
343 U.S. 579 (1952) .......................................................................................................25

**Statutes, Rules, and Regulations**

44 U.S.C.
§ 2107 note.....................................................................................................................29
§ 2112(c) ..........................................................................................................................7
§ 2201(2)......................................................................................................................4, 26
§ 2202..........................................................................................................................4, 26
§ 2203............................................................................................................................30
§ 2203(a) ................................................................................................................5, 12, 26
§ 2203(b).........................................................................................................................27
§ 2203(c) ......................................................................................................................6, 27
§ 2203(c)(1) .......................................................................................................................6
§ 2203(c)(2) .......................................................................................................................6
§ 2203(d)......................................................................................................................6, 27
§ 2203(e) .........................................................................................................................27
§ 2203(f)..........................................................................................................................27
§ 2203(g).........................................................................................................................27
§ 2203(g)(1) ...................................................................................................................6, 7
§ 2204........................................................................................................................27, 30
§ 2204(a) ...........................................................................................................................7
§ 2204(b)(2) ....................................................................................................................36

**Statutes, Rules, and Regulations—continued**

44 U.S.C.

§ 2204(c) .................................................................................................7, 21

§ 2204(e) ........................................................................................................7

§ 2205....................................................................................................27, 30

§ 2205(2)........................................................................................................7

§ 2205(2)(C)...............................................................................................7, 28

§ 2206....................................................................................................27, 30

§ 2207............................................................................................................5

§ 2208..............................................................................................5, 27, 30

§ 2209..............................................................................................6, 24, 26

§ 2209(a) ....................................................................................................1, 24

§ 2209(a)(1) ...........................................................................................5, 12, 15

§ 2209(a)(2) ...........................................................................................5, 12, 15

§ 2209(b)........................................................................................................5

§ 2209(c)(1)(A) ................................................................................................5

§ 2209(c)(1)(C) ................................................................................................5

§ 2209(c)(2) ................................................................................................5, 15

§ 2209(c)(3) ................................................................................................6, 16

§ 2911............................................................................................................1

§ 2911(a) ........................................................................................................5

§ 2911(b)........................................................................................................5

Presidential and Federal Records Act Amendments of 2014, Pub. L. 113-187, 128
Stat. 2003 (2014).............................................................................................5

Pub. L. 93-526, 88 Stat. 1695 (1974)......................................................................29

36 C.F.R. § 1270.44(f) ........................................................................................7

90 Fed. Reg. 10447 (Feb. 24, 2025) .......................................................................10

**Other Authorities**

*Constitutionality of the Presidential Records Act*, 50 Op. O.L.C. __ (April 1,
2026) ................................................................................................... *passim*

H.R. Rep. No. 95-1487 (1978)..............................................................................4

Memorandum from Donald F. McGahn II, Couns. to the President, to all White
House pers. (Feb. 22, 2017) .............................................................................8

*Ministerial*, Black's Law Dictionary (12th ed. 2024)...................................................14

*Ministerial*, Merriam-Webster Dictionary (last visited Apr. 27, 2026).........................14

NARA, Bulletin 2015-02, *Guidance on Managing Electronic Messa*ges (July 29,
2015) ........................................................................................................6

NARA, Bulletin 2015-04, *Metadata Guidance for the Transfer of Permanent
Electronic Records* (Sept. 15, 2015) ..................................................................6

**Other Authorities—continued**

Nat'l Archives and Recs. Admin., *Guidance on Presidential Records from the National Archives and Records Administration* (Jan. 21, 2021) ..............................................35

Press Release, NARA, National Archives Welcomes Presidential and Federal Records Act Amendments of 2014 (Dec. 1, 2014).....................................................5

S. Rep. 113-218, 113th Cong., 2d Sess. (2014)...........................................................12

S. Rep. No. 113-218 (2014).............................................................................................6

U.S. Const. art I., § 8, cl. 18....................................................................................27, 28

U.S. Const. art. IV, § 3, cl. 2.........................................................................................26

*Whether the CFPB May Continue to Draw Funds from the Federal Reserve System Under 12 U.S.C. § 5497 When the Federal Reserve System Is Operating at A Loss*, 49 Op. O.L.C. __, at *22 (Nov. 7, 2025), 2025 WL 3251685.............................................................................................................10

**INTRODUCTION**

Under a new policy issued on April 2, the White House is openly defying the Presidential Records Act ("PRA") and Presidential records are at imminent risk of being destroyed and forever lost to history. Plaintiffs are two nonprofits that routinely rely on Presidential and federal records and now seek preliminary relief to protect a subset of records at high risk of being irrevocably lost as a result of the White House's new policy: text messages and other electronic communications of personnel within the Executive Office of the President ("EOP") and the Office of the Vice President ("OVP").

Passed in 1978 to close the gaps in federal law that facilitated Watergate-era abuses, the PRA requires that the official activities of the President and those who assist him are recorded, establishes that those records are property of the United States, and mandates that they be preserved and, within certain constraints to protect the Presidency, eventually made available to the public. In 2014, Congress passed and the President signed into law amendments to the PRA to ensure preservation of certain electronic messages that constitute Presidential records, *see* 44 U.S.C. § 2209(a),[1] and adopted parallel requirements for all federal agency employees under the Federal Records Act ("FRA"), *see* 44 U.S.C. § 2911.

The Presidency and the PRA coexisted through every Presidential administration since the PRA went into effect in 1981 (including President Trump's first administration)—until now. In the wake of President Trump's criminal indictment stemming from his and his close advisors' defiance of federal records laws, the White House recently determined it would simply stop complying with the PRA by claiming—as no previous President has—that the PRA has always

---

[1] For purposes of this motion, references to Presidential records also include Vice Presidential Records pursuant to 44 U.S.C. § 2207, which states that "Vice-Presidential records shall be subject to the provisions of [the PRA] in the same manner as Presidential records."

been an unconstitutional exercise of Congressional authority over the President. The White House then directed the Department of Justice Office of Legal Counsel ("OLC") to issue a memo to provide legal cover for its unlawful decision to flout a duly enacted statute. On April 1, 2026, OLC issued an opinion carrying out the White House's preordained decision, declaring the PRA "unconstitutional" and "invalid in its entirety." *Constitutionality of the Presidential Records Act*, 50 Op. O.L.C. __ at 1, 50 (April 1, 2026), https://perma.cc/V4M7-NQFA ("OLC Opinion"). The OLC Opinion further asserted that, despite binding Supreme Court precedent to the contrary and the fact that the Administration has never challenged the constitutionality of the PRA in court, the President was free to ignore it immediately. *Id.* at 52.

The next day, the White House issued a new and ill-defined record retention policy to the *entire* EOP (which includes both components subject to the PRA and others subject to the Federal Records Act ("FRA")), invoking the OLC Opinion to end the White House's PRA compliance and replace it with a series of half-measures that can be terminated or ignored at will ("April 2 EOP Policy" or "EOP Policy").[2] The April 2 EOP Policy facially violates the PRA. And it expressly defies PRA provisions designed to prevent the loss of electronic communications that include Presidential record material.

Specifically, even though the April 2 EOP Policy recognizes that text messaging is so frequent at the White House that is becoming akin to speaking, it replaces the PRA's mandatory obligation to preserve electronic messages on official messaging accounts with a gentle admonition that EOP staff "should only [] preserve[]" text messages when they are the only record

---

[2] The EOP Policy was first made public in an April 21 court filing by Defendants in a related case. *See* Ex. A to Mem. in Opp. to Pls.' Mot. for Prelim. Inj. and Stay, *Am. Hist. Ass'n v. Trump* ("*AHA*"), No. 26-cv-1169-JDB (D.D.C. Apr. 21, 2026), ECF No. 19-2, https://perma.cc/EA2R-WQPD.

2

of official action or otherwise unique (without telling staff how to confirm that they are), and directs staff that they need not preserve text messages otherwise, including when they reflect undefined "ministerial" tasks, no matter how important. It does not instruct EOP staff how to preserve text messages, contain any provision for electronic messages other than text messages, or provide any remedial or disciplinary measures for even the most egregious failure to comply. And perhaps most alarmingly, the EOP Policy provides no assurance (and every reason to doubt) that records from the Trump-Vance Administration will *ever* be transferred to the National Archives and Records Administration ("NARA")—and made accessible to Plaintiffs and the American people—as required by law.

On April 24, 2026, three days after the EOP Policy became public, Plaintiffs brought this suit challenging Defendants' adoption of the OLC Opinion and their associated policies of non-compliance with the PRA. Plaintiffs seek judicial review consistent with longstanding D.C. Circuit precedent holding that courts may review EOP's official recordkeeping guidelines or directives to assess their facial compliance with the PRA. *See Armstrong v. Exec. Off. of the President, Off. of Admin.*, 1 F.3d 1274, 1290 (D.C. Cir. 1993) ("*Armstrong II*"); *CREW v. Trump*, 924 F.3d 602, 608–09 (D.C. Cir. 2019).

While Plaintiffs' Complaint challenges the Administration's broader abandonment of the PRA, this motion seeks preliminary relief as to a narrower subset of Presidential and federal records at high risk of being destroyed under the EOP Policy: text messages and similar electronic communications. Loss of these records would irreparably harm Plaintiffs Freedom of the Press Foundation ("FPF") and Citizens for Responsibility and Ethics in Washington ("CREW"), which rely on Presidential and federal records to fulfill their mission-critical functions. Without immediate injunctive relief requiring Defendants EOP, the White House Office, the Office of the

3

Vice President, and Susan Wiles (collectively, "EOP Defendants") to comply with their obligations under the PRA irrespective of the EOP Policy and OLC Opinion, these invaluable Presidential records will be forever lost to history. Because "the threat of such obliteration is a text book example of irreparable harm," *CREW v. Cheney*, 577 F. Supp. 2d 328, 339 (D.D.C. 2008) (citation omitted), Plaintiffs seek a preliminary injunction to ensure preservation of this subset of records during the pendency of this litigation.

## BACKGROUND

### I.    The Presidential Records Act

The PRA "'establish[es] the public ownership of records created by . . . presidents and their staffs in the course of discharging their official duties,'" *CREW v. Trump*, 924 F.3d at 603 (quoting H.R. Rep. No. 95-1487, at 2 (1978)), under which "[t]he United States shall reserve and retain complete ownership, possession, and control of Presidential records," 44 U.S.C. § 2202.

Under the PRA, "[t]he term 'Presidential records' means documentary materials, or any reasonably segregable portion thereof, created or received by the President, the President's immediate staff, or a unit or individual of the Executive Office of the President whose function is to advise or assist the President, in the course of conducting activities which relate to or have an effect upon the carrying out of the constitutional, statutory, or other official or ceremonial duties of the President." *Id.* § 2201(2).

To ensure a full record of the performance of the President's duties and facilitate the United States' ownership and custody of it, the PRA directs the President to take all necessary steps:

> to assure that the activities, deliberations, decisions, and policies that reflect the performance of the President's constitutional, statutory, or other official or ceremonial duties are adequately documented and that such records are preserved and maintained as Presidential records[.]

*Id.* § 2203(a).[3]

In 2014, Congress amended both the PRA and the Federal Records Act ("FRA") through the Presidential and Federal Records Act Amendments of 2014, Pub. L. 113-187, 128 Stat. 2003 (2014) ("2014 Amendments"). The 2014 Amendments sought to "modernize[] records management by focusing more directly on electronic records." Press Release, NARA, National Archives Welcomes Presidential and Federal Records Act Amendments of 2014 (Dec. 1, 2014), https://perma.cc/BSG8-XKU9. As part of that focus, the amended statute explicitly restricts White House employees' use of "non-official electronic message account[s]" to "create or send" Presidential records unless they "(1) cop[y] an official electronic messaging account. . . in the original creation or transmission of the Presidential record," or "(2) forward[] a complete copy of the Presidential . . . record to an official electronic messaging account . . . not later than 20 days after the original creation or transmission of the Presidential . . . record." 44 U.S.C. § 2209(a)(1) –(2). The 2014 Amendments similarly restrict the use of non-official electronic messaging accounts under the FRA. *Id.* § 2911(a). And they make any intentional violations of these provisions the basis for disciplinary action. *See id.* §§ 2209(b); 2911(b).

Section 2209 of the PRA defines "covered employee" to include both "the immediate staff of the President," and "a unit or individual of the Executive Office of the President whose function is to advise and assist the President." *Id.* § 2209(c)(1)(A), (C). The amended statute also broadly defines "electronic messages" to mean "electronic mail and other electronic messaging systems that are used for purposes of communicating between individuals." *Id.* § 2209(c)(2). It likewise

---

[3] The PRA also provides that the "duties and responsibilities of the Vice President, with respect to Vice-Presidential records, shall be the same as the duties and responsibilities of the President" except as it relates to one provision of the PRA allowing the President to challenge the release of individual Presidential records. *Id.* § 2207; *see also id.* § 2208.

broadly defines "electronic messaging account" to mean "any account that sends electronic messages." *Id*. § 2209(c)(3).

The legislative history for § 2209 confirms that Congress wanted both the "President" and his "staff" to "ensure that *all* Presidential records, even those sent from a personal electronic messaging account, are properly preserved and maintained in an official electronic messaging account." S. Rep. No. 113-218, at 6 (2014) (emphasis added).

NARA guidance implementing the 2014 Amendments reinforces that a "complete" version of an electronic record—including electronic messages generated in non-official accounts—must include the record's associated metadata, attachments, and functionality. *See* NARA, Bulletin 2015-02, *Guidance on Managing Electronic Messa*ges (July 29, 2015), https://perma.cc/2PNA-SYPF; NARA, Bulletin 2015-04, *Metadata Guidance for the Transfer of Permanent Electronic Records* (Sept. 15, 2015), https://perma.cc/37KN-UQTS.

The PRA imposes a multi-step process on the President before any Presidential records may be destroyed. The President must first make an affirmative determination that the records "no longer have administrative, historical, informational, or evidentiary value[.]" 44 U.S.C. § 2203(c). The President must then obtain the written views of the Archivist on the proposed destruction. *Id.* § 2203(c)(1)–(2). Upon receiving written confirmation that the Archivist intends to take any action with respect to the proposed destruction, the President must notify the appropriate congressional committee of the President's intention 60 days before the proposed disposal. *Id.* § 2203(d). This process reflects the care Congress took to ensure that multiple stakeholders would have an opportunity to weigh in before a President destroys historically important Presidential records.

Once a President leaves office, the Archivist assumes "responsibility for the custody, control, and preservation of, and access to" the former president's records. *Id.* § 2203(g)(1). The

PRA empowers the Archivist to "exercise . . . all the functions and responsibilities otherwise vested in him pertaining to Federal records or other documentary materials in his custody or under his control." *Id.* § 2112(c). In negotiating for the deposit of Presidential materials the PRA directs the Archivist "to secure to the Government, as far as possible, the right to have continuous and permanent possession of the materials." *Id.* The PRA imposes on the Archivist "an affirmative duty" to make the records of a former president "available to the public as rapidly and completely as possible[.]" *Id*. § 2203(g)(1).

The PRA provides that beginning five years after a President leaves office, the public can access Presidential records from NARA through the procedures that the Freedom of Information Act ("FOIA") establishes. *Id*. § 2204(c). Although some materials can be withheld or redacted for an extended period of time, they too eventually become available to members of the public, *id.* § 2204(a), including Plaintiffs, who are two nonpartisan, nonprofit organizations that utilize the PRA to fulfill their mission-critical functions. Compl. ¶¶ 9, 94–104. Notwithstanding those limitations, the PRA vests in Congress a special right to access archived Presidential records by requiring the Archivist to provide access to them whenever requested by either House of Congress or a committee acting within its jurisdiction and the information in the records is "needed for the conduct of its business and [is] not otherwise available." 44 U.S.C. § 2205(2)(C). Disclosure under this section is "subject to any rights, defenses, or privileges which the United States or any agency or person may invoke." *Id.* § 2205(2).

The PRA and implementing regulations set out detailed procedures—including judicial review—for resolving disputes over access to a former President's records. *See id.* § 2204(e); 36 C.F.R. § 1270.44(f). President Trump is the only former President to have filed suit under these provisions, when he sued unsuccessfully to block disclosure of Presidential records from his first

7

term to the House Select Committee to Investigate the January 6th Attack on the United States Capitol. *See Trump v. Thompson*, 142 S. Ct. 680 (2022) (mem.).

## II.    Defendants' refusal to comply with the PRA

### A.    The White House engineers the OLC Opinion to justify its refusal to comply with the PRA.

The OLC Opinion's assertion that the PRA is an unconstitutional exercise of Congressional authority over the Executive is not the result of the principled application of the law, but a preordained outcome dictated by the White House. While President Trump's track record of compliance with the PRA is abysmal, *see* Compl. ¶ 107, during his first term his White House Counsel issued directives to follow the PRA's dictates, *see* Memorandum from Donald F. McGahn II, Couns. to the President, to all White House pers. (Feb. 22, 2017), https://perma.cc/VQB3-QYC6 ("remind[ing] all personnel of their obligation to preserve and maintain presidential records, as required by the [PRA]") ("2017 PRA Policy"). But after having been indicted for 40 felonies for unlawfully retaining highly-classified documents at his private residence at Mar-a-Lago after leaving office and obstructing justice to conceal them, and after suffering another string of embarrassing scandals, including two in which Administration officials conducted sometimes life-or-death government business on private ephemeral messaging applications, *see* Compl. ¶¶ 107, 109–10, the White House changed course to claim that the PRA was, and always had been, unconstitutional.

Thus, sometime before April 1, 2026, the White House Counsel's Office "asked [OLC] to review the constitutionality of the PRA," based on the White House's new, uninformed, and erroneous view that "Congress never had the Article I power to regulate the President's records in the manner contemplated by the PRA." Declaration of Kayvan Farchadi (CREW Decl.), Ex. A at 1. On April 1, OLC gave the White House what it asked for and issued the OLC Opinion, declaring

the PRA facially "unconstitutional [because] it exceeds Congress's enumerated and implied powers, and aggrandizes Congress at the expense of the constitutional independence and autonomy of the President." OLC Op. at 1. The OLC Opinion purported to declare that the "PRA is invalid in its entirety" because supposed "constitutional defects lie at the statute's core[,]" *id.* at 50–51, and further asserted that because "the PRA is unconstitutional, . . . the President need not further comply with its dictates[,]" *id.* at 52.

The OLC Opinion cited no judicial decision holding that the PRA is facially unconstitutional, and none exists. And the OLC Opinion acknowledged that the Supreme Court's decision in *Nixon v. Administrator of General Services*, 433 U.S. 425 (1977)—a challenge to the constitutionality of the PRA's precursor statute, the Presidential Recordings and Materials Preservation Act ("Preservation Act"), brought by President Nixon—*affirmed* Congress's authority to require the collection, public ownership, and public availability of Presidential records, ruling that the exercise of that authority does not, as the OLC Opinion claims, violate the separation of powers. OLC Op. at 11–13.

To provide cover to the President and White House to immediately begin violating the clear mandates of the PRA and long-settled Supreme Court precedent, the OLC Opinion simply asserted that *Nixon* was decided incorrectly and, if challenged by the Trump Administration today—which it has not been—would be distinguishable because of what the OLC Opinion incorrectly claimed are salient factual distinctions between the circumstances surrounding *Nixon* and the relationship between Congress and the President at all other times. *Id.* at 41–49.

The OLC Opinion did not cite any authority to justify its conclusion that the President can lawfully refuse to comply with the PRA, or instruct others to do so, based solely on the legal opinions of the President, the White House Counsel, or the Department of Justice. The OLC

9

Opinion did not cite any such authority because none exists and the President is bound to comply with the law absent a judicial order.

Nevertheless, all Executive Branch employees have been ordered by President Trump to comply with the OLC Opinion. In Executive Order 14215, President Trump declared that "[t]he President and the Attorney General's opinions on questions of law are controlling on all [Executive Branch] employees in the conduct of their official duties" and that "[n]o employee of the executive branch acting in their official capacity may advance an interpretation of the law as the position of the United States that contravenes the President or the Attorney General's opinion on a matter of law." 90 Fed. Reg. 10447, 10447–49 (Feb. 24, 2025). Because the OLC Opinion constitutes the Attorney General's opinion on a question of law, it falls within the scope of Executive Order 14215 as the legal opinion of the Attorney General. *See Whether the CFPB May Continue to Draw Funds from the Federal Reserve System Under 12 U.S.C. § 5497 When the Federal Reserve System Is Operating at A Loss*, 49 Op. O.L.C. __, at *22 (Nov. 7, 2025), 2025 WL 3251685 ("[OLC] exercises the Attorney General's delegated authority to interpret the Constitution and laws for the Executive Branch."); *Campaign for Accountability v. Dep't of Just.*, 155 F.4th 724, 729 (D.C. Cir. 2025) ("Executive Branch officials consider final OLC opinions to be 'controlling legal advice.'") (quoting Memorandum from David J. Barron, Acting Assistant Attorney General, to Attorneys of the Office of Legal Counsel 1 (July 16, 2010)).

By declaring the PRA a nullity, the OLC Opinion purports to give the President sole legal ownership over all Presidential records of his administration for all time (including after leaving office), allow the President and White House Staff to not create records memorializing official actions and policy decisions, allow the President to destroy any and all Presidential records or

10

instruct others to do so, and deprive the public and Congress of their statutory rights to access all Presidential records created since the PRA took effect in 1981.

###### B.    The EOP Defendants formally repudiate the PRA.

On April 2, 2026, the White House formally broke ranks with every Presidential administration since 1981 and abandoned the PRA as a matter of policy. The preamble to the April 2 EOP Policy, issued by the Counsel to the President, nominally relies on the OLC Opinion and purports "to provide guidance on how the EOP will preserve records in light of OLC's determination" that "the PRA is unconstitutional for two reasons: it exceeds Congress's enumerated and implied powers, and it aggrandizes Congress as the expense of the constitutional independence and autonomy of the President." CREW Decl. Ex. A at 1. From there, it establishes a policy that fails to comply with any of the PRA's mandates.

The April 2 EOP Policy itself does not require compliance with the PRA and expressly defies it in several respects. CREW Decl. Ex. A at 1–2. In contrast to the PRA's various mandatory obligations to create and preserve Presidential records, the EOP Policy does not explicitly obligate EOP staff to create or preserve any record of their conduct in the course of their official duties; instead, it merely provides gentle admonishments regarding what EOP staff "should" do instead of what they "shall," "must," or "need" to do with respect to records creation and preservation.

For example, the April 2 EOP Policy's section on "Records Generally" states that "EOP staff *should* preserve any material related to the performance of their duties" because "[r]ecords may be relevant to ongoing or future litigation, and thus may be subject to other legal preservation requirements." *Id.* (emphasis added). This provision both fails to make retention mandatory and encourages EOP staff to make their own, unguided determinations about what must be preserved based on the likelihood that the record might be relevant to ongoing or future litigation, in violation of the PRA's general mandates that Presidential records be preserved because of their relation to

11

the President's official activities and forbids their disposal by anyone but the President himself following a statutorily-required process. Similarly, the EOP's Policy on "Paper Records" states that "EOP staff *should* preserve paper records necessary to the performance of their duties." *Id.* (emphasis added).

But these failings are a mere prelude to the April 2 EOP Policy's utter failure to account for—and outward hostility to—the EOP Defendants' obligations to preserve text messages and other electronic communications on messaging applications and social media. As described above, the PRA prohibits the President and White House staff from using "non-official electronic message account[s]" to "create or send" Presidential records unless they follow specific measures to ensure those Presidential records are promptly saved in "an official electronic messaging account." 44 U.S.C. § 2209(a)(1)–(2). As noted, Congress enacted these requirements to ensure that *all* electronic records that meet the statutory definition of Presidential records—including but not limited to text messages—are saved in an "official electronic messaging account." *Id.*; *see* S. Rep. 113-218, 113th Cong., 2d Sess., at 6 (2014). The April 2 EOP Policy defies these and other provisions of the PRA designed "to assure that the activities, deliberations, decisions, and policies that reflect the performance of the President's constitutional, statutory, or other official or ceremonial duties are adequately documented and that such records are preserved and maintained as Presidential records." 44 U.S.C. § 2203(a).

The deficiencies in the April 2 EOP Policy's "Text Messaging" provision begins from the false premise that the PRA requires "EOP staff to transcribe phone calls, meetings, [and] informal discussion." CREW Decl. Ex A at 2. Because doing so would "immensely time consuming and costly," according to the EOP Policy, "as text messaging becomes more akin to speaking every day, preserving all text messages would create an enormous technological burden while chilling

the ability of presidential advisors to provide candid advice." *Id.*at 2. But, as NARA's former longtime litigation director Jason Baron attests, this proposition is a straw man: nothing in the PRA requires transcribing *every* phone call, meeting, or informal discussion or preservation of *all* text messages. Rather, the statute only requires the creation and preservation of documents that meet the statutory definition of a Presidential record, and decades of federal records management practice demonstrate that automated text message archiving is readily achievable and hardly an "enormous technological burden." *See* Decl. Of J. Baron Declaration ¶ 19 ("Baron Decl.").

The April 2 EOP Policy nevertheless invokes its fanciful reading of the PRA as an excuse to flout the PRA's actual requirements. The text messaging provision does not explicitly require EOP staff to preserve *any* text messages and merely states that "[t]ext messages *should only* be preserved when they are the sole record of official decision-making, government action, or contain unique information not available elsewhere," and frees EOP personnel from any obligation to retain text messages regarding "ministerial tasks or other workplace minutiae." CREW Decl. Ex. A at 2 (emphasis added).

This provision provides no instructions for how EOP personnel should determine whether text messages reflect "the sole record of official decision-making, government action, or contain unique information not available elsewhere," nor does this standard appear anywhere in the PRA. *Id.* It also expressly permits EOP staff, even if it is a "sole record" or contains "unique information not available elsewhere" to destroy text messages constituting records of undefined "ministerial tasks." *Id.* at 3. In doing so it relegates such undefined "ministerial tasks," to the same level of importance as "personal conversations," "workplace gossip," and "other workplace minutiae," regardless of whether that task, as the plain meaning of "ministerial" would suggest, is an official

13

act or duty required by law.[4] The April 2 EOP Policy thus gives EOP personnel unchecked discretion not to preserve text messages with Presidential record material if they individually determine it is not "the sole record of official decision-making," does not "contain unique information not available elsewhere[,]" or is otherwise "ministerial," regardless of whether they are Presidential records under the PRA. *Id.* at 2-3. As NARA's former litigation director explains, the EOP Policy's adoption of these "non-statutory preservation criteria creates a serious risk that presidential records material will be irretrievably lost or destroyed in violation of the PRA." *See* Declaration of Jason R. Barron ("Barron Decl.") ¶ 24. Indeed, the EOP Policy provides an illustrative hypothetical to guide how EOP personnel should preserve text messages, but the guidance it provides is flatly inconsistent with the PRA's requirements. *See* Barron Decl. ¶¶ 24–26.

The April 2 EOP Policy also explicitly and implicitly instructs that EOP staff delete text messages containing potential Presidential record material. In contrast to the remainder of the EOP Policy, which states that EOP staff "should" preserve various records, the text messaging provision states that "[t]ext messages *should only* be preserved" if the "sole record" or "unique information" standards above are met, indicating that EOP staff should begin from the default position that they should delete text messages conducting official business. CREW Decl. Ex. A at 2. A later "Duty to Preserve" section of the EOP Policy warns that "[s]taff *should* avoid using personal devices for government business whenever possible," not because of any obligation under the PRA or because

---

[4] *See, e.g.*, *Ministerial*, Black's Law Dictionary (12th ed. 2024) ("Of, relating to, or involving an act that involves obedience to instructions or laws instead of discretion, judgment, or skill; of, relating to, or involving a duty that is so plain in point of law and so clear in matter of fact that no element of discretion is left to the precise mode of its performance"); *Ministerial*, Merriam-Webster Dictionary, https://perma.cc/83QS-KL9G (last visited Apr. 27, 2026) ("being or having the characteristics of an act or duty prescribed by law as part of the duties of an administrative office").

doing so would potentially cause the loss of Presidential records, but because doing so "has the potential to require the examination of personal devices in litigation or in response to congressional oversight requests." *Id.* at 3 (emphasis added).

In fact, while the April 2 EOP Policy forbids EOP staff from "permanently delet[ing] emails or materials saved to an EOP laptop or the EOP network" (the only prohibition in the entire Policy against permanent destruction or deletion), it contains no such prohibition for text messages. *Id.* at 2. This distinction is not semantic, as the prohibition appears in the "Electronic Records" section of the EOP Policy, which by its express terms applies only to "emails and any electronic records saved." *Id*. That section appears separately, as do sections for "Paper Records" and "Personal Records," from the EOP Policy's section on "Text Messaging." *Id.*

Moreover, even if an EOP staff member determines that they should preserve a text message, the April 2 EOP Policy states only that such messages they "should either be stored on an EOP system as soon as possible or memorialized in an email or memorandum." *Id.* at 4. This also conflicts with the PRA, which requires that when EOP personnel create or send Presidential records "using a non-official electronic message account," they must either "cop[y] an official electronic messaging account . . . in the original creation or transmission of the" record, or "forward[] a complete copy of the" record "to an official electronic messaging account . . . not later than 20 days after [its] original creation or transmission." 44 U.S.C. § 2209(a)(1)–(2).

The April 2 EOP Policy's text message provision also wholly ignores every other medium for sending private messages, even though they are all covered by the PRA. The PRA's electronic messaging restrictions do not apply only to text messages, or to any specific medium capable of transmitting private messages, but to all "electronic messages" and "electronic messaging accounts." *Id.* § 2209(c)(2) ("The term 'electronic messages' means electronic mail and other

15

electronic messaging systems that are used for purposes of communicating between individuals."); *id.* § 2209(c)(3) ("The term 'electronic messaging account' means any account that sends electronic messages."). Yet, the April 2 EOP Policy does not define text messages in any way, leaving it to individual EOP staffers to determine whether direct messages between people on private messaging applications such as WhatsApp, Telegram, SnapChat, and Signal—on which multiple high-ranking EOP officials have been caught discussing war plans—constitute "text messages" under the EOP Policy, even though all of them fall within the scope of the PRA. The EOP Policy also does not discourage, let alone ban, conducting official White House business on ephemeral messaging applications with auto-delete functions that could, intentionally or accidentally, result in the loss of Presidential records. Nor does it even purport to cover non-text message communications (including direct messages) on social media such as Facebook, X, Bluesky, and Truth Social.

Previous Presidential administrations have recognized that the PRA forbids artificially narrow interpretations of what constitutes an "electronic message" or an "electronic messaging account" under the PRA and the dangers associated with using them. For example, the PRA guidance issued to all staff by the Office of White House Counsel during President Trump's first term, stated:

> You must preserve electronic communications that are presidential records. **You are required to conduct all work-related communications on your official EOP email account**, except in emergency circumstances when you cannot access the EOP system and must accomplish time sensitive work. Emails and attachments sent to and from your EOP account are automatically saved.
>
> *If you ever send or receive email that qualifies as a presidential record using any other account, you **must** preserve that email by copying it to your official EOP email account or by forwarding it to your official email account within twenty (20) days.* After preserving the email, you must delete it from the non-EOP account. ***Any employee who intentionally fails to take these actions may be subject to administrative or even criminal penalties.***

> The same rules apply to other forms of electronic communication, including text messages. ***You should not use instant messaging systems, social networks, or other internet-based means of electronic communication to conduct official business without the approval of the Office of the White House Counsel.*** If you ever generate or receive presidential records on such platforms, you must preserve them by sending them to your EOP email account via a screenshot or other means. After preserving the communications, you must delete them from the non-EOP platform.

*See* 2017 PRA Policy at 2-3.

The April 2 EOP Policy omits all of this prior guidance. Not only does the EOP Policy repeatedly assert that the PRA is unconstitutional, but it also premises EOP's need to retain records on the fact that "[r]ecords may be relevant to ongoing or future litigation, and thus may be subject to other legal preservation requirements." CREW Decl. Ex. A at 2. Even this assertion should be viewed skeptically given the other shortcomings of the EOP Policy described above, but it makes one thing clear: absent judicial intervention, the White House will only retain Presidential records, including electronic messages, as a matter of grace, subject to its own whims.

Yet another aspect of the April 2 EOP Policy that creates a major risk that invaluable government records will be unlawfully lost or destroyed is that it was issued to the *entire* EOP, including EOP personnel who create and receive records governed by the *FRA*, not the PRA. *See* CREW Decl. Ex. A ("The purpose of this memorandum is to provide guidance on how *the EOP* will preserve records in light of OLC's determination." (emphasis added)). That includes staff at the Office of Management and Budget ("OMB"), the Office of the U.S. Trade Representative, the Office of National Drug Control Policy, the Office of Science and Technology, each of which are EOP components subject to the FRA (not the PRA) and FOIA. Barron Decl. ¶¶ 26. By indiscriminately issuing the April 2 EOP Policy to *all* EOP staff, the White House has created a

major risk that those staff will construe the Policy to supersede their obligations under the FRA—a statute that not even this Administration claims is unconstitutional. *See id.* ¶¶ 26–27.

As a whole, the April 2 EOP Policy contradicts the basic tenets of the PRA's mandates on preserving electronic messages: It gives EOP staff free rein to decide what text messages they should and should not retain, sets artificially narrow and easily manipulated guidelines that expressly permits and indeed encourages EOP staff to delete large swathes of Presidential records that are created or transmitted by text message, wholly fails to account for electronic messages other than undefined "text messages," and does all of that while acknowledging that text messages are the communication lifeblood of the White House during the current administration. *See* CREW Decl. Ex. A at 2 (stating that "text messaging [is] becom[ing] more akin to speaking every day").

By failing to require prompt and complete preservation of *all* electronic messages meeting the statutory definition of Presidential record, and instead creating the White House's own, non-statutory criteria for text message preservation, the April 2 EOP Policy flouts the PRA and will continue to result in the irreparable loss or destruction of Presidential record material generated through electronic messages. *See* Barron Decl. ¶¶ 24–26.

It would be unserious for the EOP Defendants to assert that the April 2 EOP Policy preamble's statement that "[c]omponents are free to retain the records retention policies developed under the PRA" provides sufficient assurances that EOP components will in fact do that despite the EOP Policy and April 1 OLC Opinion. CREW Decl. Ex. A at 1. As noted, the OLC Opinion adopted by the White House broadly asserts that *every* facet of the PRA is an intrusion into the President's authority and returns the White House to a legal status quo where Presidential Records are the property of President Trump himself. In that context, it is simply not credible to expect any component within the EOP to ignore the supposed unconstitutionality of the PRA and comply with

18

its mandates. And even if the April 2 EOP Policy could, in theory, be overridden by individual EOP components' PRA policies by virtue of the EOP Policy's reference to them, each EOP component is still bound to abide by the OLC Opinion, as it constitutes the opinion of the Attorney General and all executive branch officials are bound to follow it. Compl. ¶¶ 62-63.

## ARGUMENT

To obtain a preliminary injunction, a movant must show "[1] that he is likely to succeed on the merits, [2] that he is likely to suffer irreparable harm in the absence of preliminary relief, [3] that the balance of equities tips in his favor, and [4] that an injunction is in the public interest." *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 20 (2008). Here, each prong weighs heavily in favor of granting Plaintiffs preliminary relief.

### III.    Plaintiffs are likely to succeed on the merits with respect to their claims against the EOP Defendants.

Plaintiffs are likely to succeed on their equitable, *ultra vires*, and separation-of-powers claims against the EOP Defendants, especially with respect to the illegality of the EOP Policy's text messaging provisions and its failure to require compliance with the PRA's preservation requirements for electronic messages. *See* Compl. ¶¶ 120–132; 142–146; 147–142 (Counts I, III, and IV).

#### A.  Plaintiffs have standing.

For the same reasons set forth below on irreparable harm, *see infra* Argument § II, Plaintiffs have satisfied the lesser showing of Article III standing. Plaintiffs have shown that the EOP Policy will directly impair their rights to access Presidential and federal records that they have requested and intend to request in the future through FOIA, and that they routinely utilize to fulfill their mission-critical functions. *See infra* Argument § II (citing cases and Plaintiffs' declarations); *see also CREW v. DOJ*, 846 F.3d 1235, 1242 (D.C. Cir. 2017) (repeat FOIA requester has standing to

challenge a "'policy or practice' where it 'will impair the party's lawful access to information in the future.'" (quoting *Newport Aeronautical Sales v. Air Force*, 684 F.3d 160, 164 (D.C. Cir. 2012)).

###### B.    The EOP Policy is reviewable by this Court.

This Court is not writing on a blank slate when it comes to reviewing a White House's recordkeeping guidelines and directives. The D.C. Circuit has long held that "courts are accorded the power to review" a White House's "guidelines" outlining EOP personnel's recordkeeping obligations, because the President lacks "the power to assert sweeping authority over whatever materials he chooses to designate as presidential records without any possibility of judicial review." *Armstrong II*, 1 F.3d at 1290; *see also CREW*, 924 F.3d at 607-09 (reviewing White House's 2017 PRA Policy and determining it was a "facially PRA-compliant" policy that did "just what the PRA requires").

In *Armstrong II*, the Circuit held that the PRA permitted judicial review of EOP policies delineating which documents were Presidential records under the PRA and which were federal records covered by the FRA and thus subject to FOIA's guarantees of access to federal agency records. *Armstrong II,* 1 F.3d at 1290. The court stressed that the PRA does not permit judicial review of the President's "day-to-day [recordkeeping] operations," because "Congress was 'keenly aware of the separation of powers concerns . . . implicated by legislation regulating the conduct of the President's daily operations,' and thus sought 'to minimize outside interference with the day-to-day operations of the President and his closest advisors and to ensure executive branch control over presidential records during the President's term of office.'" *Id.* at 1292 (quoting *Armstrong v. Bush*, 924 F.2d 282, 290 (D.C. Cir. 1991) ("*Armstrong I*")). "At the same time, however," the court emphasized that "Congress sought to provide a clear limitation on just which materials the

President could legitimately assert control over and to preserve the pre-existing body of FOIA law governing the disclosure of government agency records." *Id.* Specifically:

> Congress preserved the critical role of judicial review under the FOIA, and avoided a conflict between the PRA and the FOIA, by explicitly exempting records subject to the FOIA from the scope of the PRA and allowing judicial review of guidelines defining presidential records under the rubric of substantive FOIA law. This narrow, clearly defined limitation on the scope of the PRA *is absolutely essential* to preventing the PRA from becoming a potential presidential *carte blanche* to shield materials from thereach of the FOIA.

*Id.* at 1292 (emphasis added).

*Armstrong II* further explained that "[r]eading the PRA to forbid judicial review *of such a guideline* [for determining what was a Presidential record] for conformity with the PRA . . . would be tantamount to allowing the PRA to functionally render the FOIA a nullity." *Id.* at 1293. Thus, while "the courts may not review any decisions regarding *whether to create* a documentary presidential record," or "the day-to-day process by which presidential records are maintained," or "disposal decisions" under the process described by the PRA, "guidelines describing which *existing* materials will be treated as presidential records in the first place are subject to judicial review." *Id.* at 1294 (citations omitted). This doctrinal framework—like the PRA itself—carefully protects the President's independence while also preserving the American people's rights of access to Presidential and federal records

This case falls squarely within the bounds of judicial review established by the D.C. Circuit's "key PRA precedents." *CREW*, 924 F.3d at 608. The EOP Policy invokes the OLC Opinion to declare that the PRA and its FOIA provisions a "nullity" and that the President has "*carte blanche* to shield" Presidential records that would become subject to FOIA under the PRA "from the reach of the FOIA." *Armstrong II,* 1 F.3d at 1292–93; *see* 44 U.S.C. § 2204(c). And outside of the context of the intersection of the PRA and FOIA, the EOP Policy invokes the OLC

21

Opinion to declare that the PRA is unconstitutional in its entirety and wholly invalid—that is, it broadly declares that *nothing* is a Presidential record under the PRA. CREW Decl. Ex. A at 1. What constituted a Presidential record under the PRA was precisely the question that *Armstrong II* declared subject to judicial review; the only distinction is that the question there was whether categories of records were subject to the PRA or FOIA, and here the question is whether the records are subject to PRA or the unrestrained whims of the President.[5] Under *Armstrong II* and its progeny, the Court may review the EOP Policy to assess its facial compliance with the PRA.

**C.    Plaintiffs are likely to prevail on their equitable, *ultra vires*, and separation-of-powers claims challenging EOP's Policy of non-compliance with the PRA.**

**Equitable cause of action (Count I).** The Supreme Court has "long held that federal courts" have inherent equitable power to "grant injunctive relief against" federal officials "who are violating, or planning to violate, federal law." *Armstrong v. Exceptional Child Ctr., Inc.*, 575 U.S. 320, 326 (2015); *see also Am. Sch. of Magnetic Healing v. McAnnulty*, 187 U.S. 94, 108 (1902) ("The acts of all [the federal government's] officers must be justified by some law, and in case an official violates the law to the injury of an individual the courts generally have jurisdiction to grant relief."). As the D.C. Circuit reaffirmed mere days ago, the district courts' "federal-question jurisdiction extends," and aggrieved parties have an equitable "right of action" to challenge, unlawful Executive Branch conduct. *Sidak v. ITC*, -- F.4th --, 2026 WL 1110981, at *3 (D.C. Cir. Apr. 24, 2026) (citing cases). Because the "full scope" of the federal courts' "equitable

---

[5] This Court should not construe any portion of the April 2 EOP Policy as an attempt to categorize electronic messages or other records described by it as Presidential records under the PRA, because the EOP Policy is premised on the assertion that no such thing exists. Even if one were to do so, however, *Armstrong II* still provides for judicial review here, because the EOP Policy (if construed to require preservation of only Presidential records) purports to describe what electronic records and text messages are and are not Presidential records, as did the guidelines reviewed in *Armstrong II*, 1 F.3d at 1292-94.

22

jurisdiction is not to be denied or limited in the absence of a clear and valid legislative command," *Porter v. Warner Holding Co.*, 328 U.S. 395, 398 (1946), even in the absence of a statutory cause of action, only the "clearest [statutory] command" can deprive a federal court of its "inherent equitable power to enjoin the Government" from violating the law, *Mathis v. U.S. Parole Comm'n*, 749 F. Supp. 3d 8, 22–23 (D.D.C. 2024) (quoting *McQuiggin v. Perkins*, 569 U.S. 383, 397 (2013)).

Here, the EOP Defendants are not merely "violating, or planning to violate" the PRA, *Armstrong*, 575 U.S. at 326—they are "simply defying a law enacted by Congress . . . without any legal basis." *CREW* 924 F.3d at 606 (quoting *In re Aiken County*, 725 F.3d 255, 266 (D.C. Cir. 2013) (granting mandamus)). *See supra* Background § II. As discussed above, the text messaging provision of the EOP Policy that they have adopted and are bound to follow rejects the PRA's basic tenets: it is voluntary rather than mandatory as the PRA requires; it explicitly directs EOP staff not to retain certain Presidential records and permits them not to retain other Presidential records based on their personal view of the need to retain them; it allows EOP staff, in place of putting complete versions of text-messaged Presidential records on government systems as required by the PRA, to simply memorialize details of Presidential records in memoranda or emails; it contains no enforcement or disciplinary regime while the PRA does so; it does not even purport to suggest the retention of *any* electronic message from any electronic messaging account that is not an email or a text message, leaving EOP staff free to delete electronic messages in other forms; and, in the absence of the PRA's legal obligations, it can be ignored by EOP staff or withdrawn by EOP at any time. *See supra* Background § II.B. The EOP Defendants' intentional violations of the PRA's preservation requirements for electronic messages—specifically under 44 U.S.C. § 2203(a) and § 2209—are clear, indefensible, and precisely the type of machinations that

the Court's equitable authority is meant to prevent.

*Ultra vires* (**Count III**). Plaintiffs are also likely to prevail on their equitable claim for declaratory and injunctive relief barring the EOP Defendants' *ultra vires* attempt to override 44 U.S.C. § 2203(a) and § 2209, which clearly "exceed[s] [their] statutory authority" under the PRA. *See Nat'l Ass'n of Postal Supervisors v. U.S. Postal Serv.*, 26 F.4th 960, 966 (D.C. Cir. 2022). Federal courts can enjoin as *ultra vires* any action by federal officials and agencies that contravene a "clear and specific statutory mandate," *id.* at 971, in a manner that is "blatantly lawless," *Fed. Express Corp. v. U.S. Dep't of Com.*, 39 F.4th 756, 764 (D.C. Cir. 2022). This is precisely such a case.

Section 2209, in particular, establishes a clear (and simple) statutory mandate for the EOP Defendants: Do not use non-official electronic messaging accounts to create or send Presidential records unless you simultaneously copy, or within 20 days move the complete Presidential record onto, an official system. 44 U.S.C. § 2209. Rather than doing so, the EOP Defendants have unilaterally and openly supplanted the PRA by adopting a policy of intentional noncompliance with that statutory obligation. *See supra* Background § II.B.[6] The EOP Defendants are thus

---

[6] The Court should not countenance any argument that § 2209's mandate is not clear or specific because it requires those who use unofficial electronic messaging accounts to determine if electronic messages are or contain Presidential records. First, there is no legal support for the argument that a statute's inclusion of a defined term defined by statute, which provides *more* information on the meaning of that statute, precludes it from being "clear and specific" for purposes of *ultra vires* claims. *Fed. Express Corp.*, 39 F.4th at 764. Second, § 2209(b) does not require perfection from those subject to the electronic messaging provisions in identifying Presidential records among their electronic communications on non-official systems, as it only subjects those who commit "intentional" violations to discipline. And finally, § 2209 only applies if an EOP employee *chooses to* conduct business on a non-official electronic messaging account, which even the EOP Policy suggests they should not do. *See* 44 U.S.C. § 2209(a); CREW Decl. Ex. A at 2. The White House Defendants cannot avoid scrutiny of their *ultra vires* actions by invoking their employees' voluntary decisions to opt into § 2209 by conducting official business

explicitly stepping into the shoes of Congress in an attempt to remove limitations on their statutory authority under PRA. What is more, by failing to adequately create and preserve Presidential records now, the EOP Defendants are also exerting their authority, without any statutory mandate, on the operation of FOIA once the records from the current Trump administration become available from the National Archives.

Worse, the EOP Defendants are doing so based on the OLC Opinion's conclusion, manufactured by the EOP itself, that because the PRA is supposedly unconstitutional in its entirety the President (and thus EOP) can simply ignore it. *See supra* Background § II.A. But as explained *infra* Argument § III.D, EOP Defendants constitutional argument fails and provides no justification for defying the PRA's dictates.

**Separation of powers (Count IV).** Plaintiffs are also likely to prevail on their separation-of-powers claim because the Executive Branch here is not merely *exceeding* its statutory authority; it is openly defying a duly enacted federal statute, there is a "conceded absence of any statutory authority" for the Executive Branch's actions, and the "only basis of authority asserted" for the Executive Branch to disregard the statute is a (meritless) constitutional defense. *Dalton v. Specter*, 511 U.S. 462, 473 (1994) (citing *Youngstown Sheet & Tube Co. v. Sawyer*, 343 U.S. 579, 587 (1952)); *see also Free Enter. Fund v. Pub. Co. Acct. Oversight Bd.*, 561 U.S. 477, 491 n.2 (2010) (recognizing equitable cause of action for a "separation-of-powers claim"); *Sidak*, 2026 WL 1110981, at *3 n.3 (distinguishing between "statutory" and "constitutional claim[s]"). There is no reasonable dispute that the EOP Defendants are, as described above, acting in direct defiance of the PRA's requirements for preserving text message and similar electronic communications. *See*

---

on private accounts and then claiming that the provisions they brought upon themselves are unclear.

25

*supra* Argument § II.B. Nor can there be any dispute that EOP Policy lacks *any* statutory basis. Instead, it hinges on the OLC Opinion's conclusion, pre-ordained by the EOP Defendants, that the

PRA is unconstitutional. *See supra* § Argument II.B; CREW Decl. Ex. A at 1. But, as discussed below, the OLC Opinion is wrong and the PRA is constitutional.

### D.   The PRA is constitutional.

The EOP Policy hinges on OLC's erroneous conclusion that the PRA is unconstitutional. But both the White House and OLC are wrong: Under settled precedents, the PRA is a valid—and critical—exercise of Congress's express and implied constitutional powers.

### 1.   Congress had the authority to enact the PRA.

Defendants' portrayal of the PRA as an unconstitutional abuse of Congressional authority mischaracterizes Congress's enumerated and inherent powers. For starters, Defendants disregard Congress's authority under the Constitution's Property Clause, which states: "The Congress shall have Power to dispose of and make all needful Rules and Regulations respecting the Territory or other Property belonging to the United States." U.S. Const. art. IV, § 3, cl. 2. The Supreme Court has long recognized that the Property Clause gives Congress such "complete power" over federal property that it is "analogous to the police power of the several states." *Kleppe v. New Mexico*, 426 U.S. 529, 40 (1976) (citing *Camfield v. United States*, 167 U.S. 518, 525 (1897). In exercising that authority, the handling and disposition of both the personal and real property of the United States "lies in the discretion of the Congress, acting in the public interest." *Ashwander v. Tennessee Valley Auth.*, 297 U.S. 288, 331, 336 (1936).

The PRA was a proper exercise of Congress's authority under the Property Clause to establish the government's ownership of records created or received by the President, Vice President, and those who advise and assist them in the course of carrying out their official duties,

*see* 44 U.S.C. §§ 2201(2), 2202, 2209, and to provide for their disposition in the public interest, *Ashwander*, 297 U.S. at 336, by, among other things, requiring their preservation during Presidential administrations, 44 U.S.C. § 2203(a), providing guidelines to ensure orderly handling and transparent disposal of them by the President when appropriate, *id.* §§ 2203(b)–(f), and their maintenance and public accessibility by NARA in perpetuity, *id.* §§ 2203(g), 2204, 2205, 2206, 2208. Defendants simply ignore the Property Clause, which "provides a specific and independent constitutional basis for" for its enactment of the PRA. *Don't Tear It Down, Inc. v. Pennsylvania Ave. Dev. Corp.*, 642 F.2d 527, 535 n.73 (D.C. Cir. 1980). Further, as discussed below, Congress's authority to make Presidential records the property of the United States within the context of the separation of powers was at issue, and taken as a given provided they did not violate the Takings Clause, when Congress first exercised its authority to do so. *See infra* at § 3.D.2.

The Necessary and Proper Clause further authorized Congress to enact the PRA. The Necessary and Proper Clause empowers Congress "[t]o make all Laws which shall be necessary and proper for carrying into Execution the foregoing [enumerated] Powers [of Congress], and all other Powers vested by this Constitution in the Government of the United States, or in any Department or Officer thereof." U.S. Const. art I., § 8, cl. 18. The OLC Opinion acknowledges the legitimacy of Congress's exercise of its power under the Necessary and Proper Clause to regulate the conduct of other branches of government but insists, without citing any authority, that Congress cannot regulate the conduct of the Executive Branch under the Necessary and Proper clause unless doing so only "facilitates [rather than burdens] the exercise of executive power." OLC Op. at 40-41. But, even assuming that the PRA burdens executive power—and no court has held that it has—the Supreme Court has already rejected the argument that Congress cannot constrain or regulate the Executive Branch. *See Mistretta v. United States*, 488 U.S. 361, 381 (1989).

27

The OLC Opinion similarly asserts, again without citing legal authority, that despite the Necessary and Proper Clause's grant of authority to Congress "[t]o make all Laws which shall be necessary and proper for carrying into Execution . . .  all other [non-enumerated] Powers vested by this Constitution in the Government of the United States, or in any Department or Officer thereof," U.S. Const. art I., § 8, cl. 18, Congress can only deploy the Necessary and Proper Clause to regulate the officials and entities it creates. OLC Op. at 30–32. Aside from being unsupported by legal precedent and contrary to historical practice, that assertion would render the Necessary and Proper Clause's referral to "all other Powers vested by this Constitution in the Government of the United States, or in any Department or Officer thereof" a nullity, as it would only permit Congress to regulate federal entities and officers created under Congress's enumerated powers. Further, the assertion that the PRA is outside of Congress's authority under Necessary and Proper Clause because of its impact on the functions of the Presidency is both circular and inconsistent with binding precedent. *See infra* at 3.D.2.

Finally, the PRA is a proper exercise of Congress's "formal authority" to conduct "activities in aid of the legislative process such as investigation and oversight." OLC Op. at 17 (citations omitted); *see McGrain v. Daugherty*, 273 U.S. 135, 174–175 (1927) (describing Congress's oversight authority and power to subpoena Executive Branch documents). Indeed, the PRA creates a special right of access to Presidential records for Congress and committees acting within their jurisdiction, so long as such Presidential records are "needed for the conduct of its business and [are] not otherwise available" 44 U.S.C. § 2205(2)(c). The OLC Opinion nevertheless attempts to artificially limit Congress's express constitutional authority to legislate "in aid of the legislative process such as investigation and oversight" by equating duly-enacted legislation like PRA with congressional subpoenas, and insisting that the constitutional validity of both must be

28

evaluated under the rubric for subpoenas established in *Trump v. Mazars USA, LLP*, 591 U.S. 848 (2020). OLC Op. at 17–18. But *Mazars* was premised on the Court's view that congressional subpoenas are mere "adjunct[s]" to Congress's legislative authority, and as such were subject to the separation of powers analysis propounded by the Court. *Id.* at 862. That analysis, and *Mazars* itself, does nothing to limit Congress's authority to legislate in aid of its enumerated powers.

### 2. Binding precedent forecloses the White House's position that the PRA is unconstitutional.

The same arguments on which the OLC Opinion relies to claim that the PRA is facially unconstitutional were rejected by the Supreme Court in *Nixon v. Administrator of General Services*, 433 U.S. 425 (1977), which remains good law today. That case was brought by President Nixon to challenge the PRA's precursor statute, the Preservation Act, which mandated the recovery and preservation records of President Nixon's administration that reflected his official conduct, made those records the property of the government, and provided Congressional and eventual public access to them. Pub. L. 93-526, 88 Stat. 1695 (1974) (codified at 44 U.S.C. § 2107 note).

In ruling that the Preservation Act was constitutional, the Supreme Court in *Nixon* came to precisely the opposite conclusions that OLC did in asserting that the PRA was unconstitutional because it "exceeds Congress's enumerated and implied powers" and impermissibly impedes "the constitutional independence and autonomy of the Executive." OLC Op. at 1. With regard to Congressional authority, the Court held that "congressional power to regulate Executive Branch documents exists" and is strengthened with respect to Presidential records because of the "important interest[]" in assuring access to Presidential records in the future. *Nixon*, 433 U.S. at 445–46. Those records, as explained by the Court, served the public interest not only by guaranteeing a historical record of the government's activities, but also ensuring continuity and

29

the effective administration of the government by providing information to future Presidents. *Id.* at 453–54.

The *Nixon* Court also comprehensively rejected the OLC Opinion's argument that Congressional enactments like the Preservation Act and PRA impermissibly impede "the constitutional independence and autonomy of the Executive." OLC Op. at 1. The Court instead recognized that collection, preservation, public ownership, and future public access to Presidential records do not "unduly disrupt[]" the operations of the Executive Branch, *Nixon*, 433 U.S. at 445, and that, given the President's ability to challenge the disclosure of specific Presidential records, constituted only "minimal" intrusion on the Presidency, *id.* at 454, that did not render such acts of Congress unconstitutional.

The OLC Opinion's arguments that *Nixon* is not controlling, adopted by the EOP Defendants, have no merit. As an initial matter, *Nixon* took no issue with the Preservation Act's establishment of Presidential records as the property of the United States as a matter of the separation of powers. *See* 433 U.S. at 445 n.8. It instead took as a given that such government ownership was acceptable so long as President Nixon, who owned his records until then, was compensated, a takings issue that does not arise in the PRA because no President since its enactment has owned their Presidential records. *Id.*

Further, in the EOP Defendants' telling, *Nixon* only permits Congress to regulate the recordkeeping of each President's Presidential records after their administration ends, rather than during it, because any such regulation necessarily inhibits the functions of the President. *See* OLC Op. at 42. But this position ignores that the Court in *Nixon* noted that the Preservation Act, like the PRA, leaves Presidential privileges wholly intact and limits access to them through moderating systems that protect the interests of the Presidency, thereby shielding those Presidential records

30

that sufficiently close to the President's execution of his constitutional duties to warrant greater confidentiality. *See* 433 U.S. at 443–46, 450–52; 44 U.S.C. §§ 2203–2206, 2208.

The EOP Defendants' position also does not account for the fact that, that while Congress did not determine to exercise its authority in this sphere until after the abuses of the Watergate era, the constitutional separation of powers between them did not change. Thus, while the events of Watergate were the impetus the Preservation Act (and the PRA), *Nixon*, 433 U.S. at 430-33, any suggestion that *Nixon*'s determinations about the authority of Congress must be cabined by the peculiarities of the Watergate era fail. Similarly, if Congress has the authority (as *Nixon* determined it always had) to assert the federal government's right to ownership, preservation, and limited dissemination of Presidential records after the President leaves office, all Presidents operate under the possibility that Congress will exercise that authority, regardless of whether the PRA is in place.

In sum, the EOP Defendants' extreme position that the PRA is facially unconstitutional is wrong, as it ignores Congress's express and implied constitutional powers and binding Supreme Court precedent. That meritless constitutional defense provides no excuse for the EOP Defendants' unlawful refusal to comply with the PRA's preservation requirements, nor does it decrease Plaintiffs' high likelihood of success on the merits.

## IV.    Plaintiffs will suffer irreparable injury absent a preliminary injunction.

Plaintiffs will suffer irreparable injury absent preliminary relief blocking EOP's unlawful policy of noncompliance with the PRA. The EOP Defendants' actions have made it highly likely that Presidential and federal records—including text messages and similar electronic communications—are already being deleted or are at imminent risk of being deleted without the possibility of recovery. The EOP Policy's facial insufficiency when it comes to the preservation

31

of these types of electronic messages all but guarantees that important records will be lost, inflicting irreparable harm on Plaintiffs. *See League of Women Voters of U.S. v. Newby*, 838 F.3d 1, 8–9 (D.C. Cir. 2016) ("As a preliminary injunction requires only a likelihood of irreparable injury, Damocles's sword does not have to actually fall on all appellants before the court will issue an injunction." (citing *Winter*, 555 U.S. at 22)).

It is well established that an irretrievable loss of government records—and particularly the historically important records covered by the PRA—qualifies as irreparable harm. *See, e.g.*, *Armstrong v. Bush*, 807 F. Supp. 816, 820–23 (D.D.C. 1992) (granting TRO in case alleging violations of FOIA, FRA, and PRA to prevent the "immediate and irreparable harm" of records being erased); *Am. First Legal Found. v. Becerra*, No. CV 24-1092 (RC), 2024 WL 3741402, at *14–16 (D.D.C. Aug. 9, 2024) ("the loss or destruction of federal records . . . is a harm that cannot be cured once the records are lost or destroyed"); *Am. Oversight v. Hegseth*, 788 F. Supp. 3d 14, 29–30 (D.D.C. 2025) (granting preliminary injunction to prevent records from being "permanently lost"); *Am. Friends Serv. Comm. v. Webster*, 720 F.2d 29, 35 (D.C. Cir. 1983) (noting district court "issued a preliminary injunction halting destruction of FBI records" pursuant to NARA-approved schedule pending resolution of suit challenging NARA's approval decision, and government "did not appeal" that ruling) (discussing *Am. Friends Serv. Comm. v. Webster*, 485 F. Supp. 222, 233–34 (D.D.C. 1980)). Not only that, but it is well established that such a loss of government records creates irreparable harm to Plaintiff CREW specifically. *See, e.g., CREW v. Off. of Admin.*, 565 F. Supp. 2d 23, 29 (D.D.C. 2008) (granting stay because "CREW convincingly argues it will suffer irreparable harm if the records . . . are not preserved"); *CREW v. Cheney*, 577 F. Supp. 2d 328, 338–40 (D.D.C. 2008) (granting preliminary injunction requiring defendants to preserve all documentary material created or received by the Vice President and his staff, in the course of

32

conducting official activities because if "Defendants' interpretation is not correct as a matter of law, there is no question that documents that may be entitled to PRA protection will not receive the statute's protections. Those unprotected documents could be transferred to other entities, destroyed, or not preserved, and if any of these events occur, the damage is inherently irreparable; once documentary material is gone, it cannot be retrieved."). That is because when records like "Signal messages are deleted, such messages are apparently 'lost to history forever.'" *Am. Oversight v. Hegseth*, 788 F. Supp. at 29 (quoting *Armstrong I*, 924 F.2d at 288). Likewise, when paper records are put in "burn bags" and incinerated, they are "fatally lost" and the bell cannot be unrung. *Am. Oversight v. U.S. Agency for Int'l Dev.*, No. 25-CV-719 (TSC), 2026 WL 592311, at *1, 5 (D.D.C. Mar. 3, 2026) (quotations omitted); *see also CREW v. Off. of Admin.*, 559 F. Supp. 2d 9, 25 (D.D.C. 2008), *aff'd*, 566 F.3d 219 (D.C. Cir. 2009) (noting that the EOP uses burn bags to dispose of paper records).

Plaintiffs routinely request Presidential and federal records and rely on them to perform their mission-critical functions and thus are concretely harmed by EOP's Policy of non-compliance with the PRA. *See Khine v. DHS*, 943 F.3d 959, 965 (D.C. Cir. 2019) ("[R]epeat requesters who 'will suffer continuing injury' have standing to bring" claims alleging that an "agency policy or practice will impair the party's lawful access to information in the future." (emphasis omitted) (quoting *Payne Enters., Inc. v. United States*, 837 F.2d 486, 491 (D.C. Cir. 1988), and citing *CREW v. DOJ*, 846 F.3d at 1242 . Plaintiffs will be irreparably injured by the loss of Presidential and federal records like text messages, which the EOP Policy acknowledges are being used pervasively to conduct official business, but that the Policy all but assures will not be fully and adequately preserved as required by law. *See supra* Background § II.B.

33

Plaintiff FPF's mission is to protect, defend, and facilitate the freedom of the press, including by ensuring the public's access to government records, including Presidential records. *See* Declaration of L. Harper ("FPF Decl.") ¶¶ 2–3. FPF requests and uses Presidential and federal records to test the veracity of the information that the government provides, to identify when and how government systems are misapplied or misused to conceal records or information, and to identify and understand the extent to which the government is engaged in conduct that is intended to chill freedom of the press. FPF Decl. ¶ 4. In addition to distributing the Presidential and federal records that it obtains to journalists, FPF publishes its own reports and trackers. FPF Decl. ¶ 5. FPF currently has 15 pending FOIA requests to NARA for Presidential records from President Trump's first term, and intends to submit additional FOIA requests for Presidential records. FPF Decl. ¶¶ 7–8. FPF also has pending FOIA requests to EOP components subject to the FRA, including OMB, and intends to submit additional requests to those components in the future.  FPF Decl. ¶¶ 8, 10.

Plaintiff CREW routinely requests and utilizes Presidential and federal records to create reports, draft administrative complaints, requests for investigation, and public testimony and letters to Congress regarding oversight matters, and to craft targeted FOIA requests for additional information. CREW Decl. ¶¶ 3-4. Because of its reliance on government records, CREW has a vested interest in ensuring government compliance with recordkeeping laws, including the PRA and FRA, and it has brought numerous lawsuits to vindicate that interest, including *CREW v. Trump*, 924 F.3d at 602, *CREW v. Trump*, 438 F. Supp. 3d 54 (D.D.C. 2020), and *National Security Archive v. Trump*, No. 20-2500 (D.D.C. Dec. 1, 2020). CREW Decl. ¶ 5. CREW has made multiple FOIA requests to NARA for Presidential records, including one such request for records from the first Trump administration that is currently pending, and intends to submit additional FOIA

34

requests for Presidential records. CREW Decl. ¶¶ 7–8. CREW also has pending FOIA requests to OMB (an EOP component subject to the FRA), and intends to submit additional requests to OMB in the future. CREW Decl. ¶¶ 10.

Access to Presidential and federal records is thus essential for Plaintiffs to fulfill their mission-critical functions. The EOP Policy resulting in the non-preservation of Presidential and federal records, of which text messages are at special risk, prevents and will continue to prevent Plaintiffs from accessing the documentary history of this administration, whether through FOIA or through other traditional investigative and journalistic methods. *See supra* Background § II.B. The EOP consists of, among other entities that are subject to the PRA, the Office of the Vice President, the Office of Policy Development, the Council of Economic Advisors, the National Security Council, the President's Foreign Intelligence Advisory Board, the President's Intelligence Oversight Board, the National Economic Council, the Office of Administration, and the White House Office,[7] and thus records from all of these entities will be lost if the EOP Policy is not enjoined.

Furthermore, there is a real and imminent risk of loss of federal agency records of EOP components that are subject to the FRA (rather than the PRA). As noted above, the EOP Defendants issued the April 2 EOP Policy to the *entire* EOP, including EOP personnel who create and receive records governed by the *FRA* and FOIA, including agency personnel at OMB. *See supra* Background § II.B. By indiscriminately issuing the EOP Policy to *all* EOP staff, the White House has created a major risk that those staff will construe the Policy to supersede their FRA obligations—a statute that not even this Administration claims is unconstitutional. *See* Baron Decl.

---

[7] Nat'l Archives and Recs. Admin., *Guidance on Presidential Records from the National Archives and Records Administration* (Jan. 21, 2021), https://perma.cc/32UZ-2H85.

¶¶ 26. The risk of harm is especially acute given the Administration's history of outright disregard for federal recordkeeping requirements. *See* Compl. ¶¶ 106–-111.

It is no defense that Plaintiffs cannot request a President's records through FOIA until at least five years after the President's term ends, 44 U.S.C. § 2204(b)(2), because the irreparable harm caused by the EOP Policy is the records being "lost forever to history," *Armstrong I*, 924 F.2d at 288, such that *no one* can access them at any point—not Plaintiffs, Congress, the general public, or anyone else. "The threat of such obliteration is a text book example of irreparable harm." *CREW v. Cheney*, 577 F. Supp. 2d at 339 (citation omitted). Any such defense also disregards the fact that Presidential records may become available to Plaintiffs and the public through other ways, including Congressional inquiries, litigation, voluntary disclosures by the government, and traditional investigative and journalistic methods.

**V.    The balance of equities and public interest favor granting a preliminary injunction.**

The balance-of-equities and public-interest factors likewise weigh strongly in favor of issuing a preliminary injunction. These factors require courts to "balance the competing claims of injury and . . . consider the effect on each party of the granting or withholding of the requested relief," in addition to paying "particular regard for the public consequences in employing the extraordinary remedy of injunction." *Winter*, 555 U.S. at 24 (2008). When "the Government is the opposing party," the two factors "merge." *Nken v. Holder*, 556 U.S. 418, 435 (2009).

Plaintiffs and the public have a powerful interest in enjoining implementation of the EOP Policy and requiring the EOP Defendants to return to the status quo of complying with the PRA's requirements for preserving text messages and similar electronic communications. As the EOP Policy makes clear by equating the frequency of White House text messaging to talking, CREW Decl. Ex. A at 2, the use of electronic messages has become central to the operations of the Trump

36

White House, and without judicial intervention to immediately stop the implementation of the EOP Policy's text message provisions, EOP Defendant staff are free, and in some cases encouraged, to delete Presidential records that the PRA requires the EOP Defendants to preserve. *See supra* Background § II.B.

Further, as recent events make clear—including the revelation that senior White House officials discuss war plans on Signal, *see* Compl. ¶¶ 107–111—the White House routinely uses text messaging and ephemeral messaging apps to communicate about matters of national security and the safety of American military personnel. Absent the preliminary injunctive relief requested by Plaintiffs, there would be no legal obligation to preserve such Presidential records of even the greatest consequence, and the EOP Defendants' antipathy toward their recordkeeping obligations—as demonstrated by the lengths to which they have gone to nullify the requirements of the PRA—indicates their eagerness to preserve as few Presidential records as possible. Any records lost while this litigation is pending will be "lost forever to history." *Armstrong I*, 924 F.2d at 288.

There is also a powerful public interest in protecting the rule of law and the separation of powers by enjoining the EOP Defendants' conduct here. The EOP Defendants have broken new and dangerous ground by abruptly asserting that a longstanding federal statute imposing legal obligations on them is unconstitutional, enlisting OLC to issue a preordained legal opinion to support it despite binding Supreme Court precedent, and then weaponizing the OLC's opinion to immediately cease complying with the law altogether. Such defiance of congressional and judicial authority only harms the public interest by eroding the rule of law and, in the absence of preliminary injunctive relief to stop it, encouraging the EOP Defendants and other components of the Executive Branch to follow suit.

The EOP Defendants can assert no meaningful countervailing interests. The EOP Defendants cannot "suffer harm form an injunction that merely ends an unlawful practice." *Open Cmtys. All. v. Carson*, 286 F. Supp. 3d 148, 179 (D.D.C. 2017) (quoting *Rodriguez v. Robbins*, 715 F.3d 1127, 1145 (9th Cir. 2013)); *see also Newby*, 838 F.3d at 12 ("There is generally no public interest in the perpetuation of unlawful agency action. To the contrary, there is a substantial public interest 'in having governmental agencies abide by the federal laws that govern their existence and operations.'") (cleaned up). The requested preliminary injunction will not require the EOP Defendants to do anything other than what they were purportedly doing until the EOP Policy was issued on April 2, and what every prior presidential administration did (including the first Trump Administration) since the PRA went into effect in 1981. And, despite President Trump serving as President for more than 1,500 days before the issuance of the OLC Opinion, the EOP Policy identifies no instance in which adherence to the PRA's mandates to preserve electronic messages has actually hindered President Trump's functions or caused the EOP Defendants or any of their personnel to compromise the quality of advice and assistance that they have provided to the President. To the contrary, as NARA's former litigation director attests, the fact that numerous "federal agencies have indeed gone forward in implemented [automated] archiving schemes for electronic messaging using existing software directly serves to contradict the [EOP Policy's] characterization of an undue technological burden in doing so." Baron Decl. ¶ 20; *see also id.* ¶¶ 10–17 (discussing automated archiving processes for text and electronic messages that are used widely within and outside of the federal government).

It is essential that this Court prevent the EOP Defendants from continuing to conduct the business of the government pursuant to the facially unlawful EOP Policy. Adherence to that unlawful policy will continue to allow EOP Defendants and their personnel—including some of

38

the highest-ranking officials in the Executive Branch, tasked with assisting the President with crucial government business—to disregard the clear mandates of the PRA, resulting in the irretrievable loss of untold numbers of invaluable Presidential and federal records.

## CONCLUSION

For the foregoing reasons, the Court should grant Plaintiffs' motion for a preliminary injunction and enter an order requiring Defendants EOP, the White House Office, the Office of the Vice President, and Susan Wiles to:

- refrain during the pendency of this litigation from implementing, applying, invoking, or otherwise acting pursuant to the April 2 EOP Policy;

- immediately and fully comply during the pendency of this litigation with their obligations to preserve electronic communications constituting Presidential or Vice-Presidential records under 44 U.S.C. § 2201(2), § 2203(a), § 2207, and § 2209, notwithstanding any contrary directives in the April 2 EOP Policy;

- preserve during the pendency of this litigation preserve—and not dispose of or cause the disposal of—electronic communications constituting Presidential or Vice-Presidential records in accordance with 44 U.S.C. § 2201(2), § 2203(a), § 2207, and § 2209, notwithstanding any contrary directives in the April 2 EOP Policy;

- immediately distribute the preliminary injunction to all EOP components and personnel to whom the EOP Defendants circulated the April 2 EOP Policy, with instructions not to follow any contrary directives in the April 2 EOP Policy during the pendency of this litigation; and

- file a notice with the Court within two days of entry of the Court's Order describing the steps it has taken to comply with the Court's Order.

39

Dated: April 27, 2026

Respectfully Submitted,

*/s/ Jonathan E. Maier*
Jonathan E. Maier (D.C. Bar No. 1013857)
Nikhel S. Sus (D.C. Bar No. 1017937)
Lauren C. Bingham (D.C. Bar No. 90043462)*
CITIZENS FOR RESPONSIBILITY
AND ETHICS IN WASHINGTON
P.O. Box 14596
Washington, DC 20044
(202) 408-5565
jmaier@citizensforethics.org
nsus@citizensforethics.org
lbingham@citizensforethics.org

*admission pending*

*Counsel for Plaintiffs*

40