**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

|  |  |
|---|---|
| FREEDOM OF THE PRESS FOUNDATION, *et al.*, <br><br> Plaintiffs, <br><br> v. <br><br> DONALD TRUMP, in his official capacity as President of the United States, *et al.*, <br><br> Defendants. | Case No. 1:26-cv-01402-JDB |

**DEFENDANTS' MEMORANDUM IN OPPOSITION TO PLAINTIFFS'
MOTION FOR PRELIMINARY INJUNCTION**

**TABLE OF CONTENTS**

INTRODUCTION ................................................................................................................. 1

BACKGROUND ................................................................................................................. 2

I.      HISTORY OF PRESIDENTIAL RECORDS ................................................................. 2

II.     THE OLC OPINION AND CURRENT PRESERVATION POLICIES ........................... 4

III.    PLAINTIFFS' COMPLAINT AND MOTION FOR PRELIMINARY
        INJUNCTION ................................................................................................. 7

LEGAL STANDARD ........................................................................................................ 8

ARGUMENT ..................................................................................................................... 9

I.      PLAINTIFFS DO NOT SHOW IRREPARABLE HARM ............................................ 9

II.     PLAINTIFFS ARE UNLIKELY TO SUCCEED ON THE MERITS ............................ 13

        A.      Plaintiffs Lack Standing to Obtain the Sweeping Preliminary Relief They
                Seek. ................................................................................................. 13

        B.      The PRA Precludes Judicial Review of Compliance with The Act. .................... 14

                1.      *Armstrong I* forecloses judicial review of Plaintiffs' PRA claims. ........... 14

                2.      The *Armstrong II* exception does not apply. ............................................. 17

        C.      Plaintiffs May Not Avoid *Armstrong I* by Asserting Inherent Equitable
                Causes of Action. ................................................................................. 20

        D.      The 2026 Policy is Consistent with The PRA's Preservation
                Requirements. ..................................................................................... 24

        E.      The PRA is Unconstitutional ................................................................... 28

                1.      The PRA has little historical precedent and imposes significant
                        burdens on the presidency ........................................................... 29

                2.      The PRA cannot be justified by any express or implied
                        congressional power ................................................................... 31

                        a.      *Oversight power* ........................................................... 31

    *b.*  *Necessary and Proper Clause*.......................................................... 33

    *c.*  *Property Clause* .............................................................. 36

   3. *Nixon v. GSA*'s evaluation of the PRMPA does not control here. ............. 37

   4. No part of the PRA can be constitutionally applied................................. 40

III. THE REMAINING FACTORS DISFAVOR PRELIMINARY RELIEF ......................... 41

CONCLUSION.................................................................................................................... 42

**TABLE OF AUTHORITIES**

<u>Cases</u>                                                                                                    <u>Page(s)</u>

*Alaska Airlines, Inc. v. Brock*,
   480 U.S. 678 (1987)............................................................................................ 41

*Allen v. Wright*,
   468 U.S. 737 (1984)............................................................................................ 13

*Am. Historical Ass'n v. Peterson*,
   876 F. Supp. 1300 (D.D.C. 1995) ...................................................................... 19

*\*Armstrong v. Bush*,
   924 F.2d 282 (D.C. Cir. 1991)...................................................................... *passim*

*Armstrong v. EOP*,
   1 F.3d 1274 (D.C. Cir. 1993)............................................................. 17, 18, 19, 20

*Armstrong v. EOP*,
   810 F. Supp. 335 (D.D.C. 1993) ........................................................................ 18

*Armstrong v. Exceptional Child Center, Inc.*,
   575 U.S. 320 (2015)...................................................................................... 20, 21

*Ass'n of Am. Physicians & Surgeons, Inc. v. Clinton*,
   997 F.2d 898 (D.C. Cir. 1993)............................................................................ 35

*Buckley v. Valeo*,
   424 U.S. 1 (1976)................................................................................................ 34

*Carter v. Carter Coal Co.*,
   298 U.S. 238 (1936)............................................................................................ 29

*CFPB v. Cmty. Fin. Servs. Ass'n of Am.*,
   601 U.S. 416 (2024)............................................................................................ 36

*Chaplaincy of Full Gospel Churches v. England*,
   454 F.3d 290 (D.C. Cir. 2006).............................................................................. 9

*Cheney v. U.S. Dist. Ct. for D.C.*,
   542 U.S. 367 (2004)............................................................................................ 29

*Circuit City Stores, Inc. v. Adams*,
   532 U.S. 105 (2001)............................................................................................ 37

*Clapper v. Amnesty Int'l USA,*
    568 U.S. 398 (2013)....................................................................................... 12, 14

*Clinton v. Jones,*
    520 U.S. 681 (1997)............................................................................................... 29

*CREW v. Cheney,*
    593 F. Supp. 2d 194 (D.D.C. 2009) ..................................................................... 19

*CREW v. EOP,*
    587 F. Supp. 2d 48 (D.D.C. 2008) ....................................................................... 20

*\*CREW v. Trump,*
    924 F.3d 602 (D.C. Cir. 2019)....................................................................... *passim*

*CREW v. Trump,*
    438 F. Supp. 3d 54 (D.D.C. 2020) ................................................................. 17, 20

*Cummings v. Premier Rehab Keller, P.L.L.C.,*
    596 U.S. 212 (2022)............................................................................................... 36

*Dalton v. Specter,*
    511 U.S. 462 (1994)............................................................................................... 21

*Democracy Forward Found. v. White House Office of Am. Innovation,*
    356 F. Supp. 3d 61 (D.D.C. 2019) ......................................................................... 4

*Dorfmann v. Boozer,*
    414 F.2d 1168 (D.C. Cir. 1969).............................................................................. 8

*Dubin v. United States,*
    599 U.S. 110 (2023)............................................................................................... 28

*FDA v. Alliance for Hippocratic Med.,*
    602 U.S. 367 (2024)............................................................................................... 13

*Fed. Express Corp. v. U.S. Dep't of Comm.,*
    39 F.4th 756 (D.C. Cir. 2022) ......................................................................... 22, 23

*Georgia v. DOJ,*
    148 F.4th 724 (D.C. Cir. 2025) ............................................................................. 28

*Global Health Council v. Trump,*
    153 F.4th 1 (D.C. Cir. 2025) ................................................................................. 21

*INS v. Chadha*,
  462 U.S. 919 (1983) .................................................................................................. 31

*Judicial Watch, Inc. v. NARA*,
  845 F. Supp. 2d 288 (D.D.C. 2012) ........................................................................ 19

*Kissinger v. Reporters Comm. for Freedom of the Press*,
  445 U.S. 136 (1980) .................................................................................................. 4

*Leedom v. Kyne*,
  358 U.S. 184 (1958) ................................................................................................ 22

*Lujan v. Defs. of Wildlife*,
  504 U.S. 555 (1992) ................................................................................................ 13

*Mazurek v. Armstrong*,
  520 U.S. 968 (1997) .................................................................................................. 9

*McCulloch v. Maryland*,
  17 U.S. 316 (1819) .................................................................................................. 34

*Mistretta v. United States*,
  488 U.S. 361 (1989) ................................................................................................ 34

*Murphy v. Nat'l Collegiate Athletic Ass'n*,
  584 U.S. 453 (2018) ........................................................................................... 40, 41

*Navajo Nation v. Azar*,
  292 F. Supp. 3d 508 (D.D.C. 2018) .......................................................................... 9

*Nixon v. Administrator of General Services*,
  433 U.S. 425 (1977) ........................................................................................ *passim*

*Nixon v. United States*,
  978 F.2d 1269 (D.C. Cir. 1992) ...................................................................... 2, 30, 39

*Nken v. Holder*,
  556 U.S. 418 (2009) ................................................................................................ 42

*Nuclear Regul. Comm'n v. Texas*,
  605 U.S. 665 (2025) ........................................................................................... 22, 23

*Printz v. United States*,
  521 U.S. 898 (1997) ................................................................................................ 41

*Sidak v. U.S. Int'l Trade Comm'n*,
--F.4th--, No. 23-5149, 2026 WL 1110981(D.C. Cir. April 24, 2026) ...................................... 21

*Spokeo, Inc. v. Robins*,
578 U.S. 330 (2016) .................................................................................................................... 13

*Town of Chester, N.Y. v. Laroe Estates, Inc.*,
581 U.S. 433 (2017) .................................................................................................................... 13

*Trump v. Anderson*,
601 U.S. 100 (2024) .................................................................................................................... 29

\**Trump v. Mazars USA, LLP*,
591 U.S. 848 (2020) ........................................................................................... 24, 32, 33, 40

*Trump v. Thompson*,
20 F.4th 10 (D.C. Cir. 2021) ...................................................................................................... 30

*Trump v. United States*,
603 U.S. 593 (2024) .................................................................................................................... 35

*Tyler v. Hennepin Cty., Minn.*,
598 U.S. 631 (2023) ............................................................................................................... 36, 37

*United States v. Comstock*,
560 U.S. 126 (2010) .................................................................................................................... 34

*United States v. Morrison*,
529 U.S. 598 (2000) .................................................................................................................... 29

*United States v. Nixon*,
418 U.S. 683 (1974) .................................................................................................................... 40

*Watkins v. United States*,
354 U.S. 178 (1957) .................................................................................................................... 32

*Winter v. Nat. Res. Def. Council, Inc.*,
555 U.S. 7 (2008) .......................................................................................................................... 8

*Youngstown Sheet & Tube Co. v. Sawyer*,
343 U.S. 579 (1952) .................................................................................................................... 21

*Zivotofsky ex rel. Zivotofsky v. Kerry*,
576 U.S. 1 (2015) ........................................................................................................................ 29

**Constitution**

U.S. Const. art I., § 8, cl. 18 .......................................................................................... 34

U.S. Const. art. IV, § 3, cl. 2 ......................................................................................... 36

**Statutes**

4 Rev. Stat. § 161 (2d ed. 1878) .................................................................................... 34

5 U.S.C. § 22 (1958) ...................................................................................................... 34

44 U.S.C. § 2201 ...................................................................................................... *passim*

44 U.S.C. § 2203 ...................................................................................................... *passim*

44 U.S.C. § 2204 ..................................................................................................... 4, 10

44 U.S.C. § 2209 .................................................................................................... 10, 23

50 U.S.C. § 3021(b) ....................................................................................................... 35

Act of July 27, 1789,
    ch. 14, § 7, 1 Stat. 68 ............................................................................................... 34

Presidential Recordings & Materials Preservation Act,
    Pub. L. No. 93-526, § 102(b), 88 Stat. 1695 (1974) ................................................. 39

**Legislative Materials**

H.R. Rep. No. 95-1487 (1978), *as reprinted in* 1978 U.S.C.C.A.N. 5732 .................................... 2

**Administrative & Executive Materials**

*Constitutionality of the Presidential Records Act*,
    50 Op. O.L.C. __ (slip op.) (April 1, 2026),
    https://www.justice.gov/olc/media/1434131/dl .................................................. *passim*

*Presidential Authority to Decline to Execute Unconstitutional Statutes*,
    18 Op. O.L.C. 199, 202 (1994) ......................................................................... 24, 31

**INTRODUCTION**

Plaintiffs ask this Court for emergency injunctive relief based on their assertion that the White House has not taken adequate measures to preserve electronic records like emails and text messages. *See* Plaintiffs' Motion for a Preliminary Injunction (Mot.), ECF No. 7; Memorandum in Support of Plaintiffs' Motion for Preliminary Injunction (PI Mem.), ECF No. 7-1. But that contention has no basis in fact: the White House's preservation policy from last month broadly mandates preservation and its current information technology program preserves *all* electronic messages and files on official systems and devices. *See* Ex. A, Declaration of Robert J. Eisenhauer. Plaintiffs have thus failed to establish irreparable harm sufficient to obtain emergency injunctive relief. Their theories of harm are speculative and hypothetical. Plaintiffs suppose that eight years from now they will request and be unable to obtain certain records that they say will not be preserved absent judicial intervention. And they claim this even though Plaintiffs lack standing to obtain preliminary relief for the same reasons that their irreparable harm showing fails.

In addition, Plaintiffs lack a cause of action to enforce the PRA. Binding precedent from the D.C. Circuit recognizes that Congress implicitly precluded private enforcement of the PRA and Plaintiffs cannot invoke any non-statutory theory of review to circumvent this preclusion, particularly to challenge the current White House preservation policies and practices. If, however, the Court reaches the merits of Plaintiffs' arguments, their claims still fail. The PRA is unconstitutional, and even if it were not, the White House's April 2026 preservation policy and its current electronic records preservation measures are consistent with the statute. There is no emergency warranting preliminary relief, and Plaintiffs' Complaint pleads no claim with a likelihood of success. Plaintiffs' motion should be denied.

**BACKGROUND**

**I.    HISTORY OF PRESIDENTIAL RECORDS**

"History, custom, and usage indicate unequivocally that, prior to [1974], Presidents exercised complete dominion and control over their presidential papers" and, "without notable exception, treated" them as "personal property." *Nixon v. United States*, 978 F.2d 1269, 1277–78 (D.C. Cir. 1992). George Washington "removed his papers to Mount Vernon" and "did not make arrangements for public access to them." *Id.* at 1278. "Presidents Jefferson, Madison[,] and Monroe passed their papers by testamentary gift." *Id.* The list goes on. *See id.* at 1288–89, Appendix (recounting the history of each President's handling of their records).

During and after the Watergate scandal, Congress endeavored to assert unprecedented control over the President's papers. *See* H.R. Rep. No. 95-1487 at 5 (1978), *as reprinted in* 1978 U.S.C.C.A.N. 5732, 5736; *see also Nixon v. Administrator of General Services*, 433 U.S. 425, 431 (1977) (*Nixon v. GSA*). In 1974, shortly after his resignation, former President Nixon concluded an agreement with the General Services Administration (GSA) that would have provided for the eventual destruction of tape recordings made by the former President during his presidency. *See Nixon v. GSA*, 433 U.S. at 433. To abrogate the agreement, Congress enacted the Presidential Recordings and Materials Preservation Act of 1974 (PRMPA) to give custody of former President Nixon's records to the National Archives, which at that time was part of the GSA, and to prohibit the destruction of the tapes or any other presidential materials. *See* H.R. Rep. No. 95-1487 at 5. Notably, the PRMPA did not regulate any other President's records, past or current, and did not impose recordkeeping obligations on the presidency.

In 1978, Congress enacted the Presidential Records Act, 44 U.S.C. §§ 2201–09. The PRA applies to materials that are

2

> created or received by the President, the President's immediate staff, or a unit or individual of the Executive Office of the President whose function is to advise or assist the President, in the course of conducting activities which relate to or have an effect upon the carrying out of the constitutional, statutory, or other official or ceremonial duties of the President.

44 U.S.C. § 2201(2).  The PRA sought to change the legal ownership of the official records of the President from private to public and established a new statutory structure under which Presidents, and subsequently the National Archives and Records Administration (NARA), must manage the records of their administrations.  Under the PRA, the President is obligated to "take all such steps as may be necessary to assure that the activities, deliberations, decisions, and policies that reflect the performance of the President's constitutional, statutory, or other official or ceremonial duties are adequately documented and that such records are preserved and maintained as Presidential records . . . ."  44 U.S.C. § 2203(a).  The PRA thus imposes two distinct and significant obligations on a sitting President with respect to records of his administration—a requirement to *generate* records as needed to document the "activities, deliberations, decisions, and policies" of his administration and a requirement to *preserve* such records.  *See id.*  The PRA also constrains the President from disposing of records that "no longer have administrative, historical, informational, or evidentiary value" unless the President first obtains the written views of the Archivist regarding such proposed disposal and only after the Archivist has obtained the views of specific congressional committees in certain circumstances.  *Id.* § 2203(c), (e).

The PRA expressly excludes from the definition of presidential records any materials that qualify as "official records of an agency (as defined in [the Freedom of Information Act (FOIA)])."  *Id.* § 2201(2)(B).[1]  It also excludes "personal records," which are materials "of a purely private or

---

[1] With respect to EOP, the Supreme Court has recognized that "the President's immediate personal staff" as well as "units in the Executive Office whose sole function is to advise and assist the President" are not included within the APA's and FOIA's definition of "agency."  *See Kissinger v.*

nonpublic character which do not relate to or have an effect upon the carrying out of the . . . duties of the President." *Id.* § 2201(2)(B), (3).  Personal records include, for example, "diaries, journals, or other personal notes serving as the functional equivalent of a diary or journal which are not prepared or utilized for, or circulated or communicated in the course of, transacting Government business."  *Id.* § 2201(3)(A).  The PRA directs the President, "to the extent practicable," to "categorize[]" materials as presidential records or personal records "upon their creation or receipt" and to "file[] [them] separately." *Id.* § 2203(b).

When a President leaves office, the Archivist "assume[s] responsibility for the custody, control, and preservation of, and access to" the presidential records of the departing administration. *Id.* § 2203(g)(1).  The Archivist generally must make records covered by the PRA available to the public under FOIA starting five years after the President leaves office.  *Id.* § 2204(b)(2), (c)(1). However, the outgoing President may specify that access to records in six defined categories be restricted for up to twelve years after leaving office.  *Id.* § 2204(a).

## II.    THE OLC OPINION AND CURRENT PRESERVATION POLICIES

On April 1, 2026, the Department of Justice's Office of Legal Counsel issued an opinion in response to a request from White House Counsel David Warrington to evaluate the constitutionality of the PRA.  OLC concluded that the PRA is unconstitutional "for two independent but interlocking reasons: It exceeds Congress's enumerated and implied powers, and it aggrandizes the Legislative Branch at the expense of the constitutional independence and

---

*Reporters Comm. for Freedom of the Press*, 445 U.S. 136, 156 (1980) (citation omitted).  For example, the White House Office and the National Security Council are not subject to FOIA and not covered by the Federal Records Act (FRA). *See*, *e.g.*, *Democracy Forward Found. v. White House Office of Am. Innovation*, 356 F. Supp. 3d 61, 66 (D.D.C. 2019).  An EOP component's records are governed either by the PRA or by the FRA, depending on whether that component's sole function is to advise and assist the President.

autonomy of the Executive." *Constitutionality of the Presidential Records Act*, 50 Op. O.L.C. __ (slip op.) at 1 (April 1, 2026)[2] (OLC Op.). OLC also found that the statute did not contain any severable portion that could be constitutionally applied because the "constitutional defects lie at the statute's core: Congress's attempt to regulate presidential records without a valid legislative purpose, and the burdens on the Presidency that such regulation effects." *Id.* at 51. OLC advised that the "President need not further comply with its dictates," although it nowhere commanded that he or anyone else must refuse to do so. *See id.* 52.

Although the White House no longer accepts the PRA's constitutionality, it continues to preserve records that would have been covered by the PRA. A recent memorandum issued by White House Counsel David Warrington states that, notwithstanding the PRA's unconstitutionality, "EOP staff should preserve any material related to the performance of their duties." Memorandum from David Warrington, Assistant to the President and Counsel to the President, *Re: Records Retention Policy After Office of Legal Counsel Finding that the Presidential Records Act is Unconstitutional* at 2 (April 2, 2026) (2026 Policy), ECF No. 1-1. This "duty to preserve" applies regardless of the "medium of the material"—"printed, electronic, or hand-written materials are considered records and should be saved if they are related to the performance of EOP staff duties." *Id.* With respect to electronic records, the memo reminds EOP staff that they "cannot permanently delete emails or materials saved to an EOP laptop or the EOP network" and that "EOP staff should conduct all work-related communications via your official EOP email account." *Id.* EOP staff are further instructed to "avoid using personal devices for government business whenever possible." *Id.* at 3. Where a non-official medium like "text messaging" is used, the memo instructs staff to

---

[2] *Available at* https://www.justice.gov/olc/media/1434131/dl.

preserve materials "when they are the sole record of official decision-making, government action, or contain unique information not available elsewhere." *Id.* at 2.

With respect to electronic records—the primary focus of Plaintiffs' motion—the White House continues to apply the preservation measures that prevailed under the PRA. *See* Eisenhauer Decl. ¶ 9. Those measures are extensive and not subject to the discretion of individual EOP employees. All emails on EOP systems are saved and EOP staff are unable to delete emails because of archive systems in place and Microsoft Exchange settings and configurations. *Id.* ¶¶ 3, 4. The same is true with respect to "an internal chat messaging program" to which EOP employees have access: "[t]hese messages are saved and the system does not allow users to delete or edit any messages." *Id.* ¶ 5. "Electronic files" created on White House systems are also "automatically saved" on a "continuous basis" and cannot be deleted. *Id.* ¶ 7. Similar measures are in place with respect to smartphones provided to EOP employees. These phones generally "do not have text messaging or iMessage enabled by default," although SMS text messaging or Signal may be enabled in some instances. *Id.* ¶ 6. Where these applications are enabled, archive systems have been implemented to ensure that all messages sent and received are "captured and saved," without any ability by the employee to delete messages from the archive and regardless of whether any auto-delete function has been enabled by any party to the communication. *Id.* And insofar as any EOP employee uses a personal device to conduct official business—notwithstanding the instruction they avoid doing so, 2026 Policy at 3—employees are instructed to preserve all text messages "when they are the sole record of official decision-making, government action, or contain unique information not available elsewhere." *See id.* at 2.

### III.    PLAINTIFFS' COMPLAINT AND MOTION FOR PRELIMINARY INJUNCTION

Plaintiffs Citizens for Responsibility and Ethics in Washington (CREW) and Freedom of the Press Foundation now bring this lawsuit to challenge the White House's recordkeeping and preservation policies, including the 2026 Policy. Compl., ECF No. 1. Plaintiffs pursue six claims against the Defendants that fall into two buckets. Counts V and VI plead statutory claims against NARA pursuant to the Administrative Procedure Act (APA) and FOIA. Plaintiffs allege that NARA has an asserted "policy of non-compliance with the PRA" that constitutes final agency action reviewable under the APA as contrary to law. *Id.* ¶¶ 154–59. They similarly allege that this asserted policy may be reviewed under FOIA as an unlawful policy or practice entitling them to equitable relief. *Id.* ¶¶ 161–63.

Plaintiffs also include various non-statutory claims regarding NARA and the EOP Defendants' alleged failure to comply with the PRA. Counts I and IV pursue causes of action in equity for relief regarding Defendants' alleged failure to comply with the PRA. *Id.* ¶¶ 121–32, 148–52. On the same basis, Count II seeks mandamus against the President, Vice President, and Archivist "to compel [them] to comply with their non-discretionary duties under the PRA." *Id.* ¶¶ 134–41. And Count III pursues a non-statutory claim for judicial review of asserted ultra vires action by the Defendants. *Id.* ¶¶ 143–46.

Plaintiffs assert injuries to themselves by virtue of their status as frequent requesters of records under FOIA and the PRA. *Id.* ¶ 94 (alleging standing to challenge Defendants' "recordkeeping policies and practices" because Plaintiffs are "organizations that routinely request federal and Presidential records and rely on them to perform their mission-critical functions"). Both Plaintiffs allege that they have requests for presidential records pending with NARA and that they intend to continue requesting presidential records in the future. *Id.* ¶¶ 99, 102, 104. Plaintiffs

contend that Defendants' alleged actions "will make it harder for Plaintiffs to perform their mission-critical functions and will deprive them of unique, highly valuable government records to which they are statutorily entitled." *Id.* ¶ 119.

Shortly after filing the Complaint, Plaintiffs moved for a preliminary injunction as to a subset of the claims and Defendants. Plaintiffs do not seek preliminary relief against NARA, rendering Plaintiffs' APA and FOIA claims irrelevant for purposes of the present briefing.[3] *See* Mot. at 1. Plaintiffs also do not seek preliminary relief against the President, Vice President, or Archivist, thereby also rendering their mandamus claim irrelevant. *See id.*; *see also* PI Mem. at 22–26 (not mentioning mandamus as a basis for preliminary relief). As to the remaining Defendants—the Executive Office of the President, the White House Office, the Office of the Vice President, and White House Chief of Staff Susan Wiles—Plaintiffs ask the Court to preliminarily enjoin any implementation of the 2026 Policy. *See* Proposed Order at 1, ECF No. 7-5. Plaintiffs also ask that the Court issue preliminary relief to ensure the "preserv[ation of] electronic messages constituting Presidential or Vice-Presidential records" under the PRA. *Id.* at 1–2.

## LEGAL STANDARD

"A preliminary injunction is an extraordinary remedy never awarded as of right." *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 24 (2008). Such a request involves the exercise of a far-reaching power that "should be sparingly exercised." *Dorfmann v. Boozer*, 414 F.2d 1168, 1173 (D.C. Cir. 1969) (citation omitted). The moving party must demonstrate all of the following

---

[3] Plaintiffs' claims against NARA would not provide any support for preliminary relief regardless. NARA continues to process requests for presidential records and to preserve presidential records in its custody. Declaration of Kate Dillon McClure, Director of the Archival Operations Division in the Office of Presidential Libraries, National Archives and Records Administration ¶¶ 4, 5 (McClure Decl.), ECF No. 19-3 in *Am. Historical Ass'n v. Trump*, No. 1:26-cv-01169-JDB (D.D.C.). Plaintiffs cannot show any basis for irreparable harm or a likelihood of success as to NARA.

factors by "*a clear showing*": (1) likelihood of success on the merits; (2) irreparable harm in the absence of preliminary injunctive relief; (3) the balance of equities between the parties tips in favor of the moving party; and (4) preliminary relief serves the public interest. *Mazurek v. Armstrong*, 520 U.S. 968, 972 (1997) (citation omitted).

## ARGUMENT

Plaintiffs' motion for preliminary relief should be denied. Plaintiffs have not shown that they will suffer irreparable injury, a likelihood of success on the merits, or that the remaining preliminary injunction factors favor their request.

## I.   PLAINTIFFS DO NOT SHOW IRREPARABLE HARM

The D.C. Circuit "has set a high standard for irreparable injury." *Chaplaincy of Full Gospel Churches v. England*, 454 F.3d 290, 297 (D.C. Cir. 2006). The moving party must demonstrate an injury "both certain and great" and "of such *imminence* that there is a 'clear and present' need for equitable relief to prevent irreparable harm." *Id.* (citation omitted). The injury must also "be beyond remediation," meaning that the possibility of corrective relief "at a later date . . . weighs heavily against a claim of irreparable harm." *Id.* at 297–98 (citation omitted); *see also Navajo Nation v. Azar*, 292 F. Supp. 3d 508, 512–13 (D.D.C. 2018). Plaintiffs have not made this showing.

Plaintiffs argue that they satisfy the irreparable harm requirement because the 2026 Policy will result in the deletion or loss of electronic presidential and federal records, "including text messages and similar electronic communications." PI Mem. at 31–32. Plaintiffs have not shown, however, any "certain and great" risk of deletion or loss of presidential records in violation of the PRA. Under the PRA, the President must ensure that the "records" of the "activities, deliberations, decisions, and policies that reflect the performance of the President's . . . duties are . . . preserved and maintained." 44 U.S.C. § 2203(a). The 2026 Policy—which was issued "to ensure that [staff]

9

are appropriately saving presidential records"—is consistent with the PRA's preservation requirements. 2026 Policy at 1. In a marker of that consistency, the 2026 Policy makes clear that "[c]omponents are free to retain the records retention policies developed under the PRA." *Id.*

The 2026 Policy instructs all EOP staff to "preserve any material related to the performance of their duties"—"[e]ven in the absence of the PRA"—including because records "may be subject to other legal preservation requirements." *Id.* at 2. It also informs staff that, "[a]s a matter of prudence, the electronic records of EOP employees will be preserved." *Id.* And consistent with the PRA's definition of "documentary material," *see* 44 U.S.C. § 2201(1), the 2026 Policy provides that "[t]he medium of the material does not matter—printed, electronic, or hand-written materials are considered records and should be saved if they are related to the performance of EOP staff duties." 2026 Policy at 3. Staff are further encouraged "to routinely file any paper records with the Office of Records Management." *Id.* at 2. Moreover, the Policy explains that "EOP staff do not have any ownership of records created or obtained in the performance of their duties," and provides that "staff may not take any records" "[w]hen leaving EOP employment." *Id.* at 2. Nor can staff "permanently delete emails or materials saved to an EOP laptop or the EOP network." *Id.* And though the President "remain[s] exclusively responsible for custody, control, and access to . . . Presidential records" created during his term in office, 44 U.S.C. § 2203(f), NARA has expressly committed to preserving all records in its custody. *See* McClure Decl. ¶¶ 4, 5.

The 2026 Policy is also consistent with 44 U.S.C. § 2209(a), concerning "non-official electronic message account[s]." That PRA provision restricts the creation or transmission of presidential records "using a non-official electronic message account unless" the covered employee "copies an official electronic messaging account" or "forwards a complete copy of the . . . record to an official electronic messaging account" within 20 days. *Id.* § 2209(a)(1), (2). Like

10

the PRA, the 2026 Policy strictly limits the creation or transmission of presidential records using non-official devices or accounts. It instructs EOP staff to "conduct all work-related communications via [their] official EOP email account." 2026 Policy at 2. And staff must "avoid using personal devices for government business whenever possible." *Id.* at 3. The 2026 Policy also requires the preservation of text messages that "contain unique information not available elsewhere" or that "are the sole record of official decision-making [or] government action." *Id.* at 2. These approaches are consistent with the PRA requirement to preserve materials that document the performance of the President's constitutional, statutory, or other official duties, *see* 44 U.S.C. § 2201(2), while excluding "personal records," *id.* § 2201(2)(B).

The 2026 Policy alone shows that Plaintiffs lack a sufficient basis to show irreparable injury. But Plaintiffs' argument as to electronic records is doubly foreclosed by the technological preservation measures that EOP continues to implement for such records. Existing archive systems and program settings ensure the continuous retention of emails, electronic files, and messages generated on EOP systems. *See* Eisenhauer Decl. ¶¶ 3–7. These systems and settings are such that EOP employees *cannot* delete messages; such messages are retained at the enterprise level regardless of an employee's attempt, for example, to delete an email from their inbox. *See id.* EOP-issued smartphones are similarly configured to ensure the retention of electronic records. These phones do not, as a default, have messaging platforms enabled. *Id.* ¶ 6. Where SMS text messaging or Signal are enabled, archive systems exist to ensure that all messages are continuously captured and retained and that employees are unable to delete messages from the archive. *Id.*

Plaintiffs' various other arguments do not show any basis for irreparable harm. Plaintiffs contend that the 2026 Policy was issued to all EOP components, including components like the Office of Management and Budget that are subject to the Federal Records Act. PI Mem. at 35.

11

Plaintiffs posit that the 2026 Policy is not compliant with the FRA and that it will result in the destruction of *federal* records, as distinct from *presidential* records. *See id.* But Plaintiffs allege no claim in their Complaint that any EOP component is failing to comply with the FRA; their claims entirely concern PRA compliance. Nor does the 2026 Policy anywhere indicate that it changes any existing FRA policy. It is entirely focused on recordkeeping under the PRA and, moreover, it explicitly instructs that components are "free to retain" existing "records retention policies." 2026 Policy at 1. Along that line, all EOP components—whether subject to the FRA or not—continue to operate under an information technology infrastructure that goes above and beyond in ensuring the preservation of *all* messages and files generated on EOP systems. *See generally* Eisenhauer Decl. There is no basis to obtain relief as to particular EOP components' compliance with the FRA.

Plaintiffs also argue that relief is needed because EOP considers the PRA to be unconstitutional. Plaintiffs thus assert that the foregoing preservation measures could be changed at some future date and the Court must enter an injunction to ensure they are not. *See* PI Mem. at 17. That argument flies in the face of basic principles of Article III. A plaintiff cannot obtain injunctive relief based on their speculation that the Executive Branch may take purportedly unlawful action at some future, uncertain date. *Cf. Clapper v. Amnesty Int'l USA*, 568 U.S. 398, 410 (2013) (allegation of injury "at some point in the future" is not sufficient for standing where the alleged injury is not "certainly impending").

In sum, the 2026 Policy and existing EOP preservation measures for electronic records establish a records preservation program that is consistent with the requirements of the PRA. Plaintiffs' claim to irreparable harm hinges on their assertion that the 2026 Policy authorizes unlawful document destruction, PI Mem. at 31–36, but it does not. And in all events, existing EOP

archive systems and settings show that destruction of electronic records on official systems by EOP employees is not even technologically possible. There is no basis for emergency relief from this Court to redress any imminent, irreparable harm during the pendency of this case.

## II.    PLAINTIFFS ARE UNLIKELY TO SUCCEED ON THE MERITS

### A.    Plaintiffs Lack Standing to Obtain the Sweeping Preliminary Relief They Seek.

As the party invoking federal jurisdiction, Plaintiffs bear the burden of establishing the three elements of constitutional standing to sue: injury in fact, traceability, and redressability. *Spokeo, Inc. v. Robins*, 578 U.S. 330, 338 (2016). Additionally, because "standing is not dispensed in gross," "a plaintiff must demonstrate standing for each claim he seeks to press and for each form of relief that is sought." *Town of Chester, N.Y. v. Laroe Estates, Inc.*, 581 U.S. 433, 439 (2017) (citation omitted).

"To establish injury in fact, a plaintiff must show that he or she [has] suffered 'an invasion of a legally protected interest' that is 'concrete and particularized' and 'actual or imminent, not conjectural or hypothetical.'" *Spokeo*, 578 U.S. at 339 (quoting *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 560 (1992)). Specifically, the injury must affect the plaintiff in "a personal and individual way" and must be "real" not "abstract." *Id*. at 339–40. A corollary to this requirement of concrete and individualized injury is that plaintiffs may not assert generalized grievances: "A citizen may not sue based only on an 'asserted right to have the Government act in accordance with law.'" *FDA v. Alliance for Hippocratic Med.*, 602 U.S. 367, 381 (2024) (quoting *Allen v. Wright*, 468 U.S. 737, 754 (1984)). "Article III does not contemplate a system where 330 million citizens can come to federal court whenever they believe that the government is acting contrary to the Constitution or other federal law." *Id.* at 382.

Plaintiffs have not pleaded any Article III injury sufficient to support a preliminary injunction for the same reasons that they have not shown irreparable harm. Plaintiffs have not demonstrated any action by the EOP Defendants injuring them. The 2026 Policy and existing electronic records retention measures are consistent with the PRA's preservation requirements and, thus, Plaintiffs have no basis to allege an Article III injury supporting preliminary relief. Nor do Plaintiffs have standing to challenge the mere possibility that at some future date the EOP Defendants may adopt a different policy. The Supreme Court has made clear that subjective fears about what could happen at some uncertain time in the future do not support Article III jurisdiction. *See Clapper*, 568 U.S. at 409–11, 414 (holding future injury must be "imminent" or "certainly impending" and rejecting standing premised on a "speculative chain of possibilities").

**B.     The PRA Precludes Judicial Review of Compliance with The Act.**

Even if Plaintiffs had standing to obtain preliminary relief as to the 2026 Policy, all of Plaintiffs' non-statutory claims against the EOP Defendants fail at the threshold because the PRA precludes judicial review of claims challenging compliance with the PRA. Accordingly, the Court lacks jurisdiction to consider Plaintiffs' attempt to challenge the EOP Defendants' compliance with the PRA under Counts I and IV (equitable causes of action regarding allegedly unlawful or unconstitutional action) or Count III (equitable cause of action to enjoin ultra vires action). With only a narrow exception not applicable here, longstanding D.C. Circuit precedent forbids judicial review of claims to enforce the PRA.

**1.     *Armstrong I* forecloses judicial review of Plaintiffs' PRA claims.**

*Armstrong v. Bush*, 924 F.2d 282 (D.C. Cir. 1991) (*Armstrong I*), recognized that the "PRA is one of the rare statutes that does impliedly preclude judicial review." *Id.* at 290. Plaintiffs' equitable, separation of powers, and ultra vires claims all challenge Defendants' purported

14

noncompliance with the PRA's requirements. *See* PI Mem. at 22 (characterizing these claims as "challenging EOP's Policy of non-compliance with the PRA"); Compl. ¶¶ 132, 145, 152. Because such challenges are precluded, the Court lacks subject matter jurisdiction over these claims.

In *Armstrong I*, the D.C. Circuit held that the PRA "precludes judicial review of the President's recordkeeping practices and decisions." 924 F.2d at 291. *Armstrong I* involved allegations that President Reagan, Vice President Bush, and components of EOP "intend[ed] to delete material from the White House computer systems in violation of the FRA and the PRA." *Id.* at 286. The plaintiffs sought to preserve access to these computer records, which contained emails and other communications of administration officials over the course of several years. *Id.* at 286–87. They also sought a "declaration that many of the documents stored in the [computer] system at the close of the Administration are federal and presidential records" and an "injunction prohibiting the destruction of these documents and directing the President and [an EOP component] to classify and preserve the documents as required by the FRA and PRA." *Id.* at 287.

In rejecting the plaintiffs' claims, the court explained that, although the PRA "contain[ed] no provision expressly precluding judicial review," "the PRA is one of the rare statutes that does impliedly preclude judicial review." *Id.* at 290. For good reason: "permitting judicial review of the President's compliance with the PRA would upset the intricate statutory scheme" that was at least intended "to keep in equipoise important competing political and constitutional concerns." *Id.*

On the one hand, "Congress sought to establish the public ownership of presidential records and ensure the preservation of presidential records for public access after the termination of a President's term in office." *Id.* On the other hand, Congress attempted to address the "separation of powers concerns that were implicated by legislation regulating the conduct of the President's

15

daily operations," and "therefore sought assiduously to minimize outside interference with the day-to-day operations of the President and his closest advisors." *Id.* Congress tried to reconcile these competing concerns by "requiring the President to maintain records documenting the policies, activities, and decisions of his administration, [while] leaving the implementation of such a requirement in the President's hands." *Id.* Indeed, under the PRA, the Archivist has no authority to override a President's decision to dispose of records, and Congress could only do so through valid legislation prohibiting disposal of particular documents. *Id.*

The court explained that "it is difficult to conclude that Congress intended to allow courts, at the behest of private citizens, to rule on the adequacy of the President's records management practices or overrule his records creation, management, and disposal decisions." *Id.* The court declined to "second-guess" Congress's choice "[not] to give outsiders the right to interfere with White House recordkeeping practices"—and instead "rel[y] on the fact that subsequent Presidents would honor their statutory obligations to keep a complete record of their administrations." *Id.* at 290–91. The court thus dismissed the plaintiffs' claims seeking injunctive and declaratory relief under the PRA. *See id.* at 287, 291.

Plaintiffs cannot plausibly distinguish their claims here from those addressed in *Armstrong I*. The point of this suit is to secure sweeping "judicial review of [Defendants'] general compliance with the PRA." *Id.* at 282. Plaintiffs seek equitable relief "requiring Defendants to comply with" the PRA, Compl. ¶ 9, and speculate that staff will fail to retain records under the 2026 Policy and that EOP may adopt different records preservation policies in the future, *id.* ¶ 87. Plaintiffs thus ask this Court to rule that the President must implement the PRA, including by "preserv[ing] . . . electronic messages constituting Presidential or Vice-Presidential records." Proposed Order at 2. Like the plaintiffs in *Armstrong I*, Plaintiffs here ask this Court to review the "President's records

16

management practices" and to "overrule his records creation, management, and disposal decisions." 924 F.2d at 290.

Plaintiffs cannot circumvent the court's holding in *Armstrong I* by alleging that the PRA imposes "non-discretionary duties" on Defendants, Compl. ¶ 122, or that Defendants' recordkeeping practices are a "clear departure from [the PRA's] statutory requirements," *id.* ¶ 145 (quotation marks omitted).  Those assertions, and Plaintiffs' inclusion of non-statutory claims, in no way distinguishes this case from *Armstrong I*, where the plaintiffs alleged that the President violated a duty—which they would no doubt have characterized as "non-discretionary" and "statutorily mandated"—to preserve documents in a computer system, some of which were alleged to be presidential records.  924 F.2d at 286–87.  And the D.C. Circuit has applied *Armstrong I* in rejecting an attempt at using mandamus to privately enforce the PRA.  *CREW v. Trump*, 924 F.3d 602, 609 (D.C. Cir. 2019) ("Determining whether White House personnel are in fact complying with the directive to conduct all work-related communication on official email would require just the kind of micromanaging proscribed by *Armstrong I*.").  The result in *Armstrong I* would have been no different if the plaintiffs had recast their claims as ultra vires.  That tactic is equally unavailing here.

### 2.    The *Armstrong II* exception does not apply.

Plaintiffs attempt to skirt the impact of *Armstrong I* by relying heavily on the Court of Appeals' subsequent decision in *Armstrong v. EOP*, 1 F.3d 1274 (D.C. Cir. 1993) (per curiam) (*Armstrong II*).  But nothing in *Armstrong II* suggests that Plaintiffs' PRA claims are reviewable. "[T]he narrow and specific *Armstrong II* exception" does not apply here.  *CREW v. Trump*, 438 F. Supp. 3d 54, 64 (D.D.C. 2020).  *Armstrong II* reaffirmed *Armstrong I*'s holding that "decisions that involve materials that are truly presidential records are immune from judicial review."

17

*Armstrong II*, 1 F.3d at 1293. But in doing so, it acknowledged that "Congress preserved the critical role of judicial review under the FOIA . . . by explicitly exempting records subject to the FOIA from the scope of the PRA and allowing judicial review of guidelines defining presidential records *under the rubric of substantive FOIA law.*" *Id.* at 1292 (emphasis added).

Following remand in *Armstrong I*, the plaintiffs amended their complaint and dropped their claim under the PRA. *See Armstrong v. EOP*, 810 F. Supp. 335, 337 n.1 (D.D.C. 1993). Instead, the plaintiffs invoked the FRA and FOIA to urge that a component of the EOP had "improperly instruct[ed] . . . staff to treat as presidential records materials that are, in fact, agency records subject to the FRA." *Armstrong II*, 1 F.3d at 1290. The court held that "courts are accorded the power to review guidelines outlining what is, and what is not, a 'presidential record,'" as opposed to a federal record. *Id.* Faced with a "potential definitional overlap between agency records under the FOIA and presidential records under the PRA," the Court concluded that it could properly review the EOP guidelines in that case "for the limited purpose of ensuring that they do not encompass within their operational definition of presidential records materials properly subject to the FOIA." *Id.* at 1290, 1292. Such limited review was necessary to "avoid[] a conflict between the PRA and the FOIA" and ensure that the PRA did not become "a potential presidential *carte blanche* to shield materials from the reach of the FOIA." *Id.* at 1292.

Thus, while *Armstrong II* reaffirmed *Armstrong I*'s holding that "decisions that involve materials that are truly presidential records are immune from judicial review," it created a limited exception for certain claims intended to vindicate *FOIA* rights by seeking "to ensure that materials that are not subject to the PRA are not treated as presidential records." *Id.* at 1293–94. But "*Armstrong II* nowhere casts in doubt [that] when enacting the PRA, 'Congress . . . sought

18

assiduously to minimize outside interference with the day-to-day operations of the President.'" *CREW*, 924 F.3d at 609 (quoting *Armstrong I*, 924 F.2d at 290).

Plaintiffs argue that *Armstrong II* allows review of any White House recordkeeping policy establishing "guidelines" for determining what constitute presidential records subject to the PRA. PI Mem. at 20–21. That expansive exception would swallow the rule of *Armstrong I* and cannot be squared with the limited holding in *Armstrong II*, which was expressly tailored to the interplay of FOIA and the PRA. *See Armstrong II*, 1 F.3d at 1292 (characterizing this exception as meant to avoid any attempt to "shield materials from the reach of the FOIA"). Nor did the D.C. Circuit adopt Plaintiffs' expansive position when Plaintiff CREW advanced it in *CREW v. Trump*, contrary to Plaintiffs' contention now. *See* PI Mem. at 20. The Court of Appeals instead concluded that it "need not resolve that debate" about the impact of *Armstrong II* because it was sufficient to say that the mandamus claim advanced by CREW there was foreclosed by *Armstrong I*. *See CREW v. Trump*, 924 F.3d at 609.

This Court should not follow the example of certain other courts in this district that erroneously extended *Armstrong II* to encompass review of guidelines governing presidential or vice-presidential recordkeeping under the PRA. *See CREW v. Cheney*, 593 F. Supp. 2d 194, 214–17 (D.D.C. 2009); *Am. Historical Ass'n v. Peterson*, 876 F. Supp. 1300, 1315 (D.D.C. 1995). These cases are not consistent with the reasoning in *Armstrong I* and *Armstrong II*. *See supra*. This Court should instead follow the lead of other courts in this district that have understood the limited scope of *Armstrong II*'s holding as concerning attempts to reclassify *federal* records as *presidential* records, not a broad mandate to review presidential recordkeeping policies. *See, e.g., Judicial Watch, Inc. v. NARA*, 845 F. Supp. 2d 288, 297 (D.D.C. 2012) ("*Armstrong II* was addressing a concern that too many records were being classified as Presidential, not too few.");

19

*see CREW v. EOP*, 587 F. Supp. 2d 48, 55 (D.D.C. 2008) (*Armstrong II* "allow[s] limited review to assure that guidelines defining Presidential records do not improperly sweep in nonpresidential records").

This case does not implicate the question addressed in *Armstrong II*. Plaintiffs here do not assert claims to "ensure that materials that are not subject to the PRA are not treated as presidential records." *Armstrong II*, 1 F.3d at 1294. Rather, the "gravamen of" Plaintiffs' claims is that Defendants are "avoid[ing] the recordkeeping contemplated by Congress," *CREW v. Trump*, 438 F. Supp. 3d at 63–64, through implementation of the 2026 Policy. "But plaintiffs' mere invocation of the word 'policy' is not enough to relieve the parties of the jurisdictional bar recognized in *Armstrong I* or to bring these claims within the ambit of the narrow and specific *Armstrong II* exception." *Id.* Plaintiffs' claims to enforce the PRA are precluded.

### C.    Plaintiffs May Not Avoid *Armstrong I* by Asserting Inherent Equitable Causes of Action.

In an attempt to avoid the fatal impact of *Armstrong I* on their PRA-compliance claims, Plaintiffs attempt to recast their objections to Defendants' recordkeeping policies under the guise of various equitable and non-statutory claims. None of these moves succeed.

In Count I, Plaintiffs invoke *Armstrong v. Exceptional Child Center, Inc.*, 575 U.S. 320 (2015), for the proposition that they may pursue an inherent equitable cause of action to enjoin assertedly unlawful conduct by the Defendants. *Id.* at 326; PI Mem. at 22. But Plaintiffs ignore the *Armstrong v. Exceptional Child Center* Court's subsequent explanation that the "power of federal courts of equity to enjoin unlawful executive action is subject to express and implied statutory limitations." *Id.* at 327. *Armstrong v. Exceptional Child Center* in fact *rejected* an attempt to pursue an implied equitable cause of action to enforce section 30(A) of the Medicaid Act because the statute there "implicitly preclude[d] private enforcement." *Id.* at 328. The Court

20

would not permit the plaintiffs to "circumvent Congress's exclusion of private enforcement" "by invoking [the Court's] equitable powers." *Id.* at 328. So it is here—the PRA precludes private enforcement and Plaintiffs may not circumvent that congressional judgment by invoking this Court's equitable power. For similar reasons, Plaintiffs miss the mark in citing *Sidak v. U.S. Int'l Trade Comm'n*, --F.4th--, No. 23-5149, 2026 WL 1110981, at *3 (D.C. Cir. April 24, 2026). Unlike here with the PRA, the Court of Appeals in *Sidak* held there was "no relevant, special statutory review scheme" that operated to limit the court's review of equitable claims. *See id.*

Nor may Plaintiffs skirt *Armstrong I* by characterizing their claim as constitutional, as they do in Count IV. That move is "foreclosed . . . by *Dalton v. Specter*." *Global Health Council v. Trump*, 153 F.4th 1, 13 (D.C. Cir. 2025), *reh'g en banc denied*, No. 25-5097, 2025 WL 2709437 (D.C. Cir. Aug. 28, 2025). *Dalton* makes clear that allegations that an official has acted in opposition to a statute are statutory claims—not "'constitutional' claims" that can be asserted through a direct cause of action. *Dalton v. Specter*, 511 U.S. 462, 473 (1994).

As the Supreme Court has explained, not "every action by the President or by another executive official, in excess of his statutory authority is *ipso facto* in violation of the Constitution." *Id.* at 472. Rather, the Court has carefully "distinguished between claims of constitutional violations and claims that an official has acted in excess of his statutory authority." *Id.* (collecting cases). The Constitution may be implicated, for example, if executive officers rely on it as an independent source of authority to act, as in *Youngstown Sheet & Tube Co. v. Sawyer*, 343 U.S. 579 (1952), or if the officers rely on a statute that itself violates the Constitution. *See Dalton*, 511 U.S. at 473 & n.5. But claims alleging simply that an official has "exceeded his statutory authority are not 'constitutional' claims" that can be asserted through a direct cause of action. *Id.* at 473.

Here, Plaintiffs' asserted constitutional claims are really "statutory one[s]," *id.* at 474, as

21

the crux of this dispute is whether the 2026 Policy and current electronic records preservation measures cohere with the statutory preservation requirements of the PRA. In any event, because Plaintiffs have not shown that Defendants are "openly defying" or "disregard[ing]" the PRA, PI Mem. at 25, their purported constitutional claim rooted in the separation-of-powers fails. *See infra* pp. 24–28.

Plaintiffs also cannot obtain relief by relabeling their PRA compliance claim yet again in Count III, this time as a challenge to ultra vires action. The Supreme Court recently clarified the narrow scope of a non-statutory ultra vires claim, describing it as the judicial equivalent of a "Hail Mary pass—and in court as in football, the attempt rarely succeeds." *Nuclear Regul. Comm'n v. Texas*, 605 U.S. 665, 681–82 (2025) (*NRC*) (citation omitted). The Court explained that ultra vires claims are "strictly limited" to the "painstakingly delineated procedural boundaries of" the Court's decision in *Leedom v. Kyne*, 358 U.S. 184 (1958). *Id.* The *Kyne* exception applies only where an "agency has taken action entirely 'in excess of its delegated powers and contrary to a *specific prohibition*' in a statute." *NRC*, 605 U.S. at 681 (citation omitted).

Neither of these two exceptional circumstances applies here. Instead, as in *NRC*, Plaintiffs merely attempt to "dress up a typical statutory-authority argument as an ultra vires claim." *Id.* at 682. To begin, ultra vires review is not available under *Armstrong I*. *See id.* at 681 (ultra vires review is not an "easy end-run around the limitations" on judicial review present in other statutes). Even if it were, Plaintiffs cannot show that the 2026 Policy and existing electronic records' preservation measures are "blatantly lawless" or a "clear departure by the [defendants] from" the preservation obligations under the PRA. *Fed. Express Corp. v. U.S. Dep't of Comm.,* 39 F.4th 756, 764 (D.C. Cir. 2022) (citation omitted); *see infra* pp. 24–28. Plaintiffs dispute that the 2026 Policy

22

coheres with the PRA's preservation requirements, but "garden-variety errors of law or fact are not enough." *Fed. Express Corp.,* 39 F.4th at 764.

Nothing in the PRA "specific[ally] prohibit[s]" the current EOP approach to preservation of records. *See NRC*, 605 U.S. at 681 (citation omitted). For example, Plaintiffs emphasize EOP's purported failure to comply with 44 U.S.C. § 2209, which prohibits "creat[ing] or send[ing] a Presidential or Vice Presidential record using a non-official electronic messaging account unless" the individual copies an official account on the message or forwards the complete message to an official account. But the 2026 Policy is consistent with that statute, where it specifically instructs employees to "avoid using personal devices for government business whenever possible" and to "conduct all work-related communications via your official EOP email account." 2026 Policy at 2, 3. Moreover, the question of what constitutes a "Presidential or Vice Presidential record" such that it would be subject to section 2209 is not amenable to ultra vires review. The statutory definition of "Presidential record" is far too ambiguous and laden with discretion to permit a Court to find the 2026 Policy "blatantly lawless" in its relationship to the statute. *Compare* 44 U.S.C. § 2201(2) (defining "Presidential records" as materials "created or received" "in the course of conducting activities which relate to or have an effect upon the carrying out of the constitutional, statutory, or other official or ceremonial duties of the President"), *with Fed. Express Corp.*, 39 F.4th at 765 (agency error must be "plain on the record and on the face of the statute") (quotation marks and alterations omitted). Whatever dissatisfaction Plaintiffs may have with the 2026 Policy, ultra vires review is not a mechanism to adjudge the particulars of how the Executive is "ensur[ing] that [EOP staff] are appropriately saving presidential records." 2026 Policy at 1.

Finally, Plaintiffs repeatedly return to the theme that judicial relief is necessary here because the White House considers the PRA to be unconstitutional. Plaintiffs thus seem to believe

23

there is a distinct relevance to the EOP Defendants' state of mind, regardless of the actions they are taking with respect to records preservation. *See, e.g.*, PI Mem. at 17 (complaining that the 2026 Policy is subject to revocation by the Executive Branch); *id.* at 22 ("here the question is whether the records are subject to PRA or the unrestrained whims of the President"). That argument has no purchase. Depending on the circumstances, a President may choose to implement laws he deems unconstitutional or to disclose records to Congress that he believes that body has no business obtaining as a matter of separation of powers. *See Presidential Authority to Decline to Execute Unconstitutional Statutes*, 18 Op. O.L.C. 199, 200–01 (1994) (explaining that the President may decide whether to comply with an unconstitutional provision "after careful weighing of the effect of compliance with the provision on the constitutional rights of affected individuals and on the executive branch's constitutional authority"); *Trump v. Mazars USA, LLP*, 591 U.S. 848, 858–59 (2020) (explaining that disputes over congressional demands for presidential documents are "hashed out in the hurly-burly, the give-and-take of the political process") (quotation marks omitted). The President's decision to continue preserving records is unsurprising; such records may be relevant, for example, to "ongoing or future litigation" or "congressional oversight requests." 2026 Policy at 2, 3. What matters for Plaintiffs' motion is what the EOP Defendants are *doing*, not what they *believe*. And the EOP Defendants' policies and practices with respect to records preservation are consistent with the PRA.

> **D.    The 2026 Policy is Consistent with The PRA's Preservation Requirements.**

Although Plaintiffs cannot obtain judicial review of the Defendants' compliance with the PRA, any such challenge would lack merit because the 2026 Policy and current EOP preservation measures plainly meet the preservation standards of the PRA. The 2026 Policy directs EOP staff to "preserve any material related to the performance of their duties," regardless of the "medium of

24

the material." 2026 Policy at 2.  As for electronic records, the memo states that staff "cannot permanently delete emails or materials saved to an EOP laptop or the EOP network" and that "EOP staff should conduct all work-related communications via your official EOP email account."  *Id.* EOP staff are further instructed to "avoid using personal devices for government business whenever possible."  *Id.* at 3.  Where a non-official medium like "text messaging" is used, the memo instructs staff to preserve materials "when they are the sole record of official decision-making, government action, or contain unique information not available elsewhere."  *Id.* at 2. Moreover, current EOP information technology practices are such that *all* emails, electronic files, instant messages, text messages, and Signal messages on EOP systems and devices are preserved. *See* Eisenhauer Decl. ¶¶ 3–9.  This more than meets the standard set by the PRA.

Plaintiffs raise a host of objections to the above policies and practices, none of which stand up to scrutiny.  To begin, Plaintiffs press various arguments about the enforceability of the policy that are squarely foreclosed by *Armstrong I*.  Plaintiffs complain that the 2026 Policy is unlikely to be followed because it says employees "should," rather than "must," take certain actions.  PI Mem. at 11.  Plaintiffs also assert there is "no enforcement or disciplinary regime" under the 2026 Policy and that it "can be ignored by EOP staff."  *Id.* at 23.  Plaintiffs' arguments that EOP employees are free under the 2026 Policy to disregard the White House Counsel's express instructions to preserve official EOP records is baseless.  *See, e.g.*, 2026 Policy at 3 (instructing employees to "make every effort to participate" in "**mandatory** records trainings").  But in all events, the PRA precludes claims like this based on the day-to-day management of the White House, as Plaintiff CREW well knows.  *See CREW v. Trump*, 924 F.3d at 609 ("Determining whether White House personnel are in fact complying with the directive to conduct all work-

related communication on official email would require just the kind of micromanaging proscribed by *Armstrong I*.").

Plaintiffs also argue that the 2026 Policy contains various holes that permit destruction of presidential records. They assert, for example, that the policy doesn't cover social media or specific named messaging platforms like WhatsApp. PI Mem. at 16, 23. The 2026 Policy applies, however, on a blanket basis to require EOP staff to "preserve any material related to the performance of their duties" regardless of the "medium of the material." 2026 Policy at 2. That plainly covers social media, WhatsApp messages, or any other kind of material. And again, *Armstrong I* does not permit claims about whether EOP employees are following this policy.

Plaintiffs also challenge the 2026 Policy's treatment of text messages. Plaintiffs contend that the policy permits EOP employees to delete presidential records and to retain others in a manner inconsistent with the PRA. PI Mem. at 23. As a matter of fact, Plaintiffs' contentions are baseless. The Eisenhauer declaration filed today establishes that all emails, instant messages, text messages, and Signal messages sent or received on EOP devices are being continuously archived without any capability for deletion by individual employees. Eisenhauer Decl. ¶¶ 3–9. And the 2026 Policy instructs employees to conduct official business on EOP systems wherever possible. 2026 Policy at 2, 3. Put together, that more than meets the PRA's requirement to preserve presidential records in the form of text messages.

Even as to messages on non-official platforms, the 2026 Policy complies with the PRA. In enacting the PRA, Congress did not mandate that the President and his advisors retain every communication generated within the White House orbit; it required preservation of materials that document the performance of the President's constitutional, statutory, or other official duties. *See* 44 U.S.C. § 2201(2). Properly considered, the definition of "Presidential records" excludes

26

informal conversations that neither record nor memorialize governmental decisionmaking, policy deliberation, or the exercise of presidential authority.  Text messages that contain no unique information fall outside that definition.  A message that says "'call me', 'what room for the meeting', [or] 'there is a typo in the first line of the memo'" does not document the discharge of presidential duties in any meaningful sense.  2026 Policy at 3.  It does not reflect a decision, preserve a rationale, or capture information that might otherwise be lost to the historical record.  The PRA does not require indiscriminate preservation of such records.

The PRA's structure reinforces that functional limit.  The Act distinguishes "Presidential records" from "personal records," the latter encompassing materials "of a purely private or nonpublic character" that do not have an effect on or relate to the official duties of the President.  44 U.S.C. § 2201(2), (3).  Routine logistical messages containing no unique information sit comfortably outside the definition of "Presidential records" for similar reasons: they do not relate to the substance of the President's official duties, but to the incidental acts of those who assist the President in his performance of those duties.  Reading the PRA to sweep in such messages would collapse the statutory distinction and convert a targeted preservation regime into a senseless and indiscriminate retention mandate.

It is simply implausible that Congress intended to create such a regime.  The Court should not lightly assume that Congress—when seeking "assiduously to minimize outside interference with the day-to-day operations of the President and his closest advisors," *Armstrong I*, 924 F.2d at 290—intended to require the retention of vast quantities of trivial, duplicative communications that add nothing to the historical record.  Indeed, padding the archival record with troves of such documents would impede "the expressed statutory goal of preserving records for historical purposes."  *Id.* at 288.

No principle of law or equity supports a hyperliteral construction of the PRA that would require retention of text messages containing no unique information.  *See Dubin v. United States*, 599 U.S. 110, 120 (2023) ("A statute's meaning does not always turn solely on the broadest imaginable definitions of its component words. Instead, linguistic and statutory context also matter.") (citation modified).  As the 2026 Policy explains, "[u]nder the PRA, no presidential administration required EOP staff to transcribe phone calls, meetings, or informal discussions," despite language in the PRA that might be interpreted to require such an "immensely time consuming and costly" result.  2026 Policy at 2; *see* 44 U.S.C. § 2203(a) (requiring the President to "assure that the . . . deliberations . . . that reflect the performance of" his official duties "are adequately documented and that such records are preserved").  Rather, the PRA must be functionally interpreted "in a common-sense way that accords with the [statute's] purposes." *Georgia v. DOJ*, 148 F.4th 724, 735 (D.C. Cir. 2025) ("refrain[ing] from giving 'intra-agency' in Exemption 5 [of FOIA] an unduly rigid reading" and adopting "textually possible" construction that "is much more in accord with the purpose of the provision") (citation omitted).

The Court should thus reject any argument that the 2026 Policy fails to comply with the PRA's preservation requirements, even if the Court deemed those requirements constitutional and found that judicial review is somehow available.

### E.      The PRA is Unconstitutional

For the reasons set forth above, Plaintiffs lack any basis to obtain the sweeping preliminary relief they seek regarding the Defendants' compliance with the PRA, so this Court need not address the PRA's constitutionality.  Nonetheless, insofar as the Court ultimately considers the question in reviewing the 2026 Policy, it is apparent that the PRA is unconstitutional.

28

The Presidential Records Act, like all statutes, "must be based on one or more of [Congress's] powers enumerated in the Constitution," *United States v. Morrison*, 529 U.S. 598, 607 (2000), or "such implied powers as are necessary and proper to carry into effect the enumerated powers," *Carter v. Carter Coal Co.*, 298 U.S. 238, 291 (1936). Additionally, special considerations apply where a statute implicates the separation of powers principle that one branch may "not impair another in the performance of its constitutional duties." *Clinton v. Jones*, 520 U.S. 681, 701 (1997) (citation omitted). Attempts by Congress to directly regulate the recordkeeping of the President and his staff necessarily implicate the "Executive Branch's interests in maintaining the autonomy of its office and safeguarding the confidentiality of its communications." *Cf. Cheney v. U.S. Dist. Ct. for D.C.*, 542 U.S. 367, 372, 385 (2004) (evaluating judicial discovery orders issued to the Vice President and other senior Executive officials).

Even if Congress had constitutional authority to regulate presidential recordkeeping, the PRA's "disruption" to the "constitutionally assigned functions" of the Executive Branch would violate the separation of powers unless "that impact is justified by an overriding need to promote objectives within the constitutional authority of Congress." *Nixon v. GSA*, 433 U.S. at 443. In considering such separation of powers questions, the Court "has often 'put significant weight upon historical practice.'" *Zivotofsky ex rel. Zivotofsky v. Kerry*, 576 U.S. 1, 23 (2015) (citation omitted). The Court has explained that "a lack of historical precedent is generally a telling indication of a severe constitutional problem with the asserted power." *Trump v. Anderson*, 601 U.S. 100, 113–14 (2024) (citation modified).

### 1.    The PRA has little historical precedent and imposes significant burdens on the presidency

The PRA establishes a sweeping presidential recordkeeping scheme that regulates the presidency and its records for all time and in all contexts, with a presumption of public disclosure.

It does so despite having essentially no historical foundation in the practices of all Presidents for the nearly 200 years preceding its enactment. Indeed, as the D.C. Circuit has explained, "history, custom, and usage indicate unequivocally that, prior to [1974], Presidents exercised complete dominion and control over their presidential papers." *Nixon v. United States*, 978 F.2d 1269, 1277 (D.C. Cir. 1992). Prior to the PRA, "Presidents were never subject to any specific, express legal duty to create or maintain their papers." *See id.* at 1276 (citation omitted).

Additionally, as OLC explained, this ahistorical regime imposes significant burdens on the presidency, both as to its autonomy and independence and as to the confidentiality of presidential communications. The PRA may chill the President's advisers from offering candid or unpopular advice, because there is uncertainty as to whether a future President will invoke the privilege on that specific topic. OLC Op. at 47–48. The risk of selective invocation of privilege is not hypothetical. In *Trump v. Thompson*, 20 F.4th 10 (D.C. Cir. 2021), for example, President Biden declined to invoke executive privilege as to certain presidential records of then-former President Trump in response to a congressional access request under the PRA. *Id.* at 16, 22. President Biden reasoned that an assertion of privilege over records relating to the events of January 6, 2021, was "not in the best interests of the United States" and declined to uphold then-former President Trump's assertions of privilege, a determination that the courts refused to disturb. *Id.* at 46–48. Under the PRA, changes in presidential administration may thus jeopardize the confidentiality of presidential advice. OLC also explained that the PRA poses a risk of inadvertent disclosure of sensitive or privileged information. OLC Op. at 48.

The capacious sweep of the PRA, OLC reasoned, also may "burden White House personnel to a degree that prevents them from effectively advising and assisting the President

30

in the performance of his constitutional duties." *Id.*   Such burdens necessarily impede the President's access to information and advice that he might otherwise receive.  *Id.* at 48–49.

Plaintiffs reject the foregoing analysis, arguing that numerous Presidents have served under the PRA and those Presidents have not made public statements criticizing the impact of the PRA or attributed any adverse events to the statute.  PI Mem. at 38.  But executive acquiescence does not function as a sort of adverse possession, permitting Congress to claim authority that it otherwise would not have.  *See INS v. Chadha*, 462 U.S. 919, 942 n.13 (1983) ("Furthermore, it is not uncommon for Presidents to approve legislation containing parts which are objectionable on constitutional grounds."); *Presidential Authority to Decline to Execute Unconstitutional Statutes*, 18 Op. O.L.C. at 202 ("[T]here is no constitutional analogue to the principles of waiver and estoppel.").  And Plaintiffs' argument that the presidency has functioned without incident during the PRA's tenure fails to account for whether each President may have received better and more fearless advice in the absence of the PRA's thoroughgoing disclosure regime.

### 2. The PRA cannot be justified by any express or implied congressional power.

Given the significant burden that the PRA imposes on the presidency, it must be "justified by an overriding need to promote objectives within the constitutional authority of Congress." *Nixon v. GSA*, 433 U.S. at 443.  No enumerated or implied congressional authority justifies the PRA's sweeping regulation of the presidency.

#### a. *Oversight power*

OLC began its analysis with the most apparently relevant congressional authority to the PRA disclosure regime—the power of inquiry or oversight power.  OLC Op. at 17.  After all, there is a long history, dating back to the Founding, of Congress requesting records from the Executive Branch, followed by dispute resolution among the political branches through the "give-and-take

31

of the political process." *Mazars*, 591 U.S. at 859 (citation omitted).  Congress's power of inquiry has significant limits, however, both as a general matter and specifically where presidential records are involved.  Although the power of inquiry is "broad," congressional requests for information must "serve a valid legislative purpose" and "concern a subject on which legislation could be had." *Id.* at 862–63 (citation modified).  "[T]here is no congressional power to expose for the sake of exposure." *Id.* at 863 (quoting *Watkins v. United States*, 354 U.S. 178, 200 (1957)).  Additionally, as to "congressional subpoenas for the President's information," such subpoenas raise "significant separations of powers issues." *Id.* at 866–67.  "Without limits on its subpoena powers, Congress could exert an imperious controul over the Executive Branch" and seek to "compel compliance" with its requests "in court" rather than "negotiating over information requests" with the Executive. *Id.* at 866–67 (citation modified).

In light of those concerns, "courts must perform a careful analysis" of the constitutionality of congressional demands for presidential information "that takes adequate account of the separation of powers principles at stake." *Id.* at 869.  That analysis should include (among other considerations) whether Congress's asserted interest "warrants the significant step of involving the President" or could instead be pursued through "other sources," whether the subpoena is "no broader than reasonably necessary to support Congress's legislative objective," and whether the subpoena imposes undue "burdens" on the President. *Id.* at 869–71.

The PRA's blanket approach cannot withstand this kind of careful analysis.  It imposes preservation obligations on an undifferentiated basis, regardless of the context or the legislative need.  OLC Op. at 23.  Indeed, unlike the PRMPA, it is not tied to the need for any particular records at all, rendering it impossible to say that the PRA is "no broader than reasonably necessary"

32

to accomplish Congress's legislative objective. *Mazars*, 591 U.S. at 870. And the PRA imposes significant burdens on the presidency, as explained above. *See supra.*

Plaintiffs dispute the relevance of *Mazars* and its discussion of the power of inquiry, contending that *Mazars* involved subpoenas that were "mere adjuncts to Congress's legislative authority," rather than a duly enacted statute "in aid of [Congress's] enumerated powers." PI Mem. at 28–29. But the issue here is not the procedure by which Congress seeks to exercise its power—it is whether the power exists in the first place. And as the Supreme Court has explained, Congress does not have a freestanding power to "expose for the sake of exposure." *Mazars*, 591 U.S. at 863 (citation omitted). The separation of powers problem of broad congressional regulation of presidential recordkeeping and disclosure under the PRA undoubtedly raises the same category of concerns as specific subpoenas for presidential information—indeed, it raises those concerns even more acutely.

Nor may the PRA be justified on the ancillary basis that Congress may require the preservation of materials so that they may be tapped in the future for legislative inquiries. Indeed, the concerns that animated the Court's decision in *Mazars*, including "burdens" on the President and the need for a robust showing of legislative need, are even more acutely presented by a sweeping preservation requirement than a targeted legislative inquiry. *Mazars* does not permit the judicial enforcement of a de facto permanent and blanket preservation notice from Congress to the President.

b.    *Necessary and Proper Clause*

There is no express textual commitment in the Constitution for congressional regulation of presidential recordkeeping. Accordingly, the OLC opinion also analyzed whether the PRA is justifiable under the Necessary and Proper Clause. A statute may be constitutional under this

33

clause where it is "a means that is rationally related to the implementation of a constitutionality enumerated power" and where the statute is not otherwise prohibited by the Constitution. *United States v. Comstock*, 560 U.S. 126, 134 (2010); *McCulloch v. Maryland*, 17 U.S. 316, 421 (1819).

OLC first considered whether the PRA is a necessary and proper regulation of agencies and offices that Congress created. But it found this possible justification wanting because the President and Vice President's offices are established by the *Constitution*, not Congress. Consistent with that distinction, the Records Act of 1789, passed by the first Congress, governed the retention and transmission of "books, records, and papers" of the Treasury and War Departments, omitting any regulation of the President's papers. Act of July 27, 1789, ch. 14, § 7, 1 Stat. 68, 69. Later amendments of the statute in the succeeding decades continued to maintain this distinction between records of Executive Departments created by Congress and records of the President. 4 Rev. Stat. § 161 (2d ed. 1878); *see also, e.g.*, 5 U.S.C. § 22 (1958); *id.* § 301 (1970).

In response, Plaintiffs assert that the Necessary and Proper Clause would be rendered a "nullity" if Congress could not regulate the presidency. *See* PI Mem. at 28. Congress may, to be sure, enact legislation to assist in the execution of the powers vested in "any Department or Officer" of the government. U.S. Const. art. I, § 8, cl. 18. But this power does not authorize Congress to interfere with the President's execution of his Article II powers. *See, e.g.*, *Buckley v. Valeo*, 424 U.S. 1, 135 (1976) (per curiam); *Mistretta v. United States*, 488 U.S. 361, 382 (1989) (explaining that the Court has "not hesitated to strike down provisions of law that . . . undermine the authority and independence of one or another coordinate Branch," such as where Congress has attempted to "reassign powers vested by the Constitution in either the Judicial Branch or the Executive Branch"). Indeed, the Court recently explained that "Congress cannot act on, and courts cannot examine, the President's actions on subjects within his 'conclusive and preclusive'

34

constitutional authority." *Trump v. United States*, 603 U.S. 593, 609 (2024). Plaintiffs' reading of the Necessary and Proper Clause is irreconcilable with this clear statement from the Court that various matters within the President's Article II domain are beyond congressional regulation.

Nor does Congress possess authority to regulate recordkeeping of EOP entities that it has established by statute. Congress's decision to formalize in law the structure of certain EOP entities cannot change their fundamental character as adjuncts and advisers to the President. OLC Op. at 32. Even by the terms of the cited statutes, EOP entities not subject to the FRA do not themselves execute the laws of the United States, such as by issuing regulations applicable to the public or directing military action. *See, e.g.*, 50 U.S.C. § 3021(b) (providing that the National Security Council has no "operational authority" and that it exists to "advise" and "make recommendations to the President"). The role of these EOP components is to advise and assist the President in carrying out *his* duties. That is consistent with the fact that the President's organization of and consultation with staff derives from his inherent Article II authorities, not congressional largesse. *See Ass'n of Am. Physicians & Surgeons, Inc. v. Clinton*, 997 F.2d 898, 909 (D.C. Cir. 1993) ("Article II not only gives the President the ability to consult with his advisers confidentially, but also, as a corollary, it gives him the flexibility to organize his advisers and seek advice from them as he wishes."). Congress cannot create for itself an otherwise nonexistent power to regulate the presidency simply by purporting to organize the President's advisers on his behalf. That turns the separation of powers on its head.

The opinion also considered whether the PRA may be necessary and proper as derived from Congress's power to appropriate funds for use by EOP and the White House, including as those funds are used in creating presidential records. OLC Op. at 32–33. The Appropriations Clause, however, is a *limitation* on federal power, requiring that no federal funds may be expended unless

35

they have been appropriated by Congress, not a substantive grant of authority for Congress to regulate the presidency. *See CFPB v. Cmty. Fin. Servs. Ass'n of Am.*, 601 U.S. 416, 438 (2024) (explaining that, although the clause "presupposes Congress' powers over the purse," its "phrasing and location in the Constitution make clear that it is not itself the source of those powers"). And any conditions on the use of federal funding that Congress may impose under the Spending Clause have no relevance here, where Congress's power under the Spending Clause to effect conduct is "in the nature of a contract" whereby recipients of federal funding may "voluntarily and knowingly" conform their conduct to the terms by which Congress has expended funds. *Cummings v. Premier Rehab Keller, P.L.L.C.*, 596 U.S. 212, 216, 219 (2022) (citation omitted). There is no basis in the Constitution to analogize this kind of contract-based Spending Clause jurisprudence to conditions on the use of federal funds by the President. Indeed, congressional appropriations to the Judiciary and the Executive are not contracts between the branches of the Federal Government; they are authorizations to those branches to draw money from the Treasury. And in all events, Congress did not invoke its spending powers in passing the PRA by, e.g., conditioning Executive Branch appropriations on compliance. OLC Op. at 36.

      *c.      Property Clause*

Plaintiffs also invoke the Property Clause, PI Mem. at 26–27, which provides that "Congress shall have Power to dispose of and make all needful Rules and Regulations respecting the Territory or other Property belonging to the United States." U.S. Const. art. IV, § 3, cl. 2. To start, Plaintiffs' argument begs the question by assuming that Congress had the power in the first place to make presidential records the property of the United States. Although statutes are "one important source" for understanding property rights, they can be overcome by longstanding "historical practice." *See Tyler v. Hennepin Cty., Minn.*, 598 U.S. 631, 638–39 (2023) (recognizing

36

traditional private-property rights in the face of a statute that had "purported to extinguish" them nearly a century earlier). That is because a legislature may not simply declare by fiat—even prospectively—that what was long understood to be private property will now belong to the state. *Cf. id.* By the time of the PRA's enactment, nearly 200 years of historical practice had established that presidential records were private property, *not* property of the United States. OLC Op. at 5–10. It is hard to see how the original public meaning of the Property Clause could encompass a kind of property that no one at the founding era would have identified as a "Property belonging to the United States." And Plaintiffs' capacious interpretation of the Property Clause flouts the *ejusdem generis* canon of interpretation. The clause's reference to "other Property" is a "residual clause" that "should itself be controlled and defined by reference to the . . . categor[y] . . . just before it." *See Circuit City Stores, Inc. v. Adams*, 532 U.S. 105, 115 (2001).

Moreover, even if the Property Clause had any relevance here, Congress's exercise of that power must still be consistent with the separation of powers. Navy ships are property of the United States, but Congress could not use its Property Clause power to compel the President to deploy an aircraft carrier. Paper and computers at the White House are property of the United States, but Congress could not forbid the President from using such media to memorialize a pardon. There is no indication that the clause was intended to create another power for Congress's use in regulating the President's exercise of Article II authorities.

### 3. *Nixon v. GSA*'s evaluation of the PRMPA does not control here.

Plaintiffs principally contend that the Supreme Court's analysis of the PRA's predecessor statute forecloses Defendants' conclusion that the PRA is unconstitutional. Their argument fails for multiple reasons.

37

To begin, *Nixon v. GSA* plainly does not control as to the PRA's regulation of each incumbent administration's recordkeeping obligations. OLC Op. at 42. The PRMPA did not regulate the recordkeeping of *any* current President but, rather, only the custody and disposition of presidential records of one particular *former* President. *Id.* Regulation of the ongoing functioning of a presidential administration raises an even more direct separation of powers confrontation than the retrospective regulation of a completed corpus of presidential materials. The *Nixon v. GSA* Court expressly recognized as much in considering the purposes of the presidential communications privilege. *See* 433 U.S. at 448 (explaining that "to the extent that the [presidential communications] privilege serves as a shield for executive officials against burdensome requests for information which might interfere with the proper performance of their duties, a former President is in less need of it than an incumbent") (citations omitted). Given this context, any statements by the *Nixon v. GSA* Court arguably bearing on the PRA's regulation of incumbent recordkeeping is dicta that this Court should not treat as persuasive for the reasons discussed above. As OLC has explained, the burdens imposed on each incumbent administration by the PRA are unjustifiable in comparison to the lack of enumerated authority for Congress's arrogation of presidential authority.

*Nixon v. GSA* also has nothing to say about the portion of the PRA that treats presidential records as property of the United States. To the contrary, the Court saw "no reason to engage in the debate whether [Nixon] has legal title to the materials" because, *inter alia*, the statute "assure[d] [Nixon] of just compensation if his economic interests are invaded." *Id.* at 445 n.8. Thus, Plaintiffs are simply wrong when they say that the *Nixon v. GSA* Court approved of the "establishment of Presidential records as property of the United States." PI Mem. at 30. The *Nixon v. GSA* Court specifically disclaimed making any decision about "legal title" to the papers

and recordings at issue. *See Nixon v. GSA*, 433 U.S. at 445 n.8. In subsequent proceedings, the D.C. Circuit held that the PRMPA constituted a "taking" of President Nixon's property rights in his records. *See Nixon v. United States*, 978 F.2d at 1287. That opinion did not consider whether the PRMPA was justifiable under the Property Clause and specifically recognized, contrary to the PRA, that "President Nixon's presidential papers were exclusively the property of the President" at the time the PRMPA was passed. *See id.* at 1284.

Even as to the aspects of the PRA that have a more direct analogue in the PRMPA, *Nixon v. GSA* is distinguishable in key respects. The PRMPA, like the PRA, required the Executive Branch's retention of presidential records and required a mechanism for public release of such records in certain circumstances. *Id.* at 434–35. *Nixon v. GSA* held that the PRMPA was permissible under the separation of powers. *Id.* at 441–46. But the context in which the PRMPA was enacted, written into the text of the statute itself, is critical. The PRMPA was passed in the wake of the Watergate scandal and its purpose was expressly tied to the preservation of records related to that scandal. As the *Nixon v. GSA* Court recognized, the statute's "primary purpose [was] to provide for the American people a historical record of the Watergate events." *Id.* at 436 n.4. The statute, consistent with its stark deviation from nearly two hundred years of historical practice regarding presidential records, "ar[ose] in a context unique in the history of the Presidency." *Id.* at 439. And the text of the statute is replete with indicia of its Watergate-focused intent. At section 104(a)(1), the statute instructs NARA to promulgate public access regulations that account for "the need to provide the public with the full truth, at the earliest reasonable date, of the abuses of governmental power popularly identified under the generic term 'Watergate.'" 433 U.S. at 435. The Act also gave special prioritization to records requests "by the Office of Watergate Special Prosecution Force." *Id.* at 434 (citing Pub. L. No. 93-526, § 102(b), 88 Stat. 1695, 1696 (1974)).

39

The Court's analysis in *Nixon v. GSA* is, at bottom, demonstrably tied to the particular context of Watergate. That Nixon and the GSA Administrator had entered into an agreement allowing for the destruction of materials needed by the Watergate Special Prosecutor, *see* 433 U.S. at 431–32, demonstrably bore on the Court's analysis, as the Court suggested that Congress's power to regulate such documents was "augmented" by the PRMPA's "important interests," *id.* at 445–46. Given that context, Congress came closer in the PRMPA to coloring inside the lines of its proper authority under Article I. *See Mazars*, 591 U.S. at 870 ("insist[ing]" that a congressional subpoena be "no broader than reasonably necessary to support Congress's legislative objective"); *cf. United States v. Nixon*, 418 U.S. 683, 709 (1974) (permitting grand jury subpoena to the President where "[t]he very integrity of the judicial system and public confidence in the system depend on full disclosure of all the facts"). Although the *Nixon v. GSA* Court saw no separation of powers problem in the PRMPA, its reasoning should not be extended to the broader PRA context, particularly where the Court did not analyze the congressional powers justifying the PRMPA.

Finally, *Nixon v. GSA* sits in significant tension with *Mazars* and other recent separation of powers decisions by the Supreme Court. OLC Op. at 45–46. That tension further warrants a limited reading of *Nixon v. GSA* that does not extend it beyond the four corners of the opinion. *Cf. id.* at 44 (noting that President Nixon did not present "any challenge to Congress's Article I power to enact the PRMPA"). Nonetheless, to the extent the Court determines that *Nixon v. GSA* is controlling, the United States preserves for appeal its argument that *Nixon v. GSA* was wrongly decided for the reasons laid out above and in OLC's opinion. *Id.* at 45–49.

### 4. No part of the PRA can be constitutionally applied.

Lastly, there are no non-severable provisions of the PRA that may be applied in the absence of the constitutionally infirm portions. *See Murphy v. Nat'l Collegiate Athletic Ass'n*, 584 U.S.

40

453 (2018). That is because, for the reasons discussed above, the lack of congressional authority to establish this scheme necessarily pervades all aspects of the PRA's recordkeeping and disclosure regime. Even as to stray provisions of the statute that do not apparently implicate the document creation, preservation, and disclosure aspects of the statute—and which might therefore be constitutionally acceptable—these provisions are not severable because the statute would not "function in a *manner* consistent with the intent of Congress" in their absence. *Alaska Airlines, Inc. v. Brock*, 480 U.S. 678, 685 (1987). Although there is nothing apparently problematic in the statute's authorization for the Archivist to "maintain and preserve Presidential records on behalf of the President" during his term in office, 44 U.S.C. § 2203(f), that provision cannot advance the intent of Congress where divorced from the Archivist's disclosure role following the term's conclusion. OLC Op. at 50–51; *see also Murphy*, 584 U.S. at 481–86 (finding "no provision" of statute severable where the Court held Congress would not have wanted remaining provisions to stand in the absence of the unconstitutional aspects of the statute).

Moreover, Plaintiffs allege standing only on the basis of the PRA's recordkeeping and public release provisions, which sit at the heart of the constitutional infirmities identified above. Plaintiffs lack standing to challenge OLC's severability analysis as to stray provisions of the PRA having no relationship to their interests. *See Printz v. United States*, 521 U.S. 898, 935 (1997) (holding the Court had "no business answering" "important questions" as to severability where "no plaintiff" burdened by potentially severable provisions was before the Court).

## III.    THE REMAINING FACTORS DISFAVOR PRELIMINARY RELIEF

Nor do the balance of harms and the public interest favor any injunction, much less the sweeping obey-the-law injunction Plaintiffs propose. The remaining equitable factors, which

merge when the government is the nonmoving party, *see Nken v. Holder*, 556 U.S. 418, 435 (2009), weigh decisively in the government's favor.

At bottom, Plaintiffs ask this Court to act as a superintendent for all White House recordkeeping, even though "Congress . . . sought assiduously [in the PRA] to minimize outside interference with the day-to-day operations of the President." *CREW*, 924 F.3d at 609 (quoting *Armstrong I*, 924 F.2d at 290). The PRA thus "accords the President virtually complete control over his records during his term of office." *Armstrong I*, 924 F.2d at 290. The kind of judicial supervision of the presidency Plaintiffs request would create its own separation of powers problem above and beyond that posed by the PRA itself. Weighed against that grave intrusion on the presidency is a minimal risk of presidential records being lost. The Eisenhauer declaration confirms that all electronic messages and files on EOP systems are being continuously preserved without exception. *See* Eisenhauer Decl. ¶¶ 3–9. That includes the archiving of text messages and Signal messages on official devices, even if a communicant erroneously sets those messages to auto-delete or acts in contravention of policy by attempting to delete messages of their own volition. *Id.* ¶ 6. And the 2026 Policy instructs EOP employees to use official systems where conducting official business and, in all events, to preserve records of their conduct of official business. 2026 Policy at 2, 3. The Court should not intervene on an emergency basis under these circumstances.

## CONCLUSION

Plaintiffs' Motion for Preliminary Injunction, ECF No. 7, should be denied.

Dated: May 5, 2026

Respectfully submitted,

BRETT A. SHUMATE
Assistant Attorney General

ERIC J. HAMILTON
Deputy Assistant Attorney General

ELIZABETH J. SHAPIRO
Deputy Director

*/s/ James Powers*
JOHN BAILEY
Counsel to the Assistant Attorney General
(Ohio Bar No. 104260)
JAMES R. POWERS (TX Bar No. 24092989)
WINSTON SHI (NY Bar No. 5747068)
Trial Attorneys
U.S. Department of Justice
Civil Division, Federal Programs Branch
1100 L Street, NW
Washington, DC 20530
Telephone: (202) 353-0543
E-mail: James.R.Powers@usdoj.gov

*Counsel for the United States*