**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| FREEDOM OF THE PRESS FOUNDATION, *et al.*, | |
| *Plaintiffs,* | |
| v. | Case No. 26-cv-01402-JDB |
| DONALD TRUMP, in his official capacity as President of the United States, *et al.*, | |
| Defendants. | |

**REPLY IN SUPPORT OF PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION**

**TABLE OF CONTENTS**

TABLE OF AUTHORITIES ........................................................................................................... ii

INTRODUCTION ....................................................................................................................... 1

ARGUMENT ............................................................................................................................ 2

    I.    Plaintiffs are likely to succeed on the merits. ................................................................ 2

        A.   Plaintiffs have standing. ......................................................................................... 2

        B.   The EOP Policy is reviewable by this Court. ........................................................... 3

        C.   The EOP Policy does not comply with the PRA. ....................................................... 5

           1.  The EOP Policy is a voluntary and revocable measure predicated on the unlawful premise that Presidential records are the President's personal property. .................... 5

           2.  Defendants do not rebut that the EOP Policy leaves document retention to the discretion of EOP staff. ...................................................................................... 7

           3.  Defendants do not rebut the insufficiency of the EOP Policy's Text Messaging Provision. .......................................................................................................... 10

        D.   Plaintiffs are likely to prevail on their equitable, *ultra vires*, and separation-of-powers claims challenging the EOP Policy. ................................................................ 12

        E.   The PRA is constitutional. .................................................................................... 15

           1.  Defendants' burden objection to the PRA is meritless. ........................................... 15

           2.  Congress had authority to enact the PRA. ............................................................. 17

           3.  Binding precedent forecloses Defendants' argument that the PRA is unconstitutional. ................................................................................................. 20

    II.   Plaintiffs will suffer irreparable harm absent a preliminary injunction. ........................ 20

    III.  The balance of equities and public interest favor granting a preliminary injunction. .. 24

CONCLUSION ........................................................................................................................ 25

**TABLE OF AUTHORITIES**[*]

**Cases**

*Am. Hist. Ass'n v. Peterson*,
876 F. Supp. 1300 (D.D.C. 1995) .................................................................3, 13

*Am. Oversight v. Hegseth*,
788 F. Supp. 3d 14 (D.D.C. 2025) ......................................................................7

*Armstrong v. Bush*,
807 F. Supp. 816 (D.D.C. 1992) .....................................................................6, 22

*Armstrong v. Bush*,
924 F.2d 282 (D.C. Cir. 1991) ............................................................................3

*Armstrong v. Exceptional Child Center, Inc.*,
575 U.S. 320 (2015) ....................................................................................12, 13

*Armstrong v. Exec. Off. of the President, Off. of Admin.*,
1 F.3d 1274 (D.C. Cir. 1993) ..................................................................... *passim*

*CREW v. Cheney*,
577 F. Supp. 2d 328 (D.D.C. 2008) ........................................................... *passim*

*CREW v. Cheney*,
593 F. Supp. 2d 194 (D.D.C. 2009) ..................................................................3, 4

*CREW v. EOP*,
587 F. Supp. 2d 48 (D.D.C. 2008) ......................................................................5

*CREW v. Off. of Admin.*,
565 F. Supp. 2d 23 (D.D.C. 2008) .................................................................22, 23

*CREW v. Trump*,
924 F.3d 602 (D.C. Cir. 2019) ..........................................................................13

*Dalton v. Specter*,
511 U.S. 462 (1994) .........................................................................................14

*Fed. Express Corp. v. U.S. Dep't of Com.*,
39 F.4th 756 (D.C. Cir. 2022) .......................................................................13, 14

*Free Enter. Fund v. Pub. Co. Acct. Oversight Bd.*,
561 U.S. 477 (2010) .........................................................................................15

*Glob. Health Council v. Trump*,
153 F.4th 1 (D.C. Cir. 2025) .............................................................................15

*Gonzales v. Raich*,
545 U.S. 1 (2005) .............................................................................................18

---

[*] Authorities marked with an asterisk are those on which counsel chiefly relies.

**Cases—continued**

*Judicial Watch v. NARA*,
845 F. Supp. 2d 288 (D.D.C. 2012) ...............................................................5

*Kleppe v. New Mexico*,
426 U.S. 529 (1976)...................................................................................19

*LaRoque v. Holder*,
650 F.3d 777 (D.C. Cir. 2011) ......................................................................2

*Leedom v. Kyne*,
358 U.S. 184 (1958) ..................................................................................14

*Nat'l Ass'n of Postal Supervisors v. U.S. Postal Serv.*,
26 F.4th 960 (D.C. Cir. 2022)......................................................................13

*\*Nixon v. Administrator of General Services*,
433 U.S. 425 (1977).........................................................................2, 15, 20

*Sidak v. U.S. Int'l Trade Comm'n*,
No. 23-5149, 2026 WL 1110981 (D.C. Cir. Apr. 24, 2026)..............................13, 15

*Tex. & N.O.R. Co. v. Bhd. of Ry. & S.S. Clerks*,
281 U.S. 548 (1930)...................................................................................14

*Texas v. United States*,
798 F.3d 1108 (D.C. Cir. 2015) .................................................................6, 21

*Trump v. Mazars USA, LLP*,
591 U.S. 848 (2020)...............................................................................19, 20

*Trump v. Thompson*,
142 S. Ct. 680 (2022)..................................................................................17

*Trump v. Thompson*,
20 F.4th 10 (D.C. Cir. 2021).....................................................................16, 17

*Trump v. United States*,
603 U.S. 593 (2024).....................................................................................18

*United States v. Trump*,
No. 23-cr-00257-TSC (D.D.C. Aug. 1, 2023) ...................................................16

**Statutes & Rules**

44 U.S.C.
§ 2202.................................................................................................3, 14
§ 2203.......................................................................................................3
§ 2204......................................................................................................17
§ 2204(c)(2) .............................................................................................16
§ 2204(e) .................................................................................................16
§ 2205.......................................................................................................3

**Statutes & Rules—continued**

44 U.S.C.
§ 2208.................................................................................................................17
*§ 2209..............................................................................................................9, 10
§ 2209(b)............................................................................................................7
§ 2911(b)............................................................................................................7

Loc. Civ. R. 7(b) .....................................................................................................6, 21

**Constitutional Provisions**

U.S. Const. art. I, § 1............................................................................................19

U.S. Const. art. I, § 8, cl. 18................................................................................18

**Other Authorities**

H.R. Res. 503, 117th Cong. § 3(1) (2021)...........................................................16

NARA, Bulletin 2023-02, *Expanding the Use of a Role-Based Approach
(Capstone) for Electronic Messages* (Jan. 5, 2023).........................................8

Report of the Select Committee to Investigate the January 6th Attack on the
United States Capitol, H.R. Rep. No. 117-663 (2022) ...................................17

*Select January 6th Committee Final Report and Supporting Materials Collection*,
GovInfo ...........................................................................................................17

**INTRODUCTION**

On April 2, Defendants adopted a policy of complete and permanent repudiation of the Presidential Records Act ("PRA"), its mandates, and Defendants' obligations to comply with the statute. Defendants' policy purports to make all Presidential records the personal property of the President whose administration generates them. *See* Decl. of Kayvan Farchadi Ex. A ("CREW Decl. Ex. A," "EOP Policy," or "Policy"), ECF No. 7-2. With the PRA cast aside, Defendants implemented guidelines that explicitly call for the non-preservation of vast quantities of Presidential records in text messages and all other forms of electronic communications, assign *no* affirmative obligations to preserve Presidential records (let alone in compliance with PRA standards), and can be ignored or withdrawn at will by the White House. *Id.* Defendants mischaracterize Plaintiffs' motion for a preliminary injunction to prevent the irreparable harm caused by this EOP Policy as a run-of-the-mill dispute about PRA implementation that this Court is powerless to review. But Defendants' arguments do not withstand the slightest scrutiny.

Binding precedent, *Armstrong v. Exec. Off. of the President, Off. of Admin.*, 1 F.3d 1274, 1292–94 (D.C. Cir. 1993) ("*Armstrong II*"), authorizes judicial review of the EOP Policy. Defendants' effort to limit *Armstrong II's* scope is incompatible with the language and logic of that decision and the PRA itself. Equally meritless is Defendants' false assertion that the EOP Policy is equivalent to the PRA. That argument relies on Defendants' counsel's rewriting of the Policy and a threadbare White House declaration, which describes a woefully deficient record retention system and omits any commitment to fully preserve records as the PRA requires.

Defendants' other merits arguments fare no better. Defendants cite no authority or statutory text to support their claim that the PRA forecloses equitable claims. Their defense to Plaintiffs' *ultra vires* claim tries to whitewash their open defiance of a duly enacted statutory scheme. Their response to Plaintiffs' separation-of-powers claims ignores that they are acting with a total absence

1

of statutory authority in flouting federal law, based on nothing but an assertion of their own constitutional authority. And on the constitutionality of the PRA, Defendants offer a blunderbuss of legal theories that are irrelevant to Congress's authority to enact the statute, and that are foreclosed by *Nixon v. Administrator of General Services*, 433 U.S. 425, 444–46 (1977).

Defendants likewise offer no serious argument on irreparable harm, as EOP staff continue to discard text messages and electronic communications per the EOP Policy. Defendants concede that such destruction of Presidential and federal records constitutes irreparable harm and fail to address an unbroken line of cases issuing emergency relief in far less egregious circumstances. Defendants insist that such harm will not occur here because the EOP policy is equivalent to the PRA, but it is not. And Defendants fail to articulate any countervailing harm they will face from a preliminary injunction, apart from (temporarily) having to comply with the PRA as every White House has since 1981.

Defendants' amalgamation of long-shot arguments do not undercut Plaintiffs' likelihood of success on the merits. And Defendants' arguments confirm that preliminary relief is necessary to prevent the imminent and irreparable loss of Presidential records.

## ARGUMENT

### I. Plaintiffs are likely to succeed on the merits.

#### A. Plaintiffs have standing.

Defendants dispute Plaintiffs' standing on the ground that their record retention practices are equivalent to those in the PRA. Defs.' Mem. in Opp'n to Pls.' Mot. for Prelim. Inj. ("Opp'n") 13–14, ECF No. 11. But that conflates standing with the merits. When evaluating standing, the Court "must assume [Plaintiffs] *will prevail on the merits*." *LaRoque v. Holder*, 650 F.3d 777, 785 (D.C. Cir. 2011) (emphasis added). Plaintiffs have amply demonstrated standing. Mem. in Supp. of Pls.' Mot. for Prelim. Inj. ("Mem.") 19–20, ECF No. 7-1. In any event, Plaintiffs have likewise

2

shown that the EOP Policy is both inconsistent with the PRA and irreparably harms Plaintiffs, for the reasons explained below. *See infra* §§ I.C, II; Mem. 11–19, 31–36.

### B. The EOP Policy is reviewable by this Court.

Defendants badly misconstrue *Armstrong v. Bush*, 924 F.2d 282 (D.C. Cir. 1991) ("*Armstrong I*"), and *Armstrong II. See* Opp'n 17–20. The animating principle of both decisions was the recognition of the need to preserve the constitutional balance that Congress struck in the PRA between "'minimiz[ing] outside interference with the day-to-day operations of the President and his closes advisors and to ensure executive branch control over presidential records during the President's term in office,'" *Armstrong II*, 1 F.3d at 1292 (quoting *Armstrong I*, 924 F.2d at 290), on the one hand, and establishing "a clear limitation on just which materials the President could legitimately assert control over ___***and***___ to preserve the pre-existing body of Freedom of Information Act ("FOIA") law governing the disclosure of government agency records," on the other, *id.* (emphasis added). As judges in this District have confirmed, *Armstrong II* permits judicial review of whether record-keeping guidelines are facially compliant with the PRA, and that review is not limited to parsing the relationship between FOIA and the PRA. *See CREW v. Cheney*, 593 F. Supp. 2d 194, 215–17 (D.D.C. 2009); *Am. Hist. Ass'n v. Peterson*, 876 F. Supp. 1300, 1315 (D.D.C. 1995).

Defendants' contrary reading of *Armstrong II* cannot be reconciled with either the language of that decision or the PRA's text, purpose, and structure. The PRA was not enacted simply to distinguish between Presidential and federal records and determine the extent to which the latter is immediately available to the public; it is a public ownership and record preservation measure that also provides rights of access to Presidential records to incumbent Presidents and Congress and by subpoena and other judicial process, as well as requires notice to Congress before Presidential records are destroyed. *See* 44 U.S.C. §§ 2202, 2203, 2205; *see also Armstrong I*, 924

F.2d at 290 (noting that PRA's notification provision is meant to allow Congress "its traditional means of voicing objection . . . or passing legislation to block the destruction of certain records"). The Court should not accept Defendants' non-sensical position that *Armstrong II*, in an explicit effort to protect the constitutional balance struck by Congress, 1 F.3d at 1292, precludes judicial review of PRA guidelines like the EOP Policy that *expressly declare PRA a nullity* and *openly defy its requirements*. Defendants' illogical argument is foreclosed by *Armstrong II*'s unambiguous holding that "guidelines describing which *existing* materials will be treated as presidential records in the first place are subject to judicial review." *Id.* at 1294. Plaintiffs' claims fit easily within this framework. *See* Mem. 20–22.

When faced with a far tamer power grab under the PRA by the Vice President in *CREW v. Cheney*, 593 F. Supp. 2d at 216, the court recognized "that it 'borders on the absurd' to believe that Congress statutorily defined Vice-Presidential records and required the Vice President to implement steps to preserve them, but denied any judicial review to prevent the Vice President from using a different definition for Vice-Presidential records." Here, Defendants have adopted guidelines that do not just apply a different definition, but reject the premise that Presidential records exist at all. Mem. at 21–22.

Further, while much of *Armstrong II* was dedicated to parsing the relationship between FOIA and the PRA because their relationship controlled the outcome of the dispute before the court, 1 F.3d at 1290–96, Defendants' unduly narrow reading of *Armstrong II* also ignores that it was decided under the presumption that the PRA—and its adoption of FOIA procedures to ensure public access to archived Presidential records—was still in place. It makes little sense that the Circuit would deem judicial review of PRA guidelines "absolutely essential to preventing the PRA from becoming a potential presidential *carte blanche* to shield materials from the reach of the

4

FOIA" and "render[ing] the FOIA a nullity" when those materials are federal records, while allowing the President to use the PRA as a *carte blanche* to shield Presidential records from the PRA's FOIA provisions and render the PRA itself a nullity. *Armstrong II*, 1 F.3d at 1292–93.

Defendants wrongly claim that two district court cases support their cramped reading of *Armstrong II*, Opp'n 18–19, but neither does. *See CREW v. EOP*, 587 F. Supp. 2d 48, 55 (D.D.C. 2008) (confirming that *Armstrong II* permitted judicial review to "assure that guidelines defining Presidential records do not improperly sweep in nonpresidential records" because that was the allegation before the court, but not suggesting that *Armstrong II* was *limited* to such cases); *Judicial Watch v. NARA*, 845 F. Supp. 2d 288, 298 (D.D.C. 2012) (determining that it "need not decide" the breadth of *Armstrong II*).

### C. The EOP Policy does not comply with the PRA.

Defendants stop short—as they must—of asserting that the EOP Policy calls for *complete* preservation Presidential records as required by the PRA. *See* Opp'n 5 (stating only that the White House "continues to preserve records that would have been covered by the PRA"). That omission is unsurprising, given the Policy's numerous facial deficiencies. *See* Mem. 11–19.

> **1.    The EOP Policy is a voluntary and revocable measure predicated on the unlawful premise that Presidential records are the President's personal property.**

Defendants concede that they have adopted the EOP Policy. Opp'n 5–6, 9–11. And while they tout the EOP Policy's statement that "[c]omponents are free to retain the records retention policies developed under the PRA," Opp'n 10; EOP Policy at 1, that mere reference does not overcome the Policy's deficiencies. Defendants offer no detail on what "records retention policies developed under the PRA" is meant to mean, what they say, or which EOP components have them. And Defendants offer no explanation of how EOP component staff, who are bound by Executive

Order to abide by the President's and the DOJ's interpretations of legal questions, *see* Mem. 10,[1] reconcile any inconsistencies with the EOP Policy.

Defendants also do not dispute, and therefore concede, *see Texas*, 798 F.3d at 1110; Loc. Civ. R. 7(b), that, absent the PRA, the Policy is entirely voluntarily and can be waived or revoked by the White House at any time. *See* Mem. 2, 23. This is no minor technicality. President Trump, who has a history of extreme hostility to government records laws, Mem. 8, Compl. ¶¶ 107, 109–10, has now been told by OLC and the Counsel to the President that he owns the Presidential records created during his administrations. This heightens the need for preliminary relief. *See Armstrong v. Bush*, 807 F. Supp. 816, 820–21 (D.D.C. 1992) (granting TRO because "history is full of instances" in which Presidents have chosen to "erase, burn, or destroy all or substantially all Presidential or [EOP] records"); *CREW v. Cheney*, 577 F. Supp. 2d 328, 339, 341 (D.D.C. 2008) (issuing preliminary injunction to preserve requested Vice-Presidential records when artificially narrow definition deprived those records "of the [PRA's] protections").

Defendants also do not dispute that they are treating Presidential records as the personal property of President Trump and will comply with any attempt by him to take control of them, including after he leaves office. *See* Mem. 18. In fact, Defendants are litigating this case to protect the President's purported right *to do exactly that*. Although Defendants assiduously avoid acknowledging these realities in the EOP Policy and their Opposition, they are foundational premises of the policy and its blatant lawlessness, *see generally* CREW Decl. Ex. A, and render the Policy non-compliant with the PRA. Put differently, Defendants do not claim that the EOP Policy *complies* with the PRA, they are claiming that it is a suitable *equivalent*. But it is not.

---

[1] Defendants do not dispute that Executive Branch officials are bound by Executive Order to follow OLC opinions and the legal opinions of the President and thus concede that point. *See Texas v. United States*, 798 F.3d 1108, 1110 (D.C. Cir. 2015); *see also* Loc. Civ. R. 7(b).

### 2. Defendants do not rebut that the EOP Policy leaves document retention to the discretion of EOP staff.

Defendants do not rebut that EOP Policy's pervasive use of the discretionary "should" impermissibly leaves questions of preservation up to individual EOP staff. *See* Mem. 11–17. The Office of White House Counsel uses mandatory language in the Policy when it intends to do so. *See* CREW Decl. Ex. A at 2–3 (stating that EOP staff "may not take any records," EOP staff "cannot permanently delete emails or materials saved to an EOP laptop or the EOP network," and referring to "**mandatory** records trainings."). President Trump's previous White House Counsel also understood the practical distinction between permissive and mandatory language when instructing EOP staff on their PRA obligations, *see* Mem. 16–17, and so do the courts. *See Am. Oversight v. Hegseth*, 788 F. Supp. 3d 14, 22–23 (D.D.C. 2025) (crediting defendants' Federal Records Act ("FRA") policies because they used mandatory language such as "must," "are required to," and "shall" and thus did "not allow for discretion in determining what should be recorded[.]"). The EOP Policy meticulously avoids such mandates. The only logical reading of the Policy's use of discretionary language—especially in the absence of the PRA's disciplinary mechanism, *see* Mem. 3, 5, 23, 24; 44 U.S.C. §§ 2209(b), 2911(b)—is that those provisions are not in fact mandatory.

Proving Plaintiffs' point, Defendants' counsel tries to obscure the discretionary nature of many Policy provisions by repeatedly replacing the non-mandatory language in the Policy with counsel's own verbiage that might be construed as mandatory. *Compare* Opp'n 5–6, 10–11, 24–26, 42 *with* CREW Decl. Ex. A at 2–3 ("Records Generally," "Electronic Records," "Text Messaging," and "Duty to Preserve" provisions). Equally unavailing is Defendants' reliance on the Policy's mandatory training provision, *id.* at 25, as training on a deficient Policy only worsens the problem.

7

Defendants' additional assertion that *Armstrong I* precludes the Court from considering the Policy's discretionary provisions because doing so would raise "claims . . . based on the day-to-day management of the White House," *see* Opp'n 25, entirely misses the point of *Armstrong II* and this case. Plaintiffs are not challenging or seeking to compel any particular recordkeeping decision by the President or his staff, but rather argue that the plain text of the Policy does not comply with the PRA and will lead to violations of the statute. *See supra* § I.B; Mem. 11–18, 20–26, 31–36. Defendants' illogical position would, if accepted, empower the White House to evade judicial review of PRA policies simply by making them discretionary—a direct contradiction of the statute itself. Mem. 4–8.

Defendants additionally dispute that holes in the EOP Policy permit destruction of records without acknowledging that it *only* forbids permanently deleting "emails or materials saved to an EOP laptop or the EOP network," CREW Decl. Ex. A at 2, or that the text messaging provision *calls for* the non-preservation of large swathes of Presidential records. *See infra* § I.C.1; Mem. 11-16. *See also* NARA, Bulletin 2023-02, *Expanding the Use of a Role-Based Approach (Capstone) for Electronic Messages* (Jan. 5, 2023) (recognizing "that the use of additional types of electronic messaging often now replaces conversations previously occurring over email"). In fact, all that Defendants muster from the EOP Policy is the assertion that the Policy "on a blanket basis [] require[s] EOP staff 'to preserve any material related to the performance of their duties' regardless of the 'medium of the material,'" Opp'n 26, when in reality the provision merely states that staff "should" do so, CREW Decl. Ex. A at 2.

And finally, Defendants' reliance on the declaration of Robert J. Eisenhauer to claim that they are preserving all Presidential records fails. *See* Opp'n 6, 11–12, 25, 26, 42. The Eisenhauer declaration is explicitly limited to describing the White House's retention practices—all of which

8

are voluntary in the absence of the PRA—with respect to "official emails and electronic documents created on EOP technology assets by employees of the EOP[.]" Decl. of Robert J. Eisenhauer ("Eisenhauer Decl.") ¶ 3, ECF No. 11-1. The declaration fails entirely to address the White House's preservation of records created or housed on *non-official* devices or accounts, or other electronic Presidential records created outside official EOP systems, which are the records most at risk of destruction under the EOP Policy because they remain in the hands of EOP staff. *See* Decl. of J. Baron ¶¶ 8, 18–26, ECF No. 7-3 (noting that in his 33 years of government experience, staff compliance with recordkeeping requirements "was minimal" when federal employees had "to take individual actions" to preserve individual electronic records, and explaining why the EOP Policy is "likely to cause confusion and compliance issues").

This is so even though the PRA contemplates that Presidential records will be created outside of government systems and expressly requires that such records be promptly preserved in official systems. Congress enacted 44 U.S.C. § 2209 to ensure that any electronic communication that includes Presidential records and is made *outside* of official messaging accounts copies an official messaging account when transmitted or, if that does not occur, a "complete copy" of that communication is transferred to an official messaging account within 20 days of its transmission. *See* Mem. 4–6.

The EOP Policy puts an even finer point on the prevalence of Presidential records outside of government systems by comparing the prevalence of text messaging to talking and outlining for EOP staff what they personally should and should not preserve, which the Policy need not do if text messages were being retained anyway. CREW Decl. Ex. A at 2. In fact, the Policy explicitly authorizes EOP staff *not* to retain certain text messages, setting them apart from the system described in the Eisenhauer declaration. *Id.* The Policy's "Electronic Records" provision, which

9

states that "[m]aterials created or edited by EOP staff should be saved on your EOP laptop or the EOP network," reinforces that EOP staff are creating Presidential records outside of EOP systems. *Id.* at 2. Indeed, the entire Policy, by suggesting what EOP staff should and should not retain without reference to the retention system described in the Eisenhauer declaration, must be understood as EOP's guidance for retention in contexts *other than* when records are created on EOP systems—namely, when they are created on non-official platforms and accounts.

### 3. Defendants do not rebut the insufficiency of the EOP Policy's Text Messaging Provision.

Defendants offer no meaningful defense of the EOP Policy's text messaging provision. To start, they offer no explanation of how that provision's statement that "[t]ext messages should *only* be preserved when they are the sole record of official decision-making, government action, or contain unique information not available elsewhere," CREW Decl. Ex. A at 2, squares with the PRA's mandate that "a complete copy" of every electronic message containing a Presidential record sent from a non-official electronic messaging account be sent to an official-messaging account, or is even achievable when EOP staff might not be in a position to evaluate whether their text messages fit those criteria, Mem. 5–6, 15. Nor do they address how the text messaging provision, which encourages EOP staff to "memorialize" information from text messages "in a more accessible format, such as an email or memorandum" and then delete the original, CREW Decl. Ex. A at 2, squares with the PRA's requirement for a complete copy of electronic messages that contain Presidential records, Mem. 5–6, 15.

Defendants' arguments in defense of the text messaging provision make little sense. Their claim that the retention practices described in the Eisenhauer declaration, coupled with the fact that the EOP Policy purportedly "instructs employees to conduct official business on EOP systems wherever possible" satisfies 44 U.S.C. § 2209, Opp'n 26, is a non-starter. As an initial matter, the

retention system described in the Eisenhauer declaration interacts only with text messages *once they are on an EOP system* and not, as the text messaging provision of the EOP Policy clearly envisions, when EOP staff are determining whether to retain text messages from non-EOP accounts. *See supra* § I.C.2. Further, the Policy does not "instruct[] employees to conduct official business on EOP systems wherever possible," Opp'n 26; it only says that EOP staff "*should* avoid using personal devices for government business whenever possible." CREW Decl. Ex. A at 2 (emphasis added). Even then, it suggests that staff refrain from doing so not because such records need to be preserved, but because it might require a search of the personal device "in litigation or in response to congressional oversight requests." *Id.* And by its express terms, that provision contemplates and permits EOP staff to conduct government business on their personal devices when avoiding doing so is not possible. *Id.*

Defendants' lengthiest defense to the EOP Policy's text messaging provision attacks a straw man. Plaintiffs' motion notes that the text messaging provision expressly permits EOP staff not to retain text messages pertaining to "ministerial tasks," even if they otherwise "should" be retained under the PRA, and even though the legal and lay definitions of "ministerial" would include records reflecting the execution of official acts and duties required by law. *See* Mem. 13–14. Defendants simply ignore that provision and argument and instead, without citation to Plaintiffs' motion, excoriate Plaintiffs for asking the Court to endorse a "hyperliteral construction" of the PRA that would require retention of personal records, "routine logistical messages," and other records that have no substantive bearing on decision-making. *See* Opp'n 26–28. But Plaintiffs made no such argument, and Defendants' misdirection in place of an actual explanation of why ministerial records need not be preserved is a telling concession.

11

Worse, Defendants mischaracterize the substantive sweep of the text messaging provision itself by repeatedly asserting that it applies to *any* "non-official medium." *See* Opp'n 5–6, 25. That is simply false. The "Text Messaging" provision makes no reference to any other form of "non-official medium," be it in the form of social media posts, direct messages on social media or other messaging applications, voice and video messages, tweets or Truth Social posts, or any of the multitude of forms of "electronic messaging accounts" used to communicate today. CREW Decl. Ex. A at 2-3; *see also* NARA, Bulletin 2015-02, *Guidance on Managing Electronic Messages* (July 29, 2015) (describing "electronic messages" as "text messaging, chat/instant messaging, messaging functionality in social media tools or applications, voice messaging, and similar forms of electronic messaging systems")   The same is true for the Policy's "Electronic Records" provision, which appears nowhere in the Opposition and is explicitly limited to "emails and electronic records saved" on government systems. CREW Decl. Ex. A at 2. The fact of the matter is that for all the fatal flaws in the text messaging provision, the EOP Policy does not even purport to suggest that EOP staff should preserve other forms of electronic messages on non-official devices and accounts.

### D. Plaintiffs are likely to prevail on their equitable, *ultra vires*, and separation-of-powers claims challenging the EOP Policy.

**Equitable cause of action (Count I).** Defendants' assertion that an equitable cause of action is unavailable to Plaintiffs mischaracterizes *Armstrong v. Exceptional Child Center, Inc.*, 575 U.S. 320 (2015). *Armstrong* is clear that the Supreme Court "ha[s] long held that federal courts may in some circumstances grant injunctive relief against state officers who are violating, or planning to violate, federal law" and that authority extends to unlawful action by federal officers, as well. 575 U.S. at 326–27. While *Armstrong* found that equitable relief in that case was barred by the specific terms of the Medicare Act (specifically, its provision of a sole remedy and the

12

judicially unadministrable nature of the statute's text), 575 U.S. at 328–29, no such terms exist in the PRA, no court has held that the PRA statutorily limits equitable relief, and Defendants cite none. Instead, Defendants pin their argument to the naked assertion that "the PRA precludes private enforcement," Opp'n 21, which contradicts multiple cases entertaining claims by private parties related to PRA compliance. *See, e.g.*, *Armstrong II*, 1 F.3d at 1292; *Cheney*, 577 F. Supp. 2d at 336–42 *see also CREW v. Trump*, 924 F.3d 602, 608–10 (D.C. Cir. 2019); *Peterson*, 876 F. Supp. at 1315. Defendants make the same mistake regarding *Sidak v. U.S. Int'l Trade Comm'n*, No. 23-5149, 2026 WL 1110981, at*3 (D.C. Cir. Apr. 24, 2026), incorrectly claiming that the PRA has a "relevant, statutory review scheme" for Defendants' adoption of unlawful PRA guidelines, without citing one. Opp'n 21.

*Ultra vires* **(Count III).** Defendants portray this litigation as a quibble about how they are complying with the PRA rather than what it is: a challenge to Defendants' wholesale rejection of *all* legal obligations under the PRA as matter of EOP policy. *See* Opp'n 22. Binding precedent establishes the availability of *ultra vires* review of government officials' defiance of "clear and specific statutory mandate[s]," *Nat'l Ass'n of Postal Supervisors v. U.S. Postal Serv.*, 26 F.4th 960, 971 (D.C. Cir. 2022) (citation omitted), in a manner that is "blatantly lawless," *Fed. Express Corp. v. U.S. Dep't of Com.*, 39 F.4th 756, 764 (D.C. Cir. 2022) (citation omitted). This is precisely such a case. Since the Circuit has deemed this standard satisfied by defiance of individual statutory provisions, *see Fed. Express*, 39 F.4th at 764, it is surely met by Defendants' across-the-board refusal to be bound by the PRA.

First, the EOP Policy runs afoul of numerous specific prohibitions in the PRA. It makes all mandatory preservation obligations discretionary, instructs EOP staff not to preserve electronic messages for which the PRA requires preservation, empowers EOP staff to retain summaries of

electronic communications rather than complete copies required by the PRA, permits EOP staff to delete Presidential records that are not saved "to an EOP laptop or the EOP network," treats Presidential records as the personal property of the President, and is not binding on the EOP. *See supra* § I.C; Mem. 11–19; *see, e.g.*, 44 U.S.C. § 2202 ("The United States shall reserve and retain complete ownership, possession, and control of Presidential records; and such records shall be administered in accordance with the provisions of this chapter.").

Second, Defendants' adoption of the EOP Policy is reviewable *ultra vires* action, as neither the PRA nor any other federal law empowers EOP to adopt policies that prospectively require non-compliance with the PRA. The EOP Policy does so in explicit terms by, formally and as a matter of operative EOP policy, ending compliance with the PRA based on its supposed unconstitutionality and instituting different, voluntary retention policies "in the absence of the PRA," CREW Decl. Ex. A at 1–2. Insulating the Policy from *ultra vires* review would endorse "blatant lawless[ness]" and "clear departure[s]" from statutory schemes that individual government entities choose to disregard. *Fed. Express*, 39 F.4th at 764 (citation omitted); *see Leedom v. Kyne*, 358 U.S. 184, 189 (1958) ("[A] definite statutory prohibition of conduct which would thwart the declared purpose of the legislation cannot be disregarded.") (quoting *Tex. & N.O.R. Co. v. Bhd. of Ry. & S.S. Clerks*, 281 U.S. 548, 568 (1930)).

**Separation of powers (Count IV).** Plaintiffs also have asserted a valid separation-of-powers claim. Again, Defendants' unlawful conduct is not a garden variety statutory violation, but a repudiation of federal law in a "conceded absence of any statutory authority," where the "only basis of authority asserted" by Defendants to justify their conduct is a claimed constitutional defense that the PRA is unconstitutional. *Dalton v. Specter*, 511 U.S. 462, 473 (1994) (emphasis omitted) (describing *Youngstown Sheet & Tube Co. v. Sawyer*, 343 U.S. 579, 587 (1952)); *see*

14

*Glob. Health Council v. Trump*, 153 F.4th 1, 7 (D.C. Cir. 2025) (stating that separation-of-powers claim cannot be brought if "underlying alleged violation *and* claimed authority are statutory" (emphasis added)); *see also Free Enter. Fund v. Pub. Co. Acct. Oversight Bd.*, 561 U.S. 477, 491 n.2 (2010) (recognizing equitable cause of action for a "separation-of-powers claim"); *Sidak*, 2026 WL 1110981, at *3 n.3 (distinguishing between "statutory" and "constitutional claim[s]"). Nothing in Defendants' Opposition suggests any other basis for their defense of the EOP Policy, and the fact that their constitutionally improper conduct manifested in a policy of noncompliance with the PRA does not convert Plaintiffs' constitutional claim to a statutory one.

### E.    The PRA is constitutional.

As explained in Plaintiffs' opening brief, Mem. 29-31, *Nixon*, 433 U.S. at 445–46, controls this case. There, the Supreme Court held that "congressional power to regulate Executive Branch documents exists," particularly with respect to Presidential records, because of the "important interest[]" in access to Presidential records in the future. *Id*. The Court recognized that the preservation, public ownership, and future public access to Presidential records does not "unduly disrupt[]" the Executive Branch, *id.* at 445, and that, given the President's ability to challenge the disclosure of specific Presidential records, there was only "minimal" intrusion on the Presidency, *id.* at 454. *Nixon* is controlling, and none of Defendants' arguments change that.

#### 1.    Defendants' burden objection to the PRA is meritless.

Defendants' primary argument that the PRA is unconstitutional is that the PRA has "little historical precedent" and imposes significant—though entirely speculative—burdens on the Presidency by impermissibly compromising its autonomy and the confidentiality of its communications, including "a risk of inadvertent disclosure" and associated "burden[s on] White House personnel." Opp'n 29–31. The OLC Opinion, which serves as Defendants' only support for those suppositions, speculates that the PRA "may chill" communications, "poses a risk of

15

inadvertent disclosure," and may "burden White House personnel." *Id.* Defendants can muster only one example of how, in their view, the disclosure of records preserved by the PRA "may chill" a presidential advisor "from offering candid or unpopular advice" due to "uncertainty as to whether a future President will invoke the privilege" on that topic. *Id.* at 30.

That example is President Biden's decision not to invoke executive privilege over certain Presidential records from the first Trump administration requested by the Select Committee to Investigate the January 6th Attack on the United States Capitol, which was established by an act of Congress to "investigat[e] and report[] on . . . the January 6th attack on the Capitol, and its 'interference with the peaceful transfer of power[.]'" *Trump v. Thompson*, 20 F.4th 10, 16 (D.C. Cir. 2021) (citing H.R. Res. 503, 117th Cong. § 3(1) (2021)). President Biden made that decision, over then-former President Trump's objections, after "expressly determin[ing] that asserting a claim of executive privilege . . . is not warranted" because it would not be "in the best interests of the United States, given the unique and extraordinary circumstances giving rise to the Committee's request, and Congress's compelling need to investigate an unprecedented effort to obstruct the peaceful transfer of power and the most serious attack on the operations of the Federal Government since the Civil War." *Id*. (citation modified).[2]

President Trump proceeded to utilize the PRA's judicial-review provisions to litigate his executive privilege claim. *See* 44 U.S.C. § 2204(e) (providing that this Court "shall have jurisdiction over any action initiated by the former President asserting that a determination made by the Archivist violates the former President's rights or privileges"); *id.* § 2204(c)(2) ("Nothing in this Act shall be construed to confirm, limit, or expand any constitutionally-based privilege

---

[2] President Trump was later criminally indicted for his efforts to overturn 2020 presidential election, including his actions on and in the run-up to January 6. *See generally* Indictment, *United States v. Trump*, No. 23-cr-00257-TSC (D.D.C. Aug. 1, 2023), ECF No. 1.

which may be available to an incumbent or former President."). And courts at every level—including the Supreme Court—refused to uphold Mr. Trump's privilege claim. *See Trump v. Thompson*, 142 S. Ct. 680 (2022) (mem.). Those Presidential records now comprise a critical part of the historical record for the unprecedented events of January 6. *See generally* Final Report of the Select Committee to Investigate the January 6th Attack on the United States Capitol, H.R. Rep. No. 117-663 (2022); *Select January 6th Committee Final Report and Supporting Materials Collection*, GovInfo, https://tinyurl.com/5n7v98kv (last visited May 10, 2026) (compiling numerous "National Archives Production[s]" of Trump White House records).

It is telling that President Trump's unsuccessful assertion of executive privilege to block the release of records relating to Congress's investigation of a violent attempt to overturn a Presidential election is the only example Defendants can muster. It highlights just how unserious Defendants' burden claims are, how the PRA and the courts provide ample opportunity for current and former Presidents to protect the Presidency from intrusion,[3] and the ongoing need for the transparency into past presidential action that the PRA provides. As the Defendants' example amply demonstrates, the PRA is not an overreaction to the abuses of the Watergate era, but a recognition that without public ownership and preservation of Presidential records, such abuses will recur with no possibility that Congress or the public will ever become aware of them.

### 2.    Congress had authority to enact the PRA.

**The Necessary and Proper Clause.** Defendants give short shrift to the Necessary and Proper Clause, which authorizes Congress "[t]o make all Laws which shall be necessary and

---

[3] Defendants do not acknowledge the statutory processes in place to ensure that Presidents can assert privileges over Presidential records, 44 U.S.C. §§ 2204, 2208, and "[t]here is no question that the former President can file suit to press his claim of executive privilege," *Trump v. Thompson*, 20 F.4th at 32.

proper" to carry out "all other Powers vested by this Constitution in the Government of the United States." U.S. Const. art. I, § 8, cl. 18. While Defendants argue that this authority inherently excludes the regulation of the EOP as "adjuncts and advisers to the President," Opp'n 35, the plain text of the clause gives Congress authority to regulate "the *Government*," which includes EOP entities that have been established by statute and which operate in an advisory role to the President, U.S. Const. art. I, § 8, cl. 18 (emphasis added). Nothing exempts those offices from Congress's authority to enact laws necessary and proper to the carrying out of the power of the "Government" so long as the law in question does not "interfere with the President's execution of his Article II powers," Opp'n 34, which the PRA does not do. Defendants' reliance on language in *Trump v. United States*, 603 U.S. 593, 609 (2024), regarding limitations on interference with the President's "'conclusive and preclusive' constitutional authority" is misplaced, as Defendants identify no provision of the Constitution giving the President "conclusive and preclusive authority" over the preservation of Presidential records. *See* Reply in Supp. of Pls' Mot. for Prelim. Inj. and Stay ("AHA Reply") at 19, *Am. Hist. Ass'n v. Trump*, No. 26-cv-1169 (D.D.C. Apr. 30, 2026) ("*AHA*"), ECF No. 22.[4]

 **The Property Clause.** Defendants' assertion that historical practice can "overcome" the PRA runs headlong into legal reality. Opp'n 36-37. As the *AHA* plaintiffs correctly explain, Congress's prior inaction in regulating presidential records does not limit the scope of its constitutional powers. Just as it may newly recognize a longstanding activity as affecting interstate commerce and begin regulating it as such, *e.g.*, *Gonzales v. Raich*, 545 U.S. 1 (2005), under the

---

[4] *AHA* is a related case for which the Court has set a consolidated hearing on the plaintiffs' motions for preliminary injunction. *See* Scheduling Order, *AHA*, No. 26-cv-1169 (Apr. 28, 2026). In the interest of judicial efficiency, Plaintiffs cite to and incorporate certain arguments made by the *AHA* plaintiffs.

18

Property Clause, Congress may prospectively define and clarify government ownership over property created by government officials in performing their duties, *Kleppe v. New Mexico*, 426 U.S. 529, 536–40 (1976); *see* AHA Reply at 18.

Defendants' insistence that the "other Property" that Congress may regulate under the Property Clause is limited by the clause's reference to "Territory," Opp'n 36–37, also contradicts settled precedent. As the *AHA* plaintiffs explain, the Supreme Court has expressly rejected Defendants' interpretation and held that the Property Clause broadly authorizes "regulation of all other personal . . . property rightfully belonging to the United States." *Ashwander v. Tenn. Valley Auth.*, 297 U.S. 288, 315, 331 (1936) (citation omitted) (electric energy). Defendants' remaining Property Clause arguments (identical to those in *AHA*, hypothesizing laws that would "compel the President to deploy an aircraft carrier" or forbid the President from "memorializ[ing] a pardon" using paper and computers) are non-sequiturs. Opp'n 37; *accord* Mem. in Opp'n to Pls.' Mot. for Prelim. Inj. and Stay at 39, *AHA*, No. 26-cv-1169 (Apr. 21, 2026), ECF No. 19. The PRA does not dictate how the President uses any record in the course of his duties; it requires only preservation and transfer custody of them after his term in office.

**Congress's oversight powers.** Defendants' effort to limit Congress's oversight authority to the confines of *Trump v. Mazars USA, LLP*, 591 U.S. 848, 859 (2020), *see* Opp'n 31–33, ignores the critical distinction between the exercise of Congressional authority through duly enacted statutes as opposed to the Congressional subpoenas at issue in *Mazars*. *See* AHA Reply at 17–19. The Congressional oversight power at issue in *Mazars* is implied and only "auxiliary to the legislative function." *Mazars*, 591 U.S. at 862 (quotations omitted). By contrast, Congress's power to *legislate* is an express, core constitutional function. *See* U.S. Const. art. I, § 1 ("All legislative Powers herein granted shall be vested in a Congress of the United States"). And as explained in

19

Plaintiffs' memorandum, the PRA is a valid exercise of Congress's authority to legislate in aid of its enumerated powers. *See* Mem. 26–29.

Defendants' assertion that the PRA's "blanket approach cannot withstand" a *Mazars* analysis, Opp'n 32, disregards the fact that the Supreme Court, in upholding the constitutionality of the PRA's predecessor, has already performed an "inquiry" "focuse[d] on the extent to which [the Act] prevents the Executive Branch from accomplishing its constitutionally assigned functions," and squarely rejected Defendants' arguments here. *See Nixon*, 433 U.S. at 443.

### 3. Binding precedent forecloses Defendants' argument that the PRA is unconstitutional.

Defendants wrongly argue that *Nixon* is not controlling here because the Presidential Recordings and Materials Preservation Act only regulated "custody and disposition of presidential records of one particular *former* President." Opp'n 37–40. But they ignore the text and rationale for the *Nixon* decision. These arguments were raised by Defendants and addressed by the plaintiffs in *AHA*. Plaintiffs agree with and adopt the plaintiffs' arguments in *AHA* and do not repeat them here. *See* AHA Reply at 16–17. It bears briefly repeating, however that *Nixon's* controlling analysis in the "Separation of Powers" and "Presidential Privilege" sections focused on Congress's power to require *any* President to preserve and transfer official records within the Executive Branch for future disclosure. 433 U.S. at 452–53. If the Court's holding related only to President Nixon, it would have made no sense to analyze the "potential for disruption" to the Executive Branch or whether the law would chill the "candid presentation of views by . . . contemporary advisers" of "an incumbent," because President Nixon was no longer in office. *Id.* at 443, 448.

## II. Plaintiffs will suffer irreparable harm absent a preliminary injunction.

Defendants ignore extensive case law supporting Plaintiffs' claims of irreparable harm. Mem. 31-33. Instead, they rely on Defendants' insufficient preservation practices and erroneous

20

assertions that Plaintiffs' claims of harm are speculative. But, as explained above, Defendants' claims that the EOP Policy complies with the PRA are meritless. *See supra* § I.C. And Defendants' active disregard for their PRA obligations and refusal to commit to fully preserving records unquestionably establish the type of irreparable harm that courts have repeatedly found to warrant preliminary relief.

To start, Defendants do not dispute and thus concede that the outright destruction of Presidential records or federal records that Plaintiffs would otherwise be able to access constitutes irreparable harm. *See Texas*, 798 F.3d at 1110; Loc. Civ. R. 7(b); *see* Mem. 31–33. Defendants' arguments that their voluntary half-measures forestall this irreparable harm have also been roundly rejected. In *Cheney*, 577 F. Supp. 2d at 332–34, CREW challenged the Vice President and the Office of the Vice President's ("OVP") classification of Vice-Presidential Records under the PRA and sought a preliminary injunction to require OVP to adopt the PRA's definition of Presidential records for the pendency of the litigation. As is the case here, OVP insisted that its policy adhered to the standards of the PRA (which it agreed applied to its operations) even though its PRA policy explicitly included preservation of only Vice-Presidential records generated in the course of duties assigned to the Vice President by law. *Id.* at 334. In issuing the preliminary injunction, the court refused to credit OVP's assertions of adherence to the standards of the PRA in the face of its refusal to accept the full applicability of the PRA. *Id.* at 335–42. Regarding irreparable harm, the court explained:

> [I]f Defendants' interpretation [of the PRA] is not correct as a matter of law, there is no question that documents that may be entitled to PRA protection *will not receive the statute's protections*. Those unprotected documents could be transferred to other entities, destroyed, or not preserved, and if any of these events occur, the damage is inherently irreparable; once documentary material is gone, it cannot be retrieved.

21

*Id.* at 339 (emphasis added). *Cheney*'s analysis rests on two settled legal propositions that foreclose Defendants' irreparable harm argument.

First, in the face of claims alleging governmental resistance to record preservation laws, only judicial intervention adequately protects against the irreparable harm caused by the destruction of documents. *See id.* As the court explained in *Bush*, 807 F. Supp. at 820–21, in issuing a temporary restraining order to prevent the destruction of EOP electronic records at the close of the George H.W. Bush administration, "[w]hile defendants contend they are not currently planning any wholesale purge of their electronic records, they are unwilling to guarantee that such a purge will not take place" and "history is full of instances where the outgoing President has decided to erase, burn, or destroy all or substantially all Presidential or [EOP] records." The court added that until the legality of EOP's record-keeping practices was decided "it does not make any sense to allow the Defendants, whose record keeping is the subject of this suit, to decide what materials are presidential records, federal records or non-records." *Id.* at 822; *see CREW v. Off. of Admin.*, 565 F. Supp. 2d 23, 30–32 (D.D.C. 2008) (issuing partial stay pending appeal despite assurances from counsel that FOIA requested records would not be lost, because voluntary assurances are not enforceable).

Second, movants need not show that defendants are planning to intentionally destroy records that must be preserved under federal law. The courts in *Cheney*, 577 F. Supp. 2d at 338–40, and *Bush*, 807 F. Supp. at 820–21, recognized that the unacceptable risk of irreparable harm by loss or deletion exists as soon as the government believes itself to be free from its preservation obligations, which is precisely what the Defendants assert here. The court reached the same conclusion in *Office of Administration*, 565 F. Supp. 2d at 27–32, when it issued a partial stay requiring the White House Office of Administration (an EOP component) to preserve records

22

potentially responsive to CREW's FOIA requests while CREW appealed the Court's determination that the Office of Administration was subject to the PRA and not an "agency" under FOIA. While the court credited the government's good faith, it determined that, absent judicial intervention, there was an intolerable risk that records could be "unwittingly" disposed of during a presidential transition. *Id.* at 29.

Here we have a far clearer case of irreparable harm: Defendants have declared the PRA void in its entirety, ignored Plaintiffs' request for confirmation that they will follow it, Compl. ¶ 88, and refused to stipulate to preserve and not destroy Presidential records in a related case, *see* Mem. of Law in Supp. of Pls.' Mot. for Prelim. Inj. and Stay at 15-16, *AHA*, No. 26-cv-1169 (Apr. 14, 2026), ECF No. 13-1. And while the defendants in the cases discussed above acknowledged they were subject to *some* statutory preservation obligations, Defendants here assert they are bound by *no* preservation statute, all but ensuring that, without immediate judicial intervention, Presidential records "will not receive the [PRA's] protections." *Cheney*, 577 F. Supp. 2d at 339. And because the EOP Policy does not differentiate between Presidential and federal records, *see, e.g.,* CREW Decl. Ex. A at 2 ("As a matter of prudence, the electronic records of EOP employees will be preserved"), the same is true with respect to federal records of those EOP components, like the Office of Management and Budget, where staff have obligations under both the FRA and PRA, and adherence to the EOP Policy will cause them to erroneously fail to retain records that would ultimately be classified as federal records. *See* Mem. 35–36.[5]

---

[5] Defendants assert that Plaintiffs' complaint is limited to Presidential records. *See* Opp'n 12. But it includes allegations regarding both FRA and Plaintiffs' reliance on federal records generally, and the harms to them caused by the EOP Policy. *See, e.g.*, Compl. ¶¶ 32, 94-103. The loss of federal records that Plaintiffs routinely request through FOIA is yet another ground for finding that the Policy irreparably harms Plaintiffs. That harm would be redressed by Plaintiffs' requested relief. *See id.* at 40 (Request for Relief); Proposed Order at 1-2, ECF No. 7-5.

Worse, Defendants do not dispute that because they believe the PRA is unconstitutional in its entirety—including the provision making Presidential records the property of the United States—they also believe that this White House's Presidential records are the private property of President Trump, who is free to do with them what he will despite his track record of criminal disregard for federal record statutes. *See* Mem. 8; Compl. ¶¶ 107, 109–10. And worse still, the voluntary preservation regime that Defendants seek to install, if followed, is guaranteed to result in not only the "unwitting deletion" of Presidential records, but the failure to preserve them in the first place. *See supra* § I.C; Mem. 14–15. Simply put, absent preliminary relief, Defendants refusal to adhere to the PRA will result in the irretrievable loss of Presidential records—a "text book example of irreparable harm." *Cheney*, 577 F. Supp. 2d at 339.

## III.    The balance of equities and public interest favor granting a preliminary injunction.

Defendants offer only circular and conclusory arguments in response to the powerful countervailing interests favoring injunctive relief. *Armstrong II* forecloses their argument that any attempt by the Court to preliminarily halt Defendants' adherence to the EOP Policy is an illegitimate abuse of judicial power against the President and thus not in the public interest. *See supra* § I.B; Opp'n 42. Defendants' only claimed burden is complying with the PRA while this litigation is pending. Opp'n 42. But every President since 1981 has done just that, and this President fails to articulate any meaningful reason for disrupting that status quo. Either Plaintiffs will ultimately prevail, in which case no such impermissible burden will exist as a matter of law, or Defendants will ultimately prevail, in which case the President will be free, as Defendants hope, to conceal, destroy, and abscond with any Presidential records created during the pendency of this litigation as the President wishes.

24

Further, a simple comparison of the PRA and the EOP Policy forecloses Defendants' assertion that there is a "minimal" risk of the loss of Presidential records if the EOP Policy remains in place. *See supra* § I.C; Mem. 11–19; Opp'n 42. Defendants have no legitimate interest in the continuation of their unlawful conduct, let alone one that overrides the powerful public interests, embodied by the PRA, in ensuring the preservation and public ownership of Presidential records. *See* Mem. 36–39. "[T]he public interest is undoubtedly served by ensuring that all documentary material potentially encompassed by the PRA's statutory language is actually preserved as Congress saw fit in enacting the PRA." *Cheney*, 577 F. Supp. 2d at 341.

## CONCLUSION

For the foregoing reasons, the Court should grant Plaintiffs' motion for a preliminary injunction.

Dated: May 11, 2026                                    Respectfully Submitted,


                                                       */s/ Jonathan E. Maier*
                                                       Jonathan E. Maier (D.C. Bar No. 1013857)
                                                       Nikhel S. Sus (D.C. Bar No. 1017937)
                                                       Lauren C. Bingham (D.C. Bar No. 90043462)
                                                       CITIZENS FOR RESPONSIBILITY
                                                       AND ETHICS IN WASHINGTON
                                                       P.O. Box 14596
                                                       Washington, DC 20044
                                                       (202) 408-5565
                                                       jmaier@citizensforethics.org
                                                       nsus@citizensforethics.org
                                                       lbingham@citizensforethics.org

                                                       *Counsel for Plaintiffs*